IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
**No. 5:07 CV 426-H**

| | |
|---|---|
| ADVANCED INTERNET TECHNOLOGIES, INC. | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| DELL INC. and DELL FINANCIAL SERVICES, INC., | ) ) ) |
| Defendants. | ) ) |

**DEFENDANT DELL INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Jane Fugate Thorpe
Scott A. Elder
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Fax: (404) 881-7777
Email: jane.thorpe@alston.com
Email: scott.elder@alston.com

Pressly M. Millen
North Carolina Bar No. 16178
WOMBLE CARLYLE SANDRIDGE
& RICE
150 Fayetteville Street, Suite 2100
Raleigh, NC 27602
Telephone: (919) 755-2135
Fax: (919) 755-6067
Email: pmillen@wscr.com

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

SUMMARY OF THE NATURE OF THE CASE .................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................... 2

LAW AND ARGUMENT ........................................................................................ 8

    I.      Legal Standards and Choice of Law ...................................................... 8

        A.      Summary Judgment Standard ....................................................... 8

        B.      The UCC as Applied by Texas Courts Governs the Contract-Related Claims and Defenses, while North Carolina Law Governs All Extra-Contractual Claims and Defenses. ........................... 9

    II.     This Dispute Is Governed By Consciable, Enforceable Contractual Terms Between Sophisticated Commercial Parties. ............................ 10

        A.      The UCC Applies to AIT's Claims. ............................................ 10

        B.      The Warranty Contracts Limit AIT's Remedies to Repair or Replacement of the Computers. ................................................ 11

        C.      The Warranty Contracts Specifically Exclude All Damages Claims Other Than Refund of Amounts Paid for Defective Computers. ................... 12

        D.      The Contractual Limitations Are Not Unconscionable. ............. 14

        E.      The Contractual Limitations Cannot Be Avoided Under the Theory of Failure of Essential Purpose. ................................................. 16

            1.      Dell Fulfilled Its Warranty Obligations. ....................... 16

            2.      Even If Failure of Essential Purpose Is Assumed, the Limitation of Damages Provisions Remain Enforceable. ........................ 18

    III.    Because the Commercial Relationship at Issue Is Contractual, AIT's Tort Claims Are Improper and Fail As a Matter of Law. ................................ 20

        A.      The Economic Loss Rule Bars AIT's Tort Claims. .................... 20

        B.      AIT Has Not Shown Facts That Would Avoid Application of the Economic Loss Rule. ................................................................ 23

            1.      AIT Can Show No Duties Owed by Dell Independent of Its Contractual Obligations, and No Actionable Conduct Separate and Distinct from Contractual Performance. ........................ 24

            2.      AIT's Allegations Do Not Show Malice, Recklessness, or Other "Substantial Aggravating Circumstances" to Overcome the Presumption Against Tort Claims in the Contractual Context. .......... 25

                a.      AIT Cannot Prove that Dell Knowingly Sold Defective Computers. ........ 26

   b. The Alleged Failure to Provide Warranty Service Was Not
    Malicious or Substantially Aggravating. .................................... 28

 C. The Intracorporate Immunity Doctrine Precludes the Civil Conspiracy
  Claim. .............................................................................................. 30

IV. Even Without the Enforceable Limitations of Liability, AIT's Damages
 Claims Fail Because They Are Speculative, Uncertain, and Unsupported By
 the Evidence. .......................................................................................... 32

 A. AIT Cannot Establish Its Damages to a Reasonable Certainty Nor Prove a
  Causal Connection Between the Alleged Computer Failures and Its
  Claimed Damages. ............................................................................. 32

 B. AIT's Goodwill and Opportunity Costs Damages Are Speculative and
  Unrecoverable. .................................................................................. 34

 C. AIT's Lost Profits Damages Are Speculative and Unrecoverable. ...................... 35

V. Conclusion ............................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ada Liss Group v. Sara Lee Corp.*, No. 1:06CV610, 2009 WL 3241821 (M.D.N.C. Sept. 30, 2009) ................................................................................................... 23

*Am. Stone Diamond, Inc. v. Lloyds of London*, 934 F. Supp. 839 (S.D. Tex. 1996) ................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................... 8

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174 (5th Cir. 1988) ......................................................................................................................... 14

*Barbee v. Atlantic Marine Sales & Service, Inc.*, 115 N.C. App. 641, 446 S.E. 2d 117 (1994) ............................................................................................................................ 29, 30

*Bartley v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 824 F. Supp. 624 (N.D. Tex. 1992) .................................................................................................................................... 15

*Behr v. Behr*, 46 N.C. App. 694, 696, 266 S.E.2d 393 (1980) ....................................................... 9

*Billings v. Joseph Harris Co.*, 290 N.C. 502, 226 S.E.2d 321 (1976) .......................................... 13

*Blount v. Westinghouse Credit Corp.*, 432 S.W.2d 549 (Tex. App. 1968) .................................... 14

*Bray International, Inc. v. Computer Associates International, Inc.*, No. CIV H-02-0098, 2005 WL 3371875 (S.D. Tex. Dec. 12, 2005) ............................................................... 18, 19

*Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985) ......................................................................... 31

*Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614 (M.D.N.C. 2006) ............................... 21

*Butcher v. DaimlerChrysler Co.*, No. 1:08-cv-207, 2008 WL 2953472 (M.D.N.C. July 29, 2008) ..................................................................................................................... 21, 25

*Catoe v. Helms Constr. & Concrete Co.*, 91 N.C. App. 492, 372 S.E.2d 331 (1988) ................. 32

*Chemetron Corp. v. Syngas Co.*, No. B14-90-00389-CV, 1991 WL 22391 (Tex. App. Feb. 21, 1991) ................................................................................................................... 12

*Coker v. DaimlerChrysler Corp.*, No. 01CVS1264, 2004 WL 32676 (N.C. Super. Jan. 5, 2004) .................................................................................................................................... 22

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ........................................ 31

*Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712 (S.D. Tex. 2000) ..................................... 19

*Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.*, 91 F. Supp. 2d 1031 (S.D. Tex. 2000) ........ 15

*First Care Med. Clinic, Inc. v. Polymedco, Inc.*, No. 3:05-cv-82, 2006 WL 3497845 (W.D.N.C. Dec. 4, 2006) ......................................................................................... 10, 22, 30

*Ford Motor Co. v. Lyons*, 405 N.W.2d 354 (Wis. Ct. App. 1987) .............................................. 31

*Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518 (5th Cir. 1998) ........... 19

*Godfredson v. JBC Legal Group, P.C.*, 387 F. Supp. 2d 543 (E.D.N.C. 2005) .......................... 31

*Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920 (5th Cir. 2000)................................. 32

*Helen of Troy, L.P. v. Zotos Corp.*, 511 F. Supp. 2d 703 (W.D. Tex. 2006)............................... 33

*Henderson v. Ford Motor Co.*, 547 S.W.2d 663 (Tex. App. 1977).............................................. 17

*Iglesias v. Wolford*, 539 F. Supp. 2d 831 (E.D.N.C. 2008) ...................................................... 31

*In re Asbestos Litig.,* 509 A.2d 1116 (Del. Super. Ct. 1986)..................................................... 31

*Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* No. 1:03CV949, 2005 WL 1610653
(M.D.N.C. July 8, 2005) ..................................................................................................... 21

*Johnson v. Sprint Solutions, Inc.*, No. 3:08-CV-00054, 2008 WL 2949253 (W.D.N.C.
July 29, 2008).................................................................................................................... 25

*Kelly v. Georgia-Pacific LLC*, No. 7:08-CV-197-D, 2009 WL 4249587 (E.D.N.C. Sept.
30, 2009) ................................................................................................................... 24, 29

*Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex. Civ. App. 1972)................................... 17

*Laxalt v. McClatchy,* 622 F. Supp. 737 (D. Nev. 1985) .......................................................... 31

*Lindemann v. Eli Lilly & Co.*, 816 F.2d 199 (5th Cir. 1987)................................................. 13, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................................. 8

*McMahon v. Synthron Inc.*, No. 1:05-cv-324, 2006 WL 149054 (W.D.N.C. Jan. 18, 2006)....... 31

*Mecklenburg County. v. Nortel Gov't. Solutions Inc.*, No.3:07-cv-00320-GCM, 2008 WL
906319 (W.D.N.C. Apr. 1, 2008) .................................................................................. 22, 23

*Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 499 S.E.2d 772 (1998) ......................... 20

*Muss v. Mercedes-Benz of N. Am., Inc.*, 734 S.W.2d 155 (Tex. App. 1987)............................. 11

*N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs. Inc.*, No. 1:03CV00911, 2005 WL
3527050 (M.D.N.C. Dec. 22, 2005) ................................................................................... 23

*Nicolet, Inc. v. Nutt,* 525 A.2d 146 (Del. 1987)...................................................................... 31

*PCS Phosphate Co. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705 (E.D.N.C. 2007)........................ 23

*Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801 (Tex. App. 2006)........ 32

*Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co.,* 604 F. Supp. 203 (W.D. Va. 1984) ....... 31

*Ross v. Wash. Mut. Bank*, 566 F. Supp. 2d 468 (E.D.N.C. 2008)............................................ 32

*SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.*, 128
S.W.3d 304 (Tex. App. 2004)....................................................................................... 11, 14

*Stetser v. TAP Pharm. Prods., Inc.*, 165 N.C. App. 1, 598 S.E.2d 570 (2004). ........................... 9

*Strum v. Exxon Co., USA*, 15 F.3d 327 (4th Cir. 1994) ......................................................... 23

*Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655 (1980) ........................................ 9

*Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276 (Tex. 1994) ................ 32

Case 5:07-cv-00426-H   Document 214-1   Filed 04/30/10   Page 5 of 46

*Union Planters Bank, N.A. v. EMC Mortg. Corp.*, No. Civ. 3:99-CV-2416-H, 2000 WL 622075 (N.D. Tex. May 12, 2000) .................................................................. 15

*United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126 (W.D.N.C. 1991) .................................................................................................................... 10

*United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985 (4th Cir. 1981) ........................ 26

*US LEC Comm'ns, Inc. v. Qwest Commn's Corp.*, No. 3:05-CV-00011, 2006 WL 1367383 (W.D.N.C. May 15, 2006) ................................................................ 23, 25

*Williams v. Hyatt Chrysler Plymouth, Inc.,* 48 N.C. App. 308, 269 S.E.2d 184 (1980) .............. 19

## Statutes

N.C. Gen. Stat. § 75-1.1 ........................................................................................................... 13

Tex. Bus. & Com. Code § 2.102 ............................................................................................... 10

Tex. Bus. & Com. Code § 2.302 ............................................................................................... 14

Tex. Bus. & Com. Code § 2.313 ............................................................................................... 10

Tex. Bus. & Com. Code § 2.314 ............................................................................................... 10

Tex. Bus. & Com. Code § 2.315 ............................................................................................... 10

Tex. Bus. & Com. Code § 2.316 ............................................................................................... 11

Tex. Bus. & Com. Code § 2.718 ............................................................................................... 11

Tex. Bus. & Com. Code § 2.719 .............................................................................. 12, 13, 16, 18, 19

## Other Authorities

Fed. R. Civ. P. 56 ....................................................................................................................... 8

## Rules

*James J. White & Robert S. Summers, White and Summers' Uniform Commercial Code* § 12-10, at 605 (3d ed. 1988) ...................................................................................... 19

# INTRODUCTION

Defendant Dell Inc. ("Dell"), by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves the Court for an order of partial summary judgment, specifically ruling that: (1) because the dispute is governed by conscionable, enforceable contractual terms between sophisticated commercial parties, the maximum damages available to Plaintiff Advanced Internet Technologies, Inc. ("AIT") in this case are limited to the amounts paid by AIT for products proven at trial to have a product defect caused by Dell; (2) because this dispute involves only economic losses, all tort claims and statutory unfair and deceptive trade practices claims are dismissed with prejudice; and (3) to the extent AIT's claimed damages are speculative, uncertain and unsupported by the evidence, those damages cannot be recovered as a matter of law.

# SUMMARY OF THE NATURE OF THE CASE

AIT commenced this suit against Dell on November 1, 2007 seeking damages for (1) Breach of Express Warranty (Count I); (2) Breach of Warranty of Merchantability (Count II); (3) Breach of Implied Warranty of Fitness for a Particular Purpose (Count III); (4) Fraud (Count IV); (5) Unfair and Deceptive Business Practices (Count V); (6) Negligence (Count VI), and in the alternative (7) Breach of Contract (Count VII). [DE # 1]. On September 9, 2008, this Court dismissed AIT's claim for Negligence. [DE # 39]. On October 29, 2008, after seeking leave to amend, AIT filed its First Amended Verified Complaint ("FAC") adding Dell Financial Services, Inc.[1] ("DFS") as a defendant and adding claims for (1) Fraud by Defendants (new Count VI); (2) Unfair and Deceptive Acts by Defendants (new Count VII); and (3) Civil Conspiracy (Count VIII). [DE # 41]. Discovery in this case closed on February 5, 2010, and this matter is set for trial on October 18, 2010.

This is a case of overreaching and opportunism. AIT overreaches in the damages it seeks—more than $90 million—and the claims it asserts—a panoply of tort claims in a commercial contractual

---

[1] The First Amended Verified Complaint improperly named Dell Financial Services LLC, Dell Financial Services, Inc.

relationship arising out of AIT's lease and use of Dell computers. A summary judgment order will properly limit this case to the terms of the agreement between these sophisticated commercial parties. In particular, the Uniform Commercial Code and applicable state law mandates the enforcement of Dell's conspicuous, commercially reasonable, and common limitation of liability provisions. As a sophisticated commercial party with in-house counsel, AIT cannot be heard to cry unconscionability of Dell's contract – especially considering that Dell's terms mirror the terms AIT employs in its own user agreements with its own customers.

AIT's overreaching tort claims include fraud, unfair and deceptive trade practices, and civil conspiracy. Under North Carolina's strong Economic Loss Rule, these claims are clearly barred where, as here, contractual terms govern the relationship between commercial parties and there has been no physical injury to persons or other property. Even without the contractual limitations, however, AIT's inflated damages claims fail as a matter of law on the common law basis that they are speculative, uncertain and unsupported by the evidence.

In short, AIT's effort to turn this contract action into a tort claim seeking treble damages lacks legal and factual support, and the undisputed facts demonstrate that Dell is entitled to partial summary judgment limiting AIT to its claim for alleged breach of warranty.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

AIT is a company based in Fayetteville, North Carolina that was founded in 1995 by Clarence Briggs, a retired Army officer. (Appx. A,[2] Tab 1 (Briggs Dep., 23:13 – 25:19, 47:19 – 24).) AIT is a technically savvy and entrepreneurial organization that had well over 200 employees at one time and has had an in-house legal department since 2000. (Appx. A, Tab 11 (Young Dep., 21:33 – 22:5); Tab 6 (Roberts Dep., 14:11 – 15:9; 17:21 – 18:20); Tab 1 (Briggs Dep., 54:4 – 11; 61:9 – 11).) Between 2001 and 2007, AIT reported annual revenues ranging from $24.3 million to $31.2 million. (Appx. A, Tab 11 (Young Dep., Ex. 2 – 3).)

---

[2] Citations to "Appx. A" refer to the Appendix of Deposition Excerpts and Exhibits filed contemporaneously herewith. The Tab numbers correspond to the appropriate Deposition or Exhibit reference, as listed on the Appendix A Index.

A significant part of AIT's business is providing web-hosting services to customers. (Appx. A, Tab 6 (Roberts Dep. 9:11 – 10:7).) In 2002, AIT decided to acquire its hardware for these web-hosting services from an outside vendor, as opposed to making the equipment itself in-house. (Appx. A, Tab 6 (Roberts Dep., 66:11 – 17; 72:24 – 73:15).) While it was exploring its hardware options, AIT called Dell and informed a Dell telephone sales representative that it needed computers with a particular processor (e.g., Pentium or Celeron), a certain amount of hard drive space, and a specified amount of memory, all at a given price point that was within AIT's budget. (Appx. A, Tab 11 (Young Dep. 114:11-115:3).) Based on AIT's parameters, Dell relayed that the Dell OptiPlex computers ("OptiPlex") met AIT's specifications. (*Id.*). AIT could have chosen to buy computers from other vendors (Appx. A, Tab 6 (Roberts Dep., 75:13 – 19)), but it specifically chose Dell because it was the "easiest to work with," and "had the best deal." (Appx. A, Tab 11 (Young Dep., 103:43 – 104:9; 105:27 – 47).)

Dell's OptiPlex model computer is designed for desktop use in a business setting; it is not intended for use as a server in a data center environment, as AIT used the bulk of its Dell computers. (Appx. A, Tab 7 (Stone Dep., Ex. 1).) While AIT hosted its customers' websites on these desktop computers, AIT chose not to host its own website on an OptiPlex. (Appx. A, Tab 6 (Roberts Dep., 44:19 – 45:1).)

After AIT decided that the OptiPlex met its hardware specifications for its web-hosting business, a Dell representative, communicating with AIT by phone and e-mail, indicated that AIT could receive the OptiPlexes faster if it leased the OptiPlexes through Dell Financial Services ("DFS"), as opposed to some other company. (Appx. A, Tab 11 (Young Dep. 137:39 – 51).) Because fast delivery was an important business priority, AIT opted to lease the OptiPlexes through DFS. (Appx. A, Tab 6 (Roberts Dep., 81:23 – 82:13).) AIT has admitted that it preferred to lease the OptiPlexes for financial and business reasons. (Appx. A, Tab 11 (Young Dep., 138:17 – 139:11).) AIT leased its first Dell computers from DFS in December 2002 and executed its last lease for an OptiPlex in March 2005. (Appx. A, Tab 11 (Young Dep. 341:22 – 342:5); DFS Ans. & Countercl., Ex. A-1 – AA-2 [DE #57-59].) During this time, AIT leased more than 2000 OptiPlexes (FAC ¶ 23.) A significant portion of these computers were obtained

through at least 27 different lease agreements with DFS, and the rest were leased through various non-party lessors. (*See* DFS Ans. & Countercl., Ex. A-1 – AA-2 [DE #57-59]; Appx. A, Tab 6 (Roberts Dep. 157:6 – 158:12).)

The OptiPlexes came with a Warranty and Terms and Conditions of Sale, collectively referred to herein as the Warranty Contracts. (Appx. B,[3] Tab 1 (Pape Dec. Exs. A – L).) The relevant terms of the Warranty Contracts did not change in any material way from 2002 through 2007. (*Id.*) These Contracts conspicuously noted (1) that disputes arising out of the Dell Warranty Contracts, such as this one, were governed by Texas law (*Id.* Exs. A – E); (2) that Dell's warranty obligations "for malfunction and defects in hardware" were "LIMITED TO REPAIR AND REPLACEMENT AS EXPRESSLY SET FORTH IN" the Warranty Contracts (*Id.* Exs. F – J), (3) that Dell limited its liability to the amount AIT paid for the computers at issue in a claim, specifying, "THIS IS THE MAXIMUM AMOUNT FOR WHICH WE ARE RESPONSIBLE" (*Id.* Exs. F – J); and (4) that Dell would not be liable for any "LOST PROFITS, LOSS OF BUSINESS, … CONSEQUENTIAL, SPECIAL, INDIRECT OR PUNITIVE," damages (*Id.* Exs. A – E). Similarly to Dell, AIT limits its liability in its agreements with its customers and disclaims all consequential damages in its own "Online Agreement." (Appx. A, Tab 1 (Briggs Dep., Ex. 5 ¶ 4).) Under the Warranty Contracts, Dell assumed a contractual obligation to repair or replace any defect in hardware. (*See* Appx. B, Tab 1 (Pape Dec. Ex. F - J).)

In January 2004, a little over ***one year after*** AIT started acquiring OptiPlex computers, Dell learned that the capacitors on some of its motherboards were potentially defective. (Appx. A, Tab 5 (Luhrs Dep. 110:5-13); Appx. B, Tab 3 (Luhrs Dec. ¶ 5).) By way of background, Dell purchases its motherboards from downstream suppliers, which in turn purchase capacitors from various other downstream suppliers. (Appx. A, Tab 5 (Luhrs Dep., 87:20 - 88:16).) Therefore, not all motherboards on all OptiPlex computers even contain capacitors made by Nichicon. (Appx. B, Tab 3 (Luhrs Dec. ¶ 8).) Moreover, the motherboard on an OptiPlex computer contains more than 20 capacitors, and the failure of

---

[3] Citations to "Appx. B" refer to the Appendix of Declarations and Exhibits filed contemporaneously herewith. The Tab numbers correspond to the appropriate Declaration or Exhibit reference, as listed on the Appendix B Index.

one capacitor does not necessarily cause the computer to fail. (Appx. A, Tab 5 (Luhrs Dep. 63:15 – 19); Appx. B, Tab 3 (Luhrs Dec. ¶ 13).) Upon learning of this problem with the Nichicon capacitors, Dell took immediate corrective action. It told its motherboard suppliers to stop buying components from Nichicon, investigated the issuer, and confirmed that Nichicon had fixed the issue in March 2004. (Appx. B, Tab 3 (Luhrs Dec . ¶¶ 6-7); Appx. A, Tab 3 (Hutten Dep., Ex. 54); Appx. A, Tab 5 (Luhrs Dep. 67:3 – 21; 84:12 – 16).) After March 2004, Dell believed that the problem with the Nichicon capacitors had been remedied. (Appx. B, Tab 3 (Luhrs Dec. ¶ 8).) However, in computers that were already in the marketplace, Dell expected to see a limited number of capacitors fail throughout 2004 and into 2005 because of the latent nature of the failures. (Appx. B, Tab 3 (Luhrs Dec. ¶ 8).) Pursuant to the Warranty Contracts, Dell intended to (and did) repair reported failures under warranty. (Appx. B, Tab 3 (Luhrs Dec. ¶ 13).)

Unbeknownst to Dell, however, Nichicon's manufacturing process continued to suffer from additional issues that caused capacitor failures, but Dell did not discover those problems until a year later – in April 2005 – *one month after* AIT acquired its last OptiPlex computers. (Appx. B, Tab 3 (Luhrs Dec. at ¶ 11); Appx. A, Tab 3 (Hutten Dep., Ex. 54 ).) After Dell discovered that the Nichicon problem may not have been confined as originally understood in early 2004, it again took immediate investigative and corrective action, and by the first week of May 2005, Dell instructed its motherboard suppliers to cease using Nichicon capacitors immediately. (Appx. B, Tab 3 (Luhrs Dec. ¶ 11); Appx. A, Tab 3 (Hutten Dep., Ex. 54); Appx. A, Tab 5 (Luhrs Dep. 84:12 – 23).)

Pursuant to the Warranty Contracts, Dell continued to "fix-on-fail" those computers that experienced a capacitor failure. (Appx. B, Tab 3 (Luhrs Dec. ¶ 13).) Moreover, Dell voluntarily offered an Out of Warranty Support Program to its customers which stated: "Dell will provide out of warranty coverage . . . for OptiPlex SX270(UFF), GX270, GX280 systems with failed motherboards due to expanding or leaking capacitors for 5 years from date of purchase, or until 31-January-2008, whichever comes first." (FAC, Ex. F.)

As stated above, AIT first began leasing OptiPlex computers from Dell in December 2002. (Appx. A, Tab 11 (Young Dep. 341:22 – 342:5); DFS Ans. & Countercl., Ex. A–1 – AA-2 [DE # 57-59].) AIT did not attempt to escalate any concerns about failing OptiPlex computers outside of Dell's normal warranty claim channels until November 2004 when AIT started keeping internal contemporaneous failure logs. (Appx. A, Tab 11 (Young Dep. 207:43-210:3; Ex. 13).) Then, in April 2005, Clarence Briggs wrote a letter to Dell claiming a 108 percent failure rate on its OptiPlexes. (Appx. A, Tab 6 (Roberts Dep., Ex. 19).) However, no one at AIT has ever performed a statistical analysis of its failures to substantiate this claimed rate. (Appx. A, Tab 1 (Briggs Dep. 121:10 – 19); Tab 10 (Winkler Dep., 83:5 – 13).) AIT attributes almost all of its OptiPlex failures to Nichicon capacitors (Appx. A, Tab 6 (Roberts Dep., 254:16 –23)), but there is no evidence that all of AIT's OptiPlexes contained Nichicon capacitors. In fact, as of June 2005, only approximately 400 of AIT's OptiPlexes *potentially* had Nichicon capacitors. (Appx. A, Tab 6 (Roberts Dep. 351:1 - 14; Ex. 24); Tab 11 (Young Dep. 277:11 – 278:2).) Dell's expert witnesses have identified environmental problems in AIT's data center as well as AIT's misuse of these desktop computers as servers as causes of the OptiPlex failures at AIT. (*See* Appx. A, Tab 7 (Stone Dep., Ex. 1); Tab 2 (Edwards Dep., Ex. 84).)

Regardless of the origin of the problems, though, Dell provided AIT warranty service. (Appx. A, Tab 11 (Young Dep. 190:19-45); Tab 6 (Roberts Dep. 176:15-177:4).) In May 2005, Dell engaged a consultant, Kenny Joines, to visit AIT's data center and to investigate the cause of its failures and to help Dell and AIT identify a root cause. (Appx. A, Tab 1 (Briggs Dep., 504:14 – 505:7); Tab 8 (Taylor Dep., 19:21 – 20:5); Tab 4 (Joines Dep., 28:19 – 29:1); Tab 8 (Taylor Dep., Ex. 45).) Mr. Joines was unable to complete his analysis, however, because AIT kicked him out of its facility after he attempted to take pictures of AIT's data center to include in his report. AIT also refused to provide Mr. Joines with requested software monitoring information relevant to his investigation, and, AIT continued to refuse to provide that information following Mr. Joines's visit. (Appx. A, Tab 4 (Joines Dep., 50:13 – 54:6; 56:6 – 8); Tab 6 (Roberts Dep., 323:19 – 324:20; 350:6 – 25).)

After Joines was kicked out of the data center, and despite its concerns about AIT's environment, Dell continued to service AIT's computers under warranty. (Appx. A, Tab 6 (Roberts Dep., 187:17 – 188:9); FAC ¶¶ 36-37).) Discussions between AIT and Dell continued well after this Joines visit in an effort to resolve AIT's problems. (Appx. A, Tab 6 (Roberts Dep., 321:17 – 322:6; 350:6 – 25); Tab 11 (Young Dep., 277:7 – 278:6).) Moreover, it is undisputed that during these discussions, Dell informed AIT of the capacitor issue no later than June 2005. (Appx. A, Tab 11 (Young Dep., 277:7 – 278:6); Tab 6 (Roberts Dep. Ex. 24); Tab 1 (Briggs Dep., pp. 571:10 – 572:10).)

Around October 2005, AIT decided to stop making its DFS lease payments. (Appx. A, Tab 6 (Roberts Dep. 188:2 – 14); Tab 11 (Young Dep. 394:13 – 18).) In light of the nonpayment of the lease, the limited warranties for the OptiPlexes appear to have been terminated. (Appx. A, Tab 6 (Roberts Dep. 187:13 – 188:18).) The Warranty Contracts specifically provided that Dell's warranty obligations were conditioned on receipt of payment for the computers. (*See* Appx. B, Tab 1 (Pape Dec., Exs. A – J).)

Further, because AIT stopped paying on all of its leases, in February 2006, DFS demanded return of AIT's leased OptiPlexes, and AIT acknowledged that it intended to return this equipment. (Appx. A, Tab 6 (Roberts Dep. 220:6 – 221:7; Ex.13 – 14); Tab 11 (Young Dep. 298:25 – 299:11, Ex. 24).) AIT, however, did not return the equipment, and in fact was still using much of the equipment after it had defaulted. AIT continued to use at least some OptiPlex computers into 2009, (Appx. A, Tab 1 (Briggs Dep., pp. 556:3 – 10); Tab 6 (Roberts Dep. 221:8 – 222:9)), and claims damages for computers it did not rightfully possess (Appx. A, Tab 6 (Roberts Dep., p. 23:10-14).)

AIT's claims the following damages in this litigation, initially totaling **$28 million** and later increased to **$41 million dollars,** categorized as follows: (i) Goodwill/Opportunity costs of $8,498,190; later claimed to be $21.7 million (Appx. A, Tab 1 (Briggs' Dep., 411:1 – 8)); (ii) Cancelled customer contracts of $15,804,623; (iii) Total amount of $1,434,703 paid for all OptiPlexes; (iv) Increased labor costs of $1,147,208; (v) I-CONN[4] potential loss of $500,000; (vi) Internal legal fees of $240,000; (vii) I-

---

[4] AIT's "I-CONN" related damages claims refer to a separate litigation action with I-CONN Healthcare Solutions, which AIT claims was caused by Dell. (Appx. A, Tab 1 (Briggs Dep., 359:25 – 360:6 and 456:3 – 11.) Because

CONN legal fees of $179,000; (viii) Customer credits of $166,000; (ix) Outside legal fees of $31,904; and (x) Packing reclaim costs of $6,500. (Appx. A, Tab 6 (Roberts Dep., Ex. 11); Tab 11 (Young Dep., Ex. 4).) AIT seeks to have its damages trebled under North Carolina's Unfair & Deceptive Trade Practices Statute, plus seeks punitive damages in an unspecified amount. AIT cannot and has not provided any substantive proof that reasonably supports its alleged damages. (*See* Appx. B, Tab 2 (Johnson Dec. ¶¶ 11, 13).)

## LAW AND ARGUMENT

I.    **Legal Standards and Choice of Law**

A.    **Summary Judgment Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U. S. C. App., p. 626). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e) . "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

---

AIT prevailed on summary judgment in that case, AIT no longer seeks recovery of the "I-CONN potential loss" of $500,000, but still seeks recovery of the "I-CONN legal fees of $179,000. (*Id.*)

**B.** **The UCC as Applied by Texas Courts Governs the Contract-Related Claims and Defenses, while North Carolina Law Governs All Extra-Contractual Claims and Defenses.**

AIT's position on the governing law has been inconsistent throughout the course of this litigation. For example, in its FAC, Counts I (Breach of Express Warranty), II (Breach of Warranty of Merchantability), and III (Breach of Implied Warranty of Fitness for a Particular Purpose) invoke the Uniform Commercial Code ("UCC") provisions as enacted by **both** Texas **and** North Carolina law. It appears, however, that AIT now concedes that Texas law rightly governs the warranty and contract claims.

The basis for applying Texas law to the warranty and contract claims is clear. The Warranty Contracts contained a conspicuous Governing Law provision selecting Texas as the law governing the sale of goods and the Warranty Contracts themselves. (*See* Appx. B, Tab 1 (Pape Dec., Ex. A - E).) Such a contractual choice-of-law provision is generally binding "as long as [the parties] had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental policy of the state of otherwise applicable law." *Behr v. Behr*, 46 N.C. App. 694, 696, 266 S.E.2d 393, 395 (1980). Because there is nothing to suggest that application of Texas UCC law in this action would contravene North Carolina public policy, Texas law should govern Counts I, II, III (Breaches of Warranties) and IV (Breach of Contract). *See Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655, 656 (1980) (giving effect to contractual choice of law clause).

While AIT's contract claims are governed by Texas law, Dell expects the Court to apply North Carolina law to AIT's non-contract claims – namely, Counts IV and VI (Fraud), V and VII (Unfair and Deceptive Business Practices under Chapter 75 of the North Carolina General Statutes) (the "UDTPA" claim), and VIII (Civil Conspiracy). For tort claims generally, North Carolina courts traditionally adhere to the rule of *lex loci delicti* – or the law where the injury occurs (the "*lex loci*" rule). *Stetser v. TAP Pharm. Prods., Inc.*, 165 N.C. App. 1, 598 S.E.2d 570, 580 (2004). The law is unsettled, however, with respect to whether the *lex loci* rule also applies in the context of UDTPA claims, with some state and

- 9 -

federal precedent showing application of the *lex loci* rule and other precedent in favor of the "most significant relationship" test. *See id.* (examining split of authority and applying both tests); *see also United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 128 (W.D.N.C. 1991) (examining split of authority and determining that *lex loci* is the rule more likely to be applied by the North Carolina Supreme Court). Under either the *lex loci* or "most significant relationship" approach, Dell assumes that the law of North Carolina would also govern the UDTPA claim and Dell's defenses. Therefore, this brief looks to Texas law for the claims sounding in contract or warranty and to North Carolina law for the remaining claims. *Cf. First Care Med. Clinic, Inc. v. Polymedco, Inc.*, No. 3:05-cv-82, 2006 WL 3497845, at *3 n.2 (W.D.N.C. Dec. 4, 2006) (Appx. C,[5] Tab 1) (relying on contractual choice of law rule to apply New York law to contract claims and relying on *lex loci* rule to apply North Carolina law to tort claims).

## II. This Dispute Is Governed By Conscionable, Enforceable Contractual Terms Between Sophisticated Commercial Parties.

As a sophisticated commercial buyer, AIT is bound by the contractual limitations of remedy and liability it accepted. Enforcement of these terms, as required by the UCC and Texas law, results in limiting AIT's available damages to a maximum of a refund of the purchase price of the OptiPlexes with proven defects.

### A. The UCC Applies to AIT's Claims.

As previously noted, AIT has invoked several UCC provisions as the law governing the contractual commercial relationship involved in this action. Because the case centers on transactions in goods, the UCC indeed applies. Tex. Bus. & Com. Code § 2.102. All of AIT's breach of warranty claims are bound by the terms of the Warranty Contracts. AIT invokes § 2.313 for its express warranty claim (Count I), § 2.314 for its breach of warranty of merchantability claim (Count II), and § 2.315 for its breach of implied warranty claim (Count III). To the extent the express terms of the Warranty Contracts

---

[5] Citations to "Appx. C" refer to the Appendix of Unpublished Opinions filed contemporaneously herewith pursuant to Local Rule 7.2(c) and (d). The Tab numbers correspond to the appropriate case reference, as listed on the Appendix C Index.

modify, limit or exclude the implied warranties, UCC § 316 is triggered.[6] Thus, the legal analysis must

begin (and ultimately end) with the terms of the applicable contracts.

### B. The Warranty Contracts Limit AIT's Remedies to Repair or Replacement of the Computers.

The Warranty Contracts plainly limit AIT's available remedies for "defects in materials and

workmanship" to repair or replacement of defective products.

> DELL'S RESPONSIBILITY FOR MALFUNCTIONS AND DEFECTS
> IN HARDWARE IS ***LIMITED TO REPAIR AND REPLACEMENT***
> AS SET FORTH IN THIS WARRANTY STATEMENT.

(*See* Appx. B, Tab 1 (Pape Dec. Ex. F - J (bolded emphasis added)).)  Thus, Dell's contractual obligation

was simply to do what the express terms required – to repair or replace defective products.  A commercial

seller's right to limit the buyer's remedies to repair or replacement is firmly established in uniform

statutory and case law.  Indeed, the UCC specifically authorizes the very limitation Dell invoked.  Tex.

Bus. & Com. Code §§ 2.316(d), 2.718, 2.719.  Section 2.719 provides as follows:

> …the agreement may … limit or alter the measure of damages
> recoverable under this chapter, ***as by limiting the buyer's remedies to
> return of the goods and repayment of the price or to repair and
> replacement of non-conforming goods or parts***.

(emphasis added).  Texas cases have applied these principles liberally to hold parties to the binding terms

of limitation.  Under section 2.719 of Texas Commercial Code, parties may "freely negotiate to limit

[contractual] liability exclusively to repair and replacement costs."  *Muss v. Mercedes-Benz of N. Am.,

Inc.*, 734 S.W.2d 155, 158 (Tex. App. 1987).  Indeed, if commercial parties "agree to a contractual

remedy, ***that remedy will be enforced*** unless it is illegal or against public policy."  *SAVA Gumarska in

Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 317 (Tex. App. 2004)

(emphasis added) ("*SAVA Gumarska*").  As the Texas Court of Appeal has stated,  "where there is no

personal injury involved, Texas courts do not hesitate to enforce the limitation of remedy provisions

---

[6] The Warranty Contracts did not disclaim these implied warranties outright, but did limit the duration of implied
warranties to the same term as the express warranty. (Appx. B, Tab 1 (Pape Dec., Ex. F – J).)

authorized by § 2.719" *Chemetron Corp. v. Syngas Co.*, No. B14-90-00389-CV, 1991 WL 22391, at * 3

(Tex. App. Feb. 21, 1991) (Appx. C., Tab 2).

> ## C. The Warranty Contracts Specifically Exclude All Damages Claims Other Than Refund of Amounts Paid for Defective Computers.

In addition to limiting AIT's remedies to repair or replacement of the OptiPlexes, the Warranty

Contracts also specifically limited AIT's damages under any theory. In conspicuous, capitalized letters,

the Warranty Contracts disclaimed liability for any category of damages beyond a refund of monies paid

for defective OptiPlexes:

> WE DO NOT ACCEPT LIABILITY BEYOND THE REMEDIES
> PROVIDED FOR IN THIS LIMITED WARRANTY OR FOR
> CONSEQUENTIAL OR INCIDENTAL DAMAGES …. ***OUR
> LIABILITY WILL BE NO MORE THAN THE AMOUNT YOU PAID
> FOR THE PRODUCT THAT IS THE SUBJECT OF A CLAIM.
> THIS IS THE MAXIMUM AMOUNT FOR WHICH WE ARE
> RESPONSIBLE***.

(Appx. B, Tab 1 (Pape Dec. Ex. G - J (bolded and italicized emphasis added)).)[7] Elsewhere, the Warranty

Contracts provided the following "Limitation of Liability":

> DELL DOES NOT ACCEPT LIABILITY BEYOND THE REMEDIES
> SET FORTH HEREIN, INCLUDING BUT NOT LIMITED TO ANY
> LIABILITY FOR PRODUCT NOT BEING AVAILABLE FOR USE,
> LOST PROFITS, [or] LOSS OF BUSINESS …. EXCEPT AS
> EXPRESSLY PROVIDED HEREIN, DELL WILL NOT BE LIABLE
> FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, OR PUNITIVE
> DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH
> DAMAGES …. YOU AGREE THAT FOR ANY LIABILITY
> RELATED TO THE PURCHASE OF PRODUCT, DELL IS NOT
> LIABLE OR RESPONSIBLE FOR ANY AMOUNT OF DAMAGES
> ABOVE THE AMOUNT INVOICED FOR THE APPLICABLE
> PRODUCT.

(Appx. B, Tab 1 (Pape Dec. Exs. B – E).)[8] Thus, the Warranty Contracts not only stated that the remedy

was limited only to repair and replacement, but they also independently excluded the recovery of all other

categories of damages.

---

[7] The 2002 version of the Warranty (Ex. F to the Dell Declaration) has slight word variations, but is the same in all material respects.
[8] The 2002 version of the Terms & Conditions of Sale (Ex. A to the Dell Declaration) has slight word variations, but is the same in all material respects. Moreover, in 2004, the following language was added to this section of the

The enforceability of these provisions is demonstrated in the Fifth Circuit's decision in *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199 (5th Cir. 1987)) (applying Texas law). In *Lindemann*, commercial farmers brought an action for breach of express warranty against the manufacturer of herbicide used for cotton crops, claiming that the herbicide failed to control excessive weeds and resulted in significant crop loss quantified at $156,000. *Id.* at 200. While the manufacturer expressly warranted the herbicide, it limited its liability to a refund of the purchase price. *Id.* at 203. The Fifth Circuit held that the limitation provision complied with Tex. Bus. & Com. Code Ann. § 2.719, thereby limiting the damages to $6,000. *Id.* at 204-205.

The *Lindemann* court favorably cited *Billings v. Joseph Harris Co.*, a leading North Carolina case in which the state Supreme Court enforced a similar limitation of liability in a contract between an illiterate farmer and a New York seed seller for the purchase of crop seeds. 290 N.C. 502, 226 S.E.2d 321, 322 (1976). The farmer claimed consequential damages of crop failure in the amount of $50,000. But the court held that the limitation provision complied with UCC sections 2-316, 2-718 and 2-719, and therefore affirmed the trial court's summary judgment order limiting the maximum amount of damages recoverable to $440 – the purchase price of the seeds. *Billings,* 290 N.C. at 510, 226 S.E. 2d at 325.

AIT is obviously not an illiterate farmer, and the enforceable limitation provisions in *Billings* are similar, if not weaker, than the limitation provisions in the Warranty Contracts here. Dell categorically and conspicuously disclaims liability for ***loss of use, lost profits, loss of business, consequential, special, indirect, or punitive damages*** – all of which AIT is seeking in this case. The damages claimed by AIT that fall into these prohibited categories represent no less than $26.5 million of Dell's damages claim (even before punitive trebling under the UDTPA[9]). But by operation of law, the maximum amount of damages AIT can possibly recover, even assuming it can prove a breach of warranty, is only the amount it actually paid for OptiPlexes that were in fact defective. The total amount that AIT paid for all OptiPlexes

---

Warranty Contracts: "NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE REMEDIES SET FORTH IN THIS AGREEMENT SHALL APPLY EVEN IF SUCH REMEDIES FAIL THEIR ESSENTIAL PURPOSE." (Appx. B, Tab 1 (Pape Dec. Exs. B – E).)
[9] *See generally,* N.C. Gen. Stat. § 75-1.1.

is claimed to be around $1.4 million, exclusive of any offset for lease payments not made and claimed as owing by DFS.  (Appx. A, Tab 11 (Young Dep., Ex. 4).)  Under unequivocal principles of well settled law, the damages limitations should be enforced.

### D.    The Contractual Limitations Are Not Unconscionable.

As noted above, the only exceptions to enforcement of contractual limitations of liability are when the limitations are illegal or against public policy.  *SAVA Gumarska*, 128 S.W.3d at 317.  To preserve commercial predictability and risk allocation, the UCC provides unhappy buyers with extremely narrow and rarely available avenues for escape from liability limitations.  The first – unconscionability under section 2.302 – is decidedly a dead-end.  Tex. Bus. & Com. Code § 2.302.  AIT, a multi-million dollar company with an in-house legal department, claims that the contractual terms should not apply because AIT suffered an unequal bargaining position.  (FAC ¶ 50.)  But establishing unconscionability requires a showing far greater than simply the alleged "superior bargaining power" of one party.  *See* Tex. Bus. & Com. Code § 2.302, *cmt.* 1.  On the undisputed facts, Texas law mandates a rejection of AIT's unconscionability claim.

Unconscionability is a question of law for the court, and the burden of proof is squarely on the party claiming unconscionability.  *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184-85 (5th Cir. 1988).  Texas law requires a claimant alleging unconscionability to prove both **substantive** and **procedural** unconscionability; that is, not only must the terms in and of themselves be "one-sided and oppressive," but the facts must demonstrate that the seller exercised "'overreaching and sharp tactics'" **combined with** the buyer's "'ignorance and inexperience.'" *Arkwright-Boston Mfrs. Mut. Ins. Co.*, 844 F.2d at 1184.  Substantive unconscionability is found where the terms are so unfair that "'no man in his senses and not under a delusion would enter into and … no honest and fair person would accept' a contract on such terms." *Lindemann*, 816 F.2d at 204 (quoting *Blount v. Westinghouse Credit Corp.*, 432 S.W.2d 549, 554 (Tex. App. 1968)).  As discussed above, the limitation of remedies to repair or replacement and the exclusion of consequential damages are frequently enforced under the UCC.  *See Union Planters Bank, N.A. v. EMC Mortg. Corp.*, No. Civ. 3:99-CV-2416-

H, 2000 WL 622075 at *2 (N.D. Tex. May 12, 2000) (Appx. C, Tab 3) ("Limitations on remedies and the time period for warranties are common, and are commonly upheld by courts.")

Indeed, AIT *itself* employed similar limitations of liability provisions in its agreements with *its own customers*. In the Online Agreement that AIT requires its customers to approve, AIT employs the following terms:

> . . . AIT MAKES ABSOLUTELY NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED. Customer further agrees that *AIT shall not be liable to Customer for any claims, damages, or loss of profit which may be suffered by Customer* or any other entity in any respect *for any direct, indirect, consequential, actual, or punitive damages* arising out of or in relation to the Services provided hereunder, including, but not limited to, losses or damages resulting from loss of data due to delays, non-deliveries, or Service interruptions.

(Appx. A, Tab 1 (Briggs Dep. Ex. 5 at ¶ 4 (emphasis added)).) For AIT to argue that Dell's less onerous warranty terms and limitations of liability are substantively unconscionable is to take the position that AIT itself imposes unconscionable terms on its own customers.

Nor can there be procedural unconscionability as between AIT and Dell. In *Arkwright-Boston*, where a commercial plaintiff claimed that a manufacturer's failure to disclose a known failure rate on its product created unconscionability, the appellate court held that the plaintiff was too sophisticated to credibly claim "'ignorance and inexperience,'" and the conduct complained of did not rise to the level of "one-sided or oppressive" to constitute unconscionability. 844 F.2d at 1184. This case is routinely cited as a strong statement of Texas' position on the enforceability of limitation of liability provisions in the sale of goods context. *See, e.g., Bartley v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 824 F. Supp. 624, 635 (N.D. Tex. 1992) ; *Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.,* 91 F. Supp. 2d 1031, 1035 (S.D. Tex. 2000); *Am. Stone Diamond, Inc. v. Lloyds of London,* 934 F. Supp. 839, 844 (S.D. Tex. 1996). Similarly, the Fifth Circuit in *Lindemann* reversed the district court's finding of unconscionability, noting, *inter alia*, that:

> The district court, relying first on procedural unconscionability, held that the Lindemanns did not bargain for their purchase of the Treflan and therefore had no choice but to accept the contractual exclusion of consequential damages. *This finding ignores the commercial context of*

> *this transaction*. The Lindemanns are not retail customers purchasing consumer goods. They are ***experienced and sophisticated*** farmers who operate a 4,000-acre tract, 1,000 acres of which are each year devoted to cotton production . . . Moreover, ***an arm's-length relationship is presumed in a commercial transaction covered by the UCC***. … These factors indicate that no procedural unconscionability exists in this case.

*Lindemann*, 816 F.2d at 203-204 (emphasis added) (citations omitted). Like the *Lindemann* plaintiffs, AIT was sophisticated and experienced in commercial transactions. Under these conditions, AIT's claim of procedural unconscionability clearly fails., and AIT has fallen far short of carrying its burden to overcome the heavy presumption against unconscionability in a commercial setting.

        **E.**      **The Contractual Limitations Cannot Be Avoided Under the Theory of Failure of Essential Purpose.**

With virtually no hope of succeeding on its unconscionability argument, AIT is also expected to argue that the repair and replacement remedies under the Warranty Contracts "failed of their essential purpose." In this desperate effort, however, AIT misapplies both the facts and the law, both of which operate to enforce the applicable limitations. Section 2-719(2) of the UCC provides that if "circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this [Act]." Tex. Bus. & Com. Code § 2.719(b). As the Official Comment explains, "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." *Id. cmt.* 1. In this case, AIT cannot show evidence that circumstances caused ***any*** failure of essential purpose. Moreover, even assuming *arguendo* that the limited remedy of repair and replacement failed, such failure would ***not operate to eviscerate the independent and enforceable limitation on damages above and beyond the purchase price.***

        1.      Dell Fulfilled Its Warranty Obligations.

In its own complaint, AIT admits that Dell fixed the OptiPlexes that failed under warranty for the vast majority of the relevant timeframe. Specifically, AIT's Complaint establishes that Dell "fulfilled its obligations under the Dell OptiPlex computers' product warranty and/or its out of warranty support program with AIT [until] about February 2006," when AIT's warranties were terminated for lack of

payment. (FAC ¶¶ 36-37.) AIT's witnesses confirmed that AIT received warranty support until it stopped making its lease payments. Having admitted that it received warranty support from Dell (Appx. A, Tab 11 (Young Dep., 190:19 – 45); Tab 6 (Roberts Dep., 176:15 – 177:4)), AIT cannot now claim that the warranties failed of their essential purpose.

The Texas case of *Henderson v. Ford Motor Co.* is directly on point. 547 S.W.2d 663 (Tex. App. 1977). In *Henderson*, the plaintiff asserted claims of breach of express warranty and fraud against a car manufacturer and dealer for alleged defects in the vehicle she purchased. *Id.* at 665. Testimony established that the buyer started having problems with the car shortly after purchasing it. In addition to seeking warranty service for the car on multiple occasions, the plaintiff wrote a letter to Ford to complain about the car, and Ford in response sent a representative to examine the car and her claims. *Id.* at 666-67. Despite Ford's inability to fix plaintiff's car to her satisfaction, the court rejected plaintiff's argument that the warranty failed of its essential purpose. *Id.*

The Texas Court of Civil Appeals reached a similar conclusion in *Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex. Civ. App. 1972). There, the undisputed evidence showed that shortly after the plaintiff's car purchase, "many defects occurred, some of an exasperating nature … and other defects rendering the vehicle unsuitable for use." *Id.* at 249. In eighteen months, about fifty different defects were identified in the car, and it was in the shop for repairs for a total of approximately 45 days. *Id.* Nevertheless, both the trial and appellate courts upheld the limitation of remedy. Specifically, the appellate court held, "Texas courts have consistently held that where there is an express written warranty, the seller will not be bound beyond the terms of the warranty." *Id.* at 250. Like the plaintiffs in *Henderson* and *Lankford*, AIT has admitted that its warranty service was fulfilled, at least until AIT stopped making lease payments and came into wrongful possession of the OptiPlexes. Therefore, AIT's failure of essential purpose argument should suffer the same fate as those plaintiffs – *i.e.*, rejection as a matter of law.

2.	Even If Failure of Essential Purpose Is Assumed, the Limitation of
	Damages Provisions Remain Enforceable.

Dell anticipates that AIT will argue that if it can prove that the ***limited remedies*** of repair and replacement fail, then the separate Limitation of Liability clause that excludes recovery of, *inter alia*, lost profits, loss of business, and consequential, special, indirect, or punitive damages would also be invalidated.  But that is not the law of Texas, North Carolina, nor the majority of states that have addressed the issue.

The case of *Bray International, Inc. v. Computer Associates International, Inc.* from the Southern District of Texas is directly on point.  No. CIV H-02-0098, 2005 WL 3371875 (S.D. Tex. Dec. 12, 2005) (Appx. C, Tab 4).  That case involved both a "Limited Warranty" clause and a "Warranty and Liability Limitations" clause in a software license agreement governed by the Texas UCC.  *Id.* at *1.  After the court determined that the limitations were neither substantively nor procedurally unconscionable, the plaintiff argued that when an exclusive remedy clause failed of its essential purpose, the seller's separate limitation on consequential damages should likewise fail.  *Id.* at *2.  The court roundly rejected that argument, providing the following cogent rationale:

> [T]he Texas UCC honors agreements between contracting parties that limit or alter the measure of damages recoverable, even to the extent of allowing a single remedy to the exclusion of all others.  Tex. Bus. Com. Code. § 2.719(a).  However, should the exclusive remedy "fail of its essential purpose," remedies provided by the Texas UCC may be available.  *Id.* at § 2.719(b).  The Texas UCC also recognizes the parties' authority to limit liability for consequential damages, "unless the limitation or exclusion is unconscionable."  *Id.* at § 2.719(c).
>
> **The court agrees … that the viability of a provision limiting liability for consequential damages is not dependent on the success of the remedy in the limited warranty clause.**  The court also agrees that neither the contract as a whole nor the limitation of liability clause is unconscionable in violation of Texas public policy. …  **The Texas UCC could not be clearer that the only exception to the enforcement of [a contractual agreement limiting liability for consequential damages] comes into play if the clause or contract is unconscionable.**

*Bray*, 2005 WL 3371875, at *3-4 (emphasis added).[10]

The *Bray* holding is firmly rooted in Texas law. Under the heading "Failure of Essential Purpose," the official annotations to UCC § 2-719 in the Texas Business and Commercial Code list the Fifth Circuit Case of *Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518 (5th Cir. 1998) (cited in note 3 of Commentary to Tex. Bus. & Com. Code § 2.719). In that commercial contract dispute alleging breach of contract under Texas law, the court rejected the plaintiff's efforts to invalidate the damages cap of $500,000 under the "failure of essential purpose" argument. *Id.* at 521, 522-23. The court explained that the clause capping damages at $500,000 does *not* limit the remedies that Global can seek under the Agreement. It limits the amount of damages that either party can collect. Under Texas law, "contracting parties can limit their liability in damages to a specified amount" and "it is *immaterial* whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach." *Id.* at 522-23. Therefore, the failure of essential purpose argument was ineffective to dislodge the enforceable limitation of liability provision. *Id.* North Carolina courts are in accord, *see Williams v. Hyatt Chrysler Plymouth, Inc.,* 48 N.C. App. 308, 269 S.E.2d 184, 189 (1980), as well as the vast majority of courts applying the UCC nationwide. *See Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 721-22 (S.D. Tex. 2000) (listing cases).

Moreover, Professors White and Summers have weighed in squarely in favor of the "independent" view – *i.e.*, the failure of essential purpose of an exclusive remedy does not invalidate a damages limitation. *James J. White & Robert S. Summers, White and Summers' Uniform Commercial Code* § 12-10, at 605 (3d ed. 1988) ("*White & Summers*"). *White & Summers* emphasizes the UCC's overriding policy of allowing parties to freely contract and allocate the risk of consequential loss and applies an example particularly applicable here:

---

[10] The court also rejected the plaintiff's novel argument that a seller's bad faith breach of warranty obligations (or breach of the implied duty of good faith and fair dealing) would somehow invalidate the limitation of liability provisions and lift the damages cap. *Id.* at *3-*6. After a thorough analysis of Texas and other case law, the court found "that the contractual limitation of liability clause is enforceable, ***even in the presence of evidence of bad faith, willful dilatoriness, and/or repudiation***." *Id.* at *6 (emphasis added).

> This is particularly true when a knowledgeable buyer is using an
> expensive machine in a business setting.  It is the buyer who operates the
> machine, adjusts it, and understands the consequences of its failure.
> Sometimes flaws in such machines are inherent and attributable to the
> seller's faulty design or manufacturing.  But the fault may also lie in
> buyer neglect, in inadequate training and supervision of the operators or
> even in intentional use in ways forbidden by the seller.  Believing the
> parties to know their own interests best, we would leave the risk
> allocation to the parties.

*Id.*  The hypothetical example presented by *White & Summers* is playing out before this very Court.

While there is dispute among the parties as to whether the problems claimed by AIT were caused by

alleged design or manufacturing defects, or instead AIT's usage and environment, there can be no dispute

that the Warranty Contracts clearly and conspicuously allocated the risk of consequential, special,

indirect, punitive and other non-refund-based damages to the buyer.  Imagine the crippling effect on

Dell's enterprise as a computer manufacturer could it not contractually manage the risk of claims of

business losses due to alleged computer malfunctions.  Yet AIT seeks to eviscerate both the letter and the

spirit of the UCC by complaining, as a sophisticated commercial buyer, that for a myriad of

unsupportable reasons, the terms it accepted should no longer apply.  AIT should lose in this effort.

### III.  Because the Commercial Relationship at Issue Is Contractual, AIT's Tort Claims Are Improper and Fail As a Matter of Law.

#### A.  The Economic Loss Rule Bars AIT's Tort Claims.

Stymied by the ironclad contractual limitations on its claims, AIT throws unfounded and

inapplicable tort claims into the mix – namely, UDTPA, fraud, and civil conspiracy under North Carolina

law.  But bedrock principles of North Carolina common law prohibit this attempted end-run around

contractual remedies.  Specifically, the Economic Loss Rule prohibits recovery in tort where a claimant's

losses are purely economic, *i.e.*, neither personal injury nor damage to property other than the subject of

the claim.  *See Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 401-402, 499 S.E.2d 772, 780

(1998).  The policy behind the rule is sound, and wholly applicable to the instant case:

> The rationale for the economic loss rule is that the sale of goods is
> accomplished by contract and the parties are free to include, or exclude,
> provisions as to the parties' respective rights and remedies, should the
> product prove to be defective.  To give a party a remedy in tort, where

the defect in the product damages the actual product, would permit the party to ignore and avoid the rights and remedies granted or imposed by the parties' contract.

*Id.* In other words, the principles of tort law simply do not apply "where a manufacturer's products simply fail to meet the business needs of his customers." *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625-26 (M.D.N.C. 2006) (quoting *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, No. 1:03CV949, 2005 WL 1610653, at *10 (M.D.N.C. July 8, 2005) (Appx. C, Tab 5)). Instead, commercial losses are governed by the terms of the contract between the parties and the law of the UCC – including enforceable limitations of liability as discussed above.

There is ample precedent for dismissal of UDTPA and fraud claims under the Economic Loss Rule in factual contexts very much like the instant case. The case of *Bussian v. DaimlerChrysler Corp.* from the neighboring Middle District of North Carolina provides a cogent example. 411 F. Supp. 2d 614. In *Bussian*, the plaintiff brought a putative class action against manufacturing defendants alleging inherent defects in ball joints in certain Dodge vehicles and claiming breach of express and implied warranties, as well as a UDTPA claim. *Id.* at 617. The plaintiff acknowledged that the defect had not caused physical injuries to him or other potential class members. *Id.* However, he asserted a UDTPA claim in addition to the warranty claims on the basis that defendants had "superior knowledge" of the increased failure rate of the ball joints and other warning signs of a defect, failed to warn consumers of the defect, and touted the reliability of the vehicles. *Id.* at 625.

The court found that these allegations, even if true, were insufficient to escape application of the Economic Loss Rule. Citing to North Carolina and extra jurisdictional case law, the *Bussian* court held that the Economic Loss Rule mandated dismissal of the UDTPA claim where "the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims." *Id.* at 627. *See also Butcher v. DaimlerChrysler Co.*, No. 1:08-cv-207, 2008 WL 2953472 (M.D.N.C. July 29, 2008) (Appx. C, Tab 6) (dismissing UDTPA claim under Economic Loss Rule where claim was based on concealment of product defect).

Fraud claims suffer the same fate as UDTPA claims under the Economic Loss Rule. In a case from the Western District of North Carolina, a commercial purchaser of laboratory equipment sought compensatory damages, including the cost of equipment and lost profits, punitive damages, and attorneys' fees for breach of contract and intentional misrepresentation arising out of an alleged product defect. *First Care Med. Clinic, Inc.*, 2006 WL 3497845. To support its fraud claim, the plaintiff alleged that defendant "'knew that its [product] had functional problems,' but described it as reliable and easy to operate." *Id.*, at *3. The court rejected this approach, holding,

> This attempt to transform a contract claim into a tort claim, when the only damages alleged constitute economic loss, is precluded by the economic loss doctrine ….
>
> First Care's claim of intentional misrepresentation falls squarely within the economic loss doctrine. The subject product was sold to First Care pursuant to a written contract, and First Care's alleged damages are for economic losses, rather than personal injury or property damage.

*Id.* at *3, *5. Thus, the court held that because the fraud claim "arises from a sale of goods governed by a contract, it is barred by the economic loss rule." *Id.*, at *5. *See also Mecklenburg County. v. Nortel Gov't. Solutions Inc.*, No.3:07-cv-00320-GCM, 2008 WL 906319, at *4-*5 (W.D.N.C. Apr. 1, 2008) (Appx. C, Tab 7) (dismissing fraud, UDTPA and negligent misrepresentation claims under the Economic Loss Rule because allowing recovery of "purely economic loss in tort would eviscerate the North Carolina distinction between contract and tort law"); *Coker v. DaimlerChrysler Corp.*, No. 01CVS1264, 2004 WL 32676, at *3-5 (N.C. Super. Jan. 5, 2004) (Appx. C, Tab 8) (dismissing fraud and UDTPA claims where losses claimed from alleged product defect were purely economic).

Likewise, AIT's UDTPA, fraud and civil conspiracy claims arise from a sale of goods governed by a contract, and are thus prohibited under the Economic Loss Rule. Under the undisputed facts presented here, North Carolina law provides no recourse in tort, and AIT is limited to the terms of the bargain it made upon receipt of the goods at issue.

**B.     AIT Has Not Shown Facts That Would Avoid Application of the Economic Loss Rule.**

The principle behind that Economic Loss Rule is that where parties enter into a contractual relationship, they are governed by the agreed upon contractual terms, not by common law tort principles. *Mecklenburg County*, 2008 WL 906319, at *5. To hold otherwise would interfere with the ability of sophisticated parties to allocate risk in commercial transactions. *Id.* Specifically, "[b]ecause parties enter into contracts in order to minimize their future risks, suing in tort for an ordinary breach of contract would 'turn every potential contractual relationship into a riskier proposition.'" *N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs. Inc.*, No. 1:03CV00911, 2005 WL 3527050, at *8 (M.D.N.C. Dec. 22, 2005) (Appx. C, Tab 9) (*quoting Strum v. Exxon Co., USA*, 15 F.3d 327, 330 (4th Cir. 1994)). Therefore, North Carolina law sets a high bar for parties seeking to overcome the presumption of contractual governance and introduce tort liability into a dispute.

It is well settled that tort claims can be introduced into a contractual dispute only in "carefully circumscribed" circumstances. *Strum v. Exxon Co., USA*, 15 F.3d 327, 331 (4th Cir. 1994); *PCS Phosphate Co. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705, 717 (E.D.N.C. 2007), *aff'd*, 559 F.3d 212 (4th Cir. 2009). First, the tort claim must be based on conduct separate and distinct from the conduct relating to performance of the contract – in other words, arise from an "independent duty" other than that created by contract. *US LEC Comm'ns, Inc. v. Qwest Commn's Corp.*, No. 3:05-CV-00011, 2006 WL 1367383, at *2 (W.D.N.C. May 15, 2006) (Appx. C, Tab 10); *Ada Liss Group v. Sara Lee Corp.*, No. 1:06CV610, 2009 WL 3241821 (M.D.N.C. Sept. 30, 2009) (Appx. C, Tab 11); *N.C. Mut. Life Ins. Co.*, 2005 WL 3527050, at *8. Second, the conduct must also include "some element of aggravation, such as fraud, malice, reckless indifference, oppression, insult, and willfulness." *Id.; see also US LEC Comm'ns, Inc.*, 2006 WL 1367383, at *2 ("The independent tort must be identifiable and 'the tortious conduct must have an aggravating element such as malice or recklessness.'") (quoting *Strum*, 15 F.3d at 331).

This second element of "aggravation" has often been stated in the context of UDTPA claims as a requirement of "substantial aggravating circumstances." *PCS Phosphate*, 520 F. Supp. 2d at 717-18;

- 23 -

*Kelly v. Georgia-Pacific LLC*, No. 7:08-CV-197-D, 2009 WL 4249587, at *12 (E.D.N.C. Sept. 30, 2009)

(Appx. C, Tab 12); *N.C. Mut. Life Ins. Co.*, 2005 WL 3527050, at *10 ("In an effort to keep [UDTPA]

claims, which provide for treble damages, from attaching to every complaint for breach of contract, North

Carolina law requires a showing of 'substantial aggravating circumstances' to elevate a breach of contract

to the level of an unfair or deceptive trade practice.").

AIT cannot satisfy the requirements that trigger application of any of these extraordinary

exceptions to the general rule.

        1.      <u>AIT Can Show No Duties Owed by Dell Independent of Its</u>
                    <u>Contractual Obligations, and No Actionable Conduct Separate and</u>
                    <u>Distinct from Contractual Performance.</u>

But for their contractual relationship as buyer and seller, Dell would have no relationship with

AIT and would owe AIT no duties at all. Indeed, all of Dell's conduct with respect to AIT was related to

its performance under contract. The *Mecklenburg County* case provides a compelling analogy. In that

case, the plaintiff ("County") had a contract with the defendant ("Nortel") whereby Nortel was to design,

deliver and implement a customized software system. 2008 WL 906319, at *1. The County alleged that

Nortel knew that the software had "numerous functional defects," and in fact made fraudulent

misrepresentations about the status and delivery of the software, even fraudulently inducing the County to

sign an addendum to continue the contract term. *Id.* In addition to breach of contract, the County brought

claims of fraud, UDTPA, and negligent misrepresentation against Nortel, seeking treble and punitive

damages. *Id.* at *2, *4. The Western District of North Carolina held that the County could not escape

application of the Economic Loss Doctrine, because the County could not "sufficiently allege identifiable

and distinct facts, arising outside of the primary breach of contract." *Id.* at *4. Explaining further, the

court reasoned as follows:

> The County alleges facts based on Nortel's performance of the contract
> and this case is at heart a contractual dispute. At first blush, the County
> makes a compelling argument that Nortel tortiously made representations
> to the County which induced the County to continue the contract, make
> payments, and sign the addendum. This argument is flawed, however,
> because at the heart of the County's allegation is the performance of the
> contract …. These statements by Nortel, addressing the level of

> preparation and functional readiness of the [system], directly relate to
> Nortel's performance of the contract.

*Id.* at *5. Likewise, in the warranty context specifically, the rationale applied by the Middle District of North Carolina in *Butcher* is applicable here:

> It is clear from the pleadings that Plaintiff's UDTPA claim is intertwined with allegations of a product defect …the only information he alleges to be concealed is that related to *a product defect*. Plaintiff has pleaded no allegations that could stand separate and apart from the alleged product defect. His UDTPA claim…should be dismissed.

*Butcher*, 2008 WL 2953472, at * 4. Similarly, all of Dell's conduct (and therefore all of the allegedly tortious conduct) directly related to Dell's products and performance of its contractual relationship with AIT. Thus, AIT has failed to present identifiable and distinct facts that would support an independent duty apart from those created by the Warranty Contracts. *Cf. Johnson v. Sprint Solutions, Inc.*, No. 3:08-CV-00054, 2008 WL 2949253, at *4 (W.D.N.C. July 29, 2008) (Appx. C, Tab 13) (where plaintiff alleged that defendant deceived her into paying charges that were not owed, court dismissed negligent misrepresentation claims because she "failed to present any identifiable and distinct fact, wholly separate from her breach of contract claim, to overcome the North Carolina economic loss doctrine"), *aff'd on other grounds*, No. 08-1948, 2009 WL 4919363 (4th Cir. Dec. 18, 2009); *US LEC Comm'ns*, 2006 WL 1367383, at *2 (dismissing fraud, negligent misrepresentation, and UDTPA claims where the claims were "premised on the same facts as its breach of contract claims").

2. AIT's Allegations Do Not Show Malice, Recklessness, or Other "Substantial Aggravating Circumstances" to Overcome the Presumption Against Tort Claims in the Contractual Context.

To avoid dismissal of tort claims under the Economic Loss Rule, it is not enough that a plaintiff establish an independent duty or conduct unrelated to contractual performance. It also must show "some element of aggravation, such as fraud, malice, reckless indifference, oppression, insult, and willfulness." *N.C. Mut. Life Ins. Co.*, 2005 WL 3527050, at *8. In the UDTPA context, this test has been explained as follows:

> In a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, but that is why remedial damages are awarded on contract claims. If such an award is to be trebled, the North Carolina legislature must have intended that ***substantial aggravating circumstances be present***.

*United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) (emphasis added). Here, AIT advances two basic theories by which it attempts to satisfy the aggravating circumstances standard and state claims for fraud and deceptive trade practices against Dell: (1) allegations that Dell knowingly sold defective computers to AIT, and (2) allegations that Dell intentionally and maliciously terminated AIT's warranty service in or around February 2006. Examination of AIT's evidentiary shortcomings as to both of these theories shows conclusively that the elevated standards of aggravating circumstances cannot possibly be satisfied under the undisputed facts.

a.    *AIT Cannot Prove that Dell Knowingly Sold Defective Computers.*

Despite AIT's conclusory allegations to the contrary, the undisputed facts demonstrate that Dell never knowingly sold computers containing defective Nichicon capacitors. AIT leased its first Dell computers from DFS in December 2002 and executed its last lease in March 2005. (Appx. A, Tab 11) (Young Dep. 341:22 – 342:5); DFS Ans. & Countercl., Ex. A-1 – AA-2 [DE #57-59].) Dell had no knowledge of any problems with the Nichicon capacitors in some of its motherboards until January 2004, a little over *one year after* AIT started acquiring OptiPlex computers.[11] (Appx. A, Tab 5 (Luhrs Dep. 110:5-13); Appx. B, Tab 3 (Luhrs Dec. ¶ 5).) Upon learning of the potential problem in January 2004, Dell instructed its motherboard suppliers to stop using Nichicon capacitors while Dell and Nichicon investigated the issue. (Appx. B, Tab 3 (Luhrs Dec. ¶ 6); Appx. A, Tab 3 (Hutten Dep., Ex. 54); Appx. A, Tab 5 (Luhrs Dep. 84:12 – 13).) Within two months, by March 2004, Nichicon had identified and corrected a problem in its manufacturing process, and Dell lifted the hold and permitted its suppliers to begin purchases of new Nichicon capacitors again. (Appx. A, Tab 5 (Luhrs Dep. 67:3 – 21; 84:13 – 16); Appx. B, Tab 3 (Luhrs Dec. ¶ 7); Appx. A, Tab 3 (Hutten Dep., Ex. 54).)

---

[11] Dell believes that AIT might rely on an email exchange regarding a customer complaint in December 2002 as alleged evidence of Dell's earlier knowledge of a Nichicon defect. (Produced in discovery as DELL0141994-DELL0141997.) That email does not reference Nichicon capacitors, and the static discharge problem referenced in that email does not pertain to Nichicon capacitors. (*See* Appx. B, Tab 3 (Luhrs Dec. ¶ 14).)

After March 2004, Dell believed that the problem with the Nichicon capacitors had been remedied.  (Appx. B, Tab 3 (Luhrs Dec. ¶ 8).)  However, in computers that were already in the marketplace, Dell expected to see a limited number of capacitors fail throughout 2004 and into 2005 because of the latent nature of the failures.  (Appx. B, Tab 3 (Luhrs Dec. ¶ 8).)  At that time, Dell believed that the affected capacitors were only included in computers shipped between May 2003 and March 2004, and only a small percentage of those capacitors were expected to fail within the computers' warranty period  (Appx. B, Tab 3 (Luhrs Dec. ¶¶ 7-8); Appx. A, Tab 3 (Hutten Dep., Ex. 54).)  Dell intended to (and did) repair any reported failures under warranty.  (Appx. B, Tab 3 (Luhrs Dec. ¶ 13).)

Unbeknownst to Dell, however, Nichicon's manufacturing process continued to suffer from additional issues that caused capacitor failures, but Dell did not discover those problems until a year later – in April 2005 – *one month after* AIT acquired its last OptiPlex computers.  ((Appx. B, Tab 3 (Luhrs Dec. ¶ 11); Appx. A, Tab 3 (Hutten Dep., Ex. 54).)  In April 2005, Nichicon informed Dell that Nichicon had independently made additional improvements to its capacitors back in August 2004.  As a result of this new information, Dell decided to investigate OptiPlex computers returned to repair facilities, and it learned for the first time that some Nichicon capacitors manufactured outside of the original affected date range (May 2003 – March 2004) showed signs of problems.  (Appx. B, Tab 3 (Luhrs Dec. ¶¶ 9-11).)  By the first week of May 2005, Dell had instructed its motherboard suppliers to cease using Nichicon capacitors immediately.  (Appx. B, Tab 3(Luhrs Dec. ¶ 11); Appx. A, Tab 3 (Hutten Dep., Ex. 54); Appx. A, Tab 5 (Luhrs Dep. 84:12 – 23).)   However, between March 2004 and April 2005, Dell had no reason to know, and did not know, that any of its computers contained problematic Nichicon capacitors.  (Appx. B, Tab 3 (Luhrs Dec. ¶ 12).)

These facts regarding Dell's discovery of and reaction to the problems with Nichicon capacitors are undisputed.  There is simply no evidence in this case that Dell allowed its suppliers to use defective Nichicon capacitors and then knowingly sold those computers to AIT or to any other customer.  Nevertheless, Dell anticipates that AIT will point to customer complaints regarding OptiPlex computers

as alleged evidence that Dell knowingly sold defective computers. Customer complaints do not and cannot suggest that Dell knowingly sold defective computers, because until April 2005, Dell believed that those complaints related to computers and capacitors sold before Dell originally discovered the Nichicon capacitor problem in January 2004. (Appx. B, Tab 3 (Luhrs Dec. ¶ 12).) The failure of the Nichicon capacitors was typically manifesting at least 9 months and often one year or more after the computer was put into service, and even though Dell was experiencing some customer complaints about computer failures, its failures were not exceeding the company's projections. (Appx. B, Tab 3 (Luhrs Dec. ¶¶ 8, 12).) Thus, between March 2004 (when Dell lifted the first hold on Nichicon capacitors) and April 2005 (when Nichicon informed Dell of additional revisions to its process), Dell had no reason to know – and did not know – that any capacitors sold during that time period might have contained defective capacitors. (Appx. B, Tab 3 (Luhrs Dec. ¶ 12).)

Because the undisputed evidence demonstrates that Dell stopped selling computers containing Nichicon capacitors upon learning of a potential defect, there is no evidence that Dell knowingly concealed a material fact from AIT or that Dell intended to defraud AIT by selling defective computers. Accordingly, cannot avoid application of the Economic Loss Rule, and Dell is entitled to summary judgment on AIT's fraud and UDTPA claims.

        b.  *The Alleged Failure to Provide Warranty Service Was Not Malicious or Substantially Aggravating.*

AIT's theory that Dell's alleged failure to provide warranty service after AIT stopped making its lease payments constitutes a malicious or substantially aggravating circumstance is equally flawed. As an initial matter, Dell's refusal to provide warranty service could not be fraudulent or deceptive under the UDTPA, because AIT knew of the decision and the basis for that decision (AIT's refusal to make its payments). (Appx. A, Tab 6 (Roberts Dep. 187:13 – 188:18).) Thus, AIT must show that Dell's alleged refusal to provide warranty service could constitute an unfair practice under the UDTPA, *i.e.*, that it was in violation of public policy or somehow immoral or unscrupulous.

AIT cannot meet that burden. It is clear that "[u]nder North Carolina law, a breach of warranty alone is insufficient to state a UDTPA claim," *Kelly,* 2009 WL 4249587 at *12, and, therefore, insufficient to avoid the application of the Economic Loss Rule in this case. This situation is readily distinguishable from the narrow circumstances in which courts have allowed a refusal of warranty service to give rise to a UDTPA claim.

For example, in *Barbee v. Atlantic Marine Sales & Service, Inc.*, 115 N.C. App. 641, 446 S.E. 2d 117 (1994), the plaintiff purchased a defective boat and sought warranty service from the defendant seller. After several unsuccessful attempts to recommend fixes for the boat, the defendant eventually sent a representative to examine the boat at plaintiff's request. The representative, however, refused to ride in the boat or to examine the problem. 115 N.C. App. at 645, 446 S.E. 2d at 120. Instead, the representative observed that the boat was being used for commercial purposes, and, based on that fact, the defendant refused to provide any warranty service at all. *Id*. at 647-48, 446 S.E. 2d at 121. The court noted that the commercial use exclusion was not valid, because it was not in a warranty applicable to the plaintiff's boat, and that the defendant "made no offer of concession such as offering to credit the price plaintiffs had paid for their boat toward a new boat." *Id*. The court concluded that these circumstances provided sufficient evidence that the defendant "seized upon the commercial use exclusion in a bad faith attempt to avoid responsibility for the defective boat." *Id*. at 648, 446 S.E. 2d at 121.

The contrasts with this case are striking. Here, Dell hired a third party, Kenny Joines, to investigate the failures at AIT. (Appx. A, Tab 8 (Taylor Dep., 19:21 – 20:5); Tab 4 (Joines Dep., 28:19 – 29:1).) Unlike the representative who refused to examine the boat in *Barbee*, Mr. Joines attempted to examine the AIT data center. However, AIT did not allow Mr. Joines to finish his examination, because it kicked him out of the data center after he tried to take pictures to include in his report. (Appx. A, Tab 4 (Joines Dep., 50:13 – 54:6); Tab 6 (Roberts Dep., 323:19 – 324:20).) AIT also refused to provide Mr. Joines with the results of monitoring software that might have identified problems with AIT's data center environment, including problems with the temperature control. (Appx. A, Tab 6 (Roberts Dep., 350:6 – 25); Tab 4 (Joines Dep., 56:6 – 8).) Importantly, Mr. Joines concluded that AIT was using the OptiPlex computers in the wrong environment, and that the environment was likely contributing to the computer failures at AIT. (Appx. A, Tab 8 (Taylor Dep., Ex. 45 at p. 11).) As it did then, AIT disagrees with Mr. Joines's conclusions and continues to insist that all of the OptiPlex failures were

- 29 -

attributable to Nichicon capacitors.  However, Dell's experts in this litigation, Dr. Harold Stone and Mr. Bruce Edwards, have since confirmed that AIT's environment was in fact a likely cause of these failures.  (Appx. A, Tab 7 (Stone Dep., Ex. 1); Tab 2 (Edwards Dep, Ex. 84).)

More importantly, Dell did not stop providing warranty service to AIT following the Joines report. Rather, in contrast to the defendant's conduct in *Barbee*, Dell provided AIT with the Joines report, and the parties had several conference calls to discuss the situation.  (Appx. A, Tab 6 (Roberts Dep., 321:17 – 322:6; 350:6 – 25); Tab 11 (Young Dep., 277:7 – 278:10).)  During these calls, Dell requested some of the information that Mr. Joines was unable to obtain from AIT, but it appears that the information was never provided.  (Appx. A, Tab 6 (Roberts Dep., 350:6 – 25).)  Nevertheless, Dell did not refuse warranty service, even though AIT refused to provide information about its environment.  It was not until AIT stopped paying for its computers that Dell allegedly stopped providing warranty service.  (FAC ¶¶ 36 – 37; Appx. A, Tab 6 (Roberts Dep., 187:13 – 188:18).)  Moreover, Dell's warranty specifically provides that warranty service is conditioned on payment.  (*See* Appx. B, Tab 1 (Pape Dec. Ex. A – E).)  Thus, the parties were at a commercial impasse – AIT refused to pay for the computers, and Dell refused to provide warranty service.  While AIT might dispute whether Dell's refusal constitutes a breach of warranty, this case bears no resemblance to the narrow circumstances in which a breach of warranty constitutes an actionable tort.  AIT has no basis for avoiding the Economic Loss Rule, and Dell is entitled to summary judgment on all of AIT's tort claims.[12]

## C. The Intracorporate Immunity Doctrine Precludes the Civil Conspiracy Claim.

Framed by AIT as an independent cause of action, the civil conspiracy claim adds little to the mix, because North Carolina does not recognize civil conspiracy as an independent cause of action; rather, a conspiracy claim is dependent on proof of some other wrong.  *McMahon v. Synthron Inc.*, No. 1:05-cv-

---

[12] The *Barbee* case is distinguishable from this case in another important way.  The *Barbee* opinion does not address any Economic Loss Rule argument, nor apply Economic Loss analysis to the claims.  Instead, it is noted that the plaintiff's claims included "failure to warn of known dangerous defects in the design of the boat hull."  *Barbee*, 115 N.C. App. at 645, 446 S.E. 2d at 120.  Given the description of the boat as taking in excessive water when idling or anchored in the open sea, it stands to reason that the product defects at issue in that case posed a threat to the personal safety of its users.  *Id.* at 644.  There are no such allegations of threats of personal injury in this case, triggering application of the Economic Loss Rule to eliminate tort claims at step one.  *First Care Med. Clinic, Inc.*, 2006 WL 3497845, at *5.

324, 2006 WL 149054 (W.D.N.C. Jan. 18, 2006) (Appx. C, Tab 14). In any event, the conspiracy claim is subject to dismissal under the intracorporate immunity doctrine articulated by the U.S. Supreme Court in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), because DFS has always been a subsidiary of Dell. (Appx. A, Tab 9 (Thacker Dep. 14:21 – 15:5; 15:24 – 16:7).) In that antitrust case, the Supreme Court held that a corporation cannot conspire with its own subsidiary because the subsidiary, if controlled by the parent corporation, is simply an agent of the corporation as would be the corporation's officers and employees. *Id.* at 771. In other words, a corporation cannot conspire with itself. Numerous other courts, including the Fourth Circuit, have applied this doctrine in contexts other than the antitrust framework of *Copperweld*. *See, e.g., Buschi v. Kirven*, 775 F.2d 1240, 1251-52 (4th Cir. 1985) (applying intracorporate conspiracy doctrine to § 1983 claim in Virginia case); *Laxalt v. McClatchy*, 622 F. Supp. 737, 745-46 (D. Nev. 1985) (holding that wholly owned subsidiaries of a newspaper company have no separate legal existence for civil conspiracy claims); *Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co.*, 604 F. Supp. 203, 204-05 (W.D. Va. 1984) (*Copperweld* logic controls conspiracy claim under Virginia statute notwithstanding any distinction between Sherman Act and state statute), *aff'd*, No. 84-2299, 1985 WL 14172 (4th Cir. July 11, 1985); *Ford Motor Co. v. Lyons*, 405 N.W.2d 354 (Wis. Ct. App. 1987) (*Copperweld* rule applies to state statutory action for conspiracy to injure another's reputation, trade, business or profession); *In re Asbestos Litig.*, 509 A.2d 1116, 1120 n.2 (Del. Super. Ct. 1986) (*Copperweld* cited as authority for holding that a parent corporation cannot conspire with its subsidiary for purposes of civil conspiracy liability), *aff'd sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987).

Importantly, North Carolina state and federal trial courts have adopted the intracorporate immunity doctrine. *See McMahon*, 2006 WL 149054, at *4; *see also Iglesias v. Wolford*, 539 F. Supp. 2d 831, 835 (E.D.N.C. 2008) (dismissal of a state law civil conspiracy claim against city employees based on intracorporate immunity doctrine); *Godfredson v. JBC Legal Group, P.C.*, 387 F. Supp. 2d 543, 551 (E.D.N.C. 2005) (applying intracorporate conspiracy doctrine in civil conspiracy claim). Therefore, to the extent that the civil conspiracy claim constitutes a separate cause of action, it is due to be dismissed.

**IV.** **Even Without the Enforceable Limitations of Liability, AIT's Damages Claims Fail Because They Are Speculative, Uncertain, and Unsupported By the Evidence.**

> **A.** **AIT Cannot Establish Its Damages to a Reasonable Certainty Nor Prove a Causal Connection Between the Alleged Computer Failures and Its Claimed Damages.**

While there is little doubt that the contractual limitations of liability eliminate the lion's share of AIT's damages claims, established common law principles regarding damages prohibit recovery as well. AIT's damages claims for consequential damages - lost profits, goodwill, and opportunity costs - are unsupported by the evidence and fail as a matter of law regardless of the underlying theory of recovery or applicable state law. Under Texas law, in order to recover for lost profits, "the amount of the loss must be shown by competent evidence with reasonable certainty." *Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). "Evidence of lost profits must not be uncertain or speculative." *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 808 (Tex. App. 2006). Likewise, "under North Carolina law, the party seeking lost profits bears the burden of proof, and to meet that burden, a party must prove such losses with reasonable certainty." *Ross v. Wash. Mut. Bank*, 566 F. Supp. 2d 468, 482 (E.D.N.C. 2008) (internal quotation marks omitted). "A party must present evidence, not mere speculation, to recover lost profits." *Catoe v. Helms Constr. & Concrete Co.*, 91 N.C. App. 492, 496, 372 S.E.2d 331, 334 (1988). Whether a party's evidence meets the "reasonable certainty" standard is a question of law for the court, not a question of fact for the jury. *Ross*, 566 F. Supp. 2d at 482.

The basis of AIT's damages claims are nothing more than "the product of guesswork by interested parties," which spelled the demise of a commercial plaintiff's damages claims in *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 924 (5th Cir. 2000). That case involved similar claims against a water bottle system manufacturer arising from alleged defects causing repeated leaks. *Id.* at 922. The plaintiff sought damages both for lost profits and the decline in value of the company. *Id.* The court struck those consequential damages, however, because of the inadequacy of the evidence to support the claims. Specifically, the only witnesses who testified as to lost customers based their opinions on

"general observations" of the business; each witness came up with a different estimate of the volume of customers lost; and each conceded that customers canceled for reasons other than the leakage. *Id.* at 923-924. The court categorically rejected "such unprincipled predicates" and struck the lost profits and consequential damages awards as "necessarily arbitrary and unsupportable." *Id.* at 924.

The failure to prove a causal connection – or to eliminate the economic impact of other intervening causes – is a recurring theme in damages jurisprudence. The *Ross* case from the Eastern District of North Carolina provides another example. 566 F. Supp. 2d 468. In that case, the plaintiff sued Washington Mutual bank ("WaMu") for making erroneous negative entries on her credit reports and for improper debt collection practices. *Id.* at 471-74. The plaintiff claimed "numerous economic injuries, including lost wages, failure of a teaching certification exam, … and a lost business opportunity to open a senior assisted-living facility," which she claimed "would have netted her over $3,000,000 in profits each year." *Id.* at 481, 473.

The court granted summary judgment to WaMu on the issue of damages based primarily on plaintiff's failure to eliminate other possible causes for the losses she blamed on WaMu. For example, though she attributed her teaching exam failure on WaMu's conduct, she admitted that she did not study for the exam, did not take a practice test, took the exam only one time, and did not know the failure rate for the exam generally. *Id.* at 481. The *Ross* court also faulted the plaintiff for her "unsupported assumptions" on which she based her lost profits claim on the assisted living facility, which included assuming that she would have received federal and private funding to open the facility and that it would have been fully occupied. *Id.* at 482-83*; see also Helen of Troy, L.P. v. Zotos Corp.*, 511 F. Supp. 2d 703, 726 (W.D. Tex. 2006) (where plaintiff's expert opined lost customer revenue damages of $17 million, court limited award to $18,000 because plaintiffs' attribution of business losses were unsupported by the evidence in the record, which showed other alternative potential causes for customer returns and dissatisfaction).

AIT similarly has failed to support its damages claims to a reasonable certainty and has failed to establish the requisite causal connection between the alleged Dell computer failures and its damages. As

an initial matter, AIT attempts to support complex damages claims involving lost profits, customer good will, and increased labor costs without any expert analysis. Nor has AIT produced any coherent written analysis of its damages, pointing instead to impenetrable spreadsheets which AIT employees purport to interpret to prove damages.

**B.  AIT's Goodwill and Opportunity Costs Damages Are Speculative and Unrecoverable.**

AIT's claim related to alleged loss of goodwill and opportunity costs is a prime example of its complete inability to reasonably support its damages. AIT's list of "Dell Total Damages" reflects a claim for "Good Will/Opportunity Cost" of just under $8.5 million. (Appx. A, Tab 11 (Young Dep., 85:33 – 86:7, Ex. 4).) No corporate representative has been able to explain how AIT arrived at that number. AIT's former CFO, Steven Young,[13] testified that these damages related to opportunities to either acquire businesses or to be acquired that AIT somehow missed as a result of the Dell OptiPlex computers, but he did not examine and could not testify about any particular transaction in any detail. (Appx. A, Tab 11 (Young Dep. pp. 68-81).) Moreover, Mr. Young did not have the information necessary to calculate a dollar figure for these damages (Appx. A, Tab 11 (Young Dep. 86:17 – 31)), and testified that he was only providing "elements of what made up that figure," not actual numbers (Appx. A, Tab 11 (Young Dep. 85:49 – 86:7)). Mr. Young had not reviewed any documents, because he did not know of any, that allegedly supported AIT's claim for opportunity cost damages. (Appx. A, Tab 11 (Young Dep. p. 80:21-37).)

AIT also designated its CEO, Clarence Briggs, to address goodwill and opportunity cost damages, and Mr. Briggs told an entirely different story. At his deposition, Mr. Briggs announced that AIT was seeking $21.7 million in opportunity cost damages, not $8.5 million. (Appx. A, Tab 1 (Briggs Dep. 400:8 – 21, Ex. 4).) Mr. Briggs initially attributed the $21.7 million to customer discounts, lost business opportunities similar those described by Mr. Young, and to lost management time. (Appx. A, Tab 1 (Briggs Dep. 412:22 – 416:10).) However, after conceding that AIT had not calculated, and could

---

[13] Mr. Young was designated as a 30(b)(6) corporate representative on this measure of damages. (Appx. A, Tab 12 (Young Dep. 66:41 – 49).)

not calculate, damages from the latter two categories, (Appx. A, Tab 1 (Briggs Dep. 414:15 – 20 and 415:15 – 416:3)) Mr. Briggs decided that the entire figure was based on customer discounts (Appx. A, Tab 1 (Briggs Dep. 416:11 – 417:21)).  Mr. Briggs claimed that those damages had been calculated in a spreadsheet that had been produced to Dell *for the first time* the previous day, which was the first day of his deposition.  (Appx. A, Tab 1 (Briggs Dep. 418:18 – 419:15, Ex. 9).)  Discussing the new spreadsheet, Mr. Briggs conceded that it contained no customer-specific information and was based on the *premise* that any discount granted by AIT resulted from the failure of a Dell computer.  (Appx. A, Tab 1 (Briggs Dep. 424:24 – 425:3).)  Mr. Briggs further conceded that this new spreadsheet contained no documentation on a customer-by-customer basis from which that premise could be proved or disproved.  (Appx. A, Tab 1 (Briggs Dep. 425:4 – 16).)  Plainly, AIT's last-ditch effort to "prove" damages by dumping this spreadsheet on Dell and radically changing its theory at the eleventh hour of discovery does not amount to proof of damages to a reasonable certainty.

### C.    AIT's Lost Profits Damages Are Speculative and Unrecoverable.

AIT's lost profits damages are similarly built on speculative and unfounded assumptions.  AIT seeks $15.8 million in lost profits for thousands of customer contracts that were allegedly cancelled because of the OptiPlex failures.  (*See* Appx. A, Tab 11 (Young Dep., Ex. 4).)  AIT's primary proof of these claims is a spreadsheet created for the litigation that allegedly links computer failures to particular contract cancellations.  Because this "proof" is not accompanied by any meaningful analysis and is riddled with speculative assumptions, AIT's lost profits damages are not reasonably supported and, therefore, unrecoverable.

As a threshold matter, AIT has not provided any coherent explanation of its methodology for calculating lost profits from contract cancellations.  AIT's CEO testified that it had between 190,000 and 220,000 customers at any given time, and that it lost between four and six thousand of those customers as a result of the OptiPlex failures.  (Appx. A, Tab 1 (Briggs Dep. 137:13 – 139:17).)  Nowhere, however,

has Mr. Briggs or any other witness explained how losing around two or three percent of its customers[14] could have resulted in the alleged losses claimed here. To put AIT's claim in perspective, its "top line sales" during this time period ranged between $27 million and $31 million, (Appx. A, Tab 11 (Young Ex. 2-3)) and its profit (using "EBITDA," the measure preferred by its CFO at the time) (Appx. A, Tab 11 (Young Dep. 16:35 – 41)) between 2003 and 2007 ranged from $1.1 million to $40,000 (Appx. A, Tab 11 (Young Dep. 49:41 – 51, Ex. 2-3)). AIT has not even attempted to explain how it allegedly lost $15 million in lost profits – in addition to the alleged $21 million in customer discounts – at a time when its total profits were in the $1 million range. In other words, AIT's damages claims are far-reaching to say the least, and these claims are made without any cogent analysis connecting them to failures of the OptiPlex computers.

Moreover, AIT has not taken the fundamental step of accounting for other factors that could have explained its alleged losses. AIT's CFO confirmed that the web hosting business was becoming more competitive during this time (Appx. A, Tab 11 (Young Dep. 45:15 – 31 and 66:11 – 31)), but AIT has not offered any analysis of whether and, if so, how much, increased competition might account for its alleged losses. On a more specific level, AIT has failed to account for the fact that customers might leave a web hosting company for any number of reasons entirely unrelated to the failure of an OptiPlex computer; in fact, AIT's own proof suggests that many of its customers did just that.

As noted above, AIT's primary proof of lost profits from canceled customer contracts is a spreadsheet prepared for this litigation and produced to Dell in response to Dell's motion to compel related to AIT's damages evidence. AIT designated its Chief Information Officer, Michael Roberts, as its 30(b)(6) witness on this document. (Appx. A, Tab 6 (Roberts Dep. 200:3 – 22; 201:12 – 17; 216:7 – 8, Ex. 12).) AIT's spreadsheet lists specific computers and provides failure dates and contract cancellation dates for individual customers. (Appx. A, Tab 6 (Roberts Dep. 200 – 216, Ex. 12).) The spreadsheet also provides a "cancellation reason" that was selected by the customer at the time of cancelling the contract. (Appx. A, Tab 6 (Roberts Dep. 208:8 – 210:5).)

---

[14] If AIT had 190,000 customers, 6000 customers would be about 3%.

On its face, this spreadsheet fails to support AIT's claims. For example, many of the customers selected "Business – Out of Business" as the reason for terminating service with AIT. (Appx. A, Tab 6 (Roberts Dep. 238:8 – 239:9).)[15] Nevertheless, AIT attributes those and other contract cancellations to an OptiPlex failure based on AIT's interpretation of the "real" reasons the customers left, which are allegedly revealed in a set of "trouble tickets" documenting service calls from AIT's customers. (Appx. A, Tab 6 (Roberts Dep. 266:4 – 268:4; 269:19 – 25).) The fundamental flaws in this methodology are significant. First, AIT's alleged analysis of the trouble tickets is not documented anywhere. Second, AIT has not articulated any criteria for analyzing the trouble tickets, it just relies on its own self-serving interpretation. Finally, AIT's entire analysis is demonstrably speculative.

A few examples are in order. One customer[16] reported that it cancelled its contract on October 24, 2006, because it went out of business. (Appx. A, Tab 6 (Roberts Dep. 257:21 – 258:3).) The only computer failure associated with the customer on AIT's damages spreadsheet occurred on January 21, 2005 – ***more than nineteen months earlier***. (*Id.*).[17] When pressed for the causal connection between a computer failure one day and a customer going out of business nineteen months later, Mr. Roberts stated that AIT's customers "are a very different breed of business people," and "they have a very good memory." (*Id.* at 259:7 – 260:15.) Mr. Roberts continued:

> So do I have any concerns about a customer that had a failure one year and then canceling in the next not being attributable to the fact that they had a failure on a Dell machine the year before, I have no concerns about that at all, none.

(*Id.*) Despite Mr. Roberts' confidence in his opinion, his testimony confirms that AIT's lost profits damages are based on speculative opinions from a lay witness. And this is not an isolated example. Addressing a separate customer who cancelled a contract almost a year after the listed failure, Mr. Roberts explained that his interpretation depends not only on his alleged knowledge of entrepreneurs generally, but also on those entrepreneurs' assessments of the cause of their business failures:

---

[15] Customers also provided other reasons that raise doubts about any connections to OptiPlex failures, most notably "Moving to Cheaper Service." (*See* Appx. B, Tab 2 (Johnson Dec., ¶ 7).)
[16] Customer number 675 on AIT's spreadsheet. (Appx. A, Tab 7 (Roberts Dep., Ex. 12).)
[17] Mr. Roberts confirmed that there were no other failures in the 19-month span on which the customer cancellation was based. (Appx. A, Tab 7 (Roberts Dep. 258:15-259:2).)

> Q.   Okay.  So then this customer calls almost one year later and wants to cancel.  How is that cancellation at all related to the failure of that computer almost a year earlier for an hour?
> A.   Because I've talked to entrepreneurs that are in this situation.  And if a situation that they were down on a very important day or week or month did not afford them the ability to collect the large amount of money that they were expecting, they may muddle through the rest of the year with that enterprise.
>
> And if they don't have enough money a year later or a little bit less than a year later, as this indicates, then they may need to cancel it and say I never made the money that I expected to make because I was down.

(Appx. A, Tab 6 (Roberts Dep. 244:8 – 23).)  The length of time between alleged failures and contract cancellations is not by any means the only flaw in AIT's "analysis."  In another telling example, AIT includes an entry for a customer who both entered and canceled a contract on the same day, and Mr. Roberts agreed that the customer's website was never established successfully.  (Appx. A, Tab 6 (Roberts Dep. 247:5 – 17).)  The same customer, however, signed a new contract the following day. *Id.*  AIT's lost profits claim includes the projected value of the full lifetime of the ***first*** cancelled contract, with no adjustment for the apparent replacement contract entered into on the following day.  (Appx. A, Tab 6 (Roberts Dep. 249:1 – 5).)  Mr. Roberts' explanation of his reasoning is telling:

> Q.   Well, you didn't then experience $3,898.50 in lost contract fees from that customer if he came back the next day and entered into a contract with you?
> A.   I wouldn't agree with that statement.
> Q.   So you think that customer would have entered into two contracts with you?
> A.   Could have.
> Q.   Do you have any way of knowing that?
> A.   Do I have any way of knowing this particular customer, that they would have done that?
> Q.   Yes.
> A.   Not sitting here today, no.

(Appx. A, Tab 6 (Roberts Dep. 249:6 – 18).)  Although Mr. Roberts' testimony is more than sufficient to demonstrate the speculative nature of AIT's lost profits damages, Dell's damages expert, Stan Johnson, a CPA from Navigant Consulting, has confirmed this conclusion.  Mr. Johnson reviewed, among other documents, AIT's lost profits spreadsheet, its trouble tickets and Mr. Roberts' deposition.  He then chose a sample of customer cancellations, including both cancellations with a higher potential of being related to an OptiPlex failure as well as those with a lower potential.  (Appx. B, Tab 2 (Johnson Dec. ¶¶ 7-8).)  After reviewing over 100 individual customers and the associated trouble tickets, Mr. Johnson concluded that "the trouble ticket information and documentation does not support the association or damages being claimed by

AIT." (Appx. B, Tab 2 (Johnson Dec. ¶ 13).) Mr. Johnson's written analysis, as well as his initial report addressing the failings in AIT's damages claims, stands unrebutted.

In summary, AIT has not met its burden of establishing its lost profits damages to a reasonable certainty. AIT offers no methodology or written explanation of its analysis and no expert testimony. Instead, it attributes customer cancellations to OptiPlex failures based on speculation, conjecture and its own self-serving analysis of trouble tickets. Accordingly, Dell is entitled to summary judgment on all of AIT's consequential damages.

## V. Conclusion

For the reasons stated herein, Dell is entitled to a summary judgment order that will curtail AIT's overreaching damages and tort claims as a matter of law.

Respectfully submitted, this 30th day of April, 2010.

/s/ Pressly M. Millen
Pressly M. Millen
North Carolina Bar No. 16178
WOMBLE CARLYLE SANDRIDGE & RICE,
*A Professional Limited Liability Company*
150 Fayetteville Street, Suite 2100
Raleigh, NC 27602
Telephone: (919) 755-2135
Fax: (919) 755-6067
Email: pmillen@wscr.com

/s/ Jane Fugate Thorpe
Jane Fugate Thorpe
Scott A. Elder
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Fax: (404) 881-7777
Email: jane.thorpe@alston.com
Email: scott.elder@alston.com

ATTORNEYS FOR DEFENDANT
DELL INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
**No. 5:07 CV 426-H**

ADVANCED INTERNET                )
TECHNOLOGIES, INC.               )
                                 )
                   Plaintiff,    )
                                 )
        vs.                      )
                                 )
DELL INC. and DELL FINANCIAL     )
SERVICES, INC.,                  )
                                 )
                  Defendants.    )

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2010, I electronically filed the foregoing **Memorandum of Law In Support of Partial Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

/s/ Scott A. Elder
Scott A. Elder
ALSTON & BIRD LLP
1201 West Peachtree Street, NW
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Fax: (404) 881-7777
Email: scott.elder@alston.com