IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No 5:07-CV-426


| | |
|---|---|
| ADVANCED INTERNET TECHNOLOGIES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DELL, INC. and DELL FINANCIAL SERVICES, INC | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT
DELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Darren T. Kaplan (Admitted *Pro Hac Vice*)
Chitwood, Harley, Harnes, LLP
185 Great Neck Road, Suite 340
Great Neck, NY 11021
Tel: (516) 773-6090
Fax: (516) 706-0497
GA State Bar No. 172670

A. Bikash Roy, # 28382
Advanced Internet Technologies, Inc.
421 Maiden Lane
Fayetteville, NC 28301
Tel: (910) 321-1365
Fax: 910-321-1392

# TABLE OF CONTENTS

I.     INTRODUCTION AND OVERVIEW ..........................................................................................

II.    DELL IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE DELL HAS
       FAILED TO DEMONSTRATE THE ABSENCE OF GENUINE ISSUES OF
       MATERIAL FACT...................................................................................................................

III.   DELL IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY LEGAL GROUND
       BECAUSE DELL EITHER MISSTATES THE LAW OR FAILS TO INVOKE THE LAW
       APPLICABLE ON THE FACTS OF THE CASE .......................................................................

       (a)    Dell's argument that North Carolina's "economic loss rule" bars AIT's claims of fraud
              and under the Unfair and Deceptive Trade Practices Act misstates the law of North
              Carolina.

       (b)    Dell's argument that the Uniform Commercial Code Limits AIT's recovery of
              consequential damages for breach of limited warranties pursuant to warranty disclaimers
              misstates the applicable law.

       (c)    Dell is not entitled to partial summary judgment on AIT's UDTPA claims.

IV.    DAMAGES..............................................................................................................................

       (a)    Plaintiff Has Sufficient Evidence To Support Its Claim for Damages for Breach of
              Contract  Under Texas Law  .............................................................................................

       (b)    Plaintiff Has Sufficient Evidence To Support Its Claim for Damages for Fraud and Unfair
              Trade Practices Under North Carolina Law.......................................................................

       (a)    The Briggs, Macomber, and Roberts Affidavits Set Forth Sufficient Evidence For A Jury
              To Return A Verdict of Damages to AIT

V.     CONCLUSION........................................................................................................................

**CASES**

*Ada Liss Group (2003) v. Sara Lee Corp.*,
  No. 1:06CV610, 2009 WL 3241821 (M.D.N.C. Sept. 30, 2009) ................................................ 14

*Balderson-Berger Equip. Co. v. Blount*,
  653 S.W.2d 902 (Tex. App. 1981) ........................................................................................ 16

*Bernard v. Cent. Carolina Truck Sales, Inc.*,
  68 N.C. App. 228, 314 S.E.2d 582 (N.C. App. 1984) ............................................. ......24

*Bowen v. Bank*,
  209 N.C. 140, 183 S.E. 266 (1936)....................................................................................... 25

*Bower v. Metro. Transit Auth. of Harris County*,
  No. 01-06-00553, 2007 WL 1299803 (Tex. App. May 3, 2007)................................................ 23

*Brecheisen v. James*,
  No. 07-01-0236, 2002 WL 31778667 (Tex. App. Dec 12, 2002)................................................ 23

*Bussian v. DaimlerChrysler Corp.*,
  411 F. Supp. 2d 614 (M.D.N.C. 2006) ................................................................................... 12

*Butcher v. DaimlerChrysler Co.*, LLC,
  No. 1:08cv207, 2008 WL 2953472 (M.D.N.C. July 29, 2008) ................................................. 12

*Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp.*,
  63 N.C. App. 292 (1983) .................................................................................................... 16

*Byrd's Lawn & Landscaping, Inc. v. Smith*,
  142 N.C. App. 371, 378 542 S.E.2d (N.C. App. 2001) ............................................................ 25

*C.A. May Marine Supply Co. v. Brunswick Corp.*,
  649 F.2d (5th Cir. 1981) .................................................................................................... 23

*Club Car Inc. v. Dow Chem. Co.*,
  06-CVS-15530, 2007 WL 2570088 (Mecklenberg County Sup. Ct. May 3, 2007) ................... 14

*Coker v. DaimlerChrysler Corp.*,
  01-CVS-1264, 2004 WL 32676 (Rowan County Sup. Ct. Jan. 5, 2004) ................................... 13

*Coker v. DaimlerChrysler Corp.*,
  172 N.C. App. 386 (2005) .................................................................................................. 13

*Curtis B. Pearson Music Co. v. Everitt*,
  No. 08-1933, 2010 WL 707700 (4th Cir. Mar. 2, 2010).......................................................... 15

*Ferst v. Gaul,*
    No. 05-CV-0682, 2006 WL 1167886 (E.D.Pa. Apr. 28, 2006) ................................. 26

*Field v. AIM Mgmt. Group, Inc.,*
    845 S.W.2d 469 (Tex. App. 1993) ........................................................................ 22

*First Care Med. Clinic v. Polymedco, Inc.,*
    No. 3:05-CV-82, 2006 WL 3497845 (W.D.N.C. Dec. 4, 2006) ................................. 12

*Global Octanes Texas, LP v. BP Exploration & Oil, Inc.,*
    154 F.3d 518 (5th Cir. 1998) ............................................................................... 18

*Goodfrey v. Res-Care, Inc.,*
    165 N.C. App. 68, 598 S.E.2d 396 ...................................................................... 24

*Great Pines Water Co., Inc. v. Liqui-Box, Inc.,*
    203 F.3d 920 (5th Cir. 2000) ............................................................................... 17

*Hahnemann Univ. Hosp. v. Dudnick,*
    292 N.J. Super. 11 (App. Div. 1996) .................................................................... 16

*Helena Chem. Co. v. Wilkins,*
    47 S.W.3d 486 (Tex. 2001) ................................................................................. 22

*Holt Atherton Indus., Inc. v. Heine,*
    835 S.W.2d 80 (Tex. 1992) .............................................................................21, 22

*Indemn. Ins. Co. of N. Amer. v. Amer. Eurocopter LLC,*
    No. 1:03CV949, 2005 WL 1610653 (M.D.N.C. July 8, 2005) ................................. 14

*Iron Steamer, Ltd. v. Trinity Rest., Inc.,*
    110 N.C. App. 843, 431 S.E.2d 767 (1993) ......................................................... 25

*Keith v. Day,*
    81 N.C.App.185, 343 S.E.2d 562 (1986) ............................................................. 25

*Kelly v. Georgia-Pacific LLC,*
    671 F. Supp. 2d 785 (E.D.N.C. 2009) ................................................................. 14

*Keo v. Vu,*
    76 S.W.3d 725 (Tex. App. 2002) ........................................................................ 22

*Lapierre v. Samco Dev. Corp.,*
    103 N.C. App. 551, 406 S.E.2d 646 (N.C. App. 1991) ........................................... 24

*Lord v. Customized Consulting Specialty Inc.,*
    182 N.C. App. 635 (2007) .................................................................................. 12

*Marshall v. Miller,*
    302 N.C. 539 (1981) ................................................................................... passim

*McKnight v. Hill & Hill Exterminators, Inc.*,
689 S.W.2d 206 (Tex. 1985)............................................................................22

*Media Networks, Inc. v. Long Haymes Carr, Inc.*,
678 S.E.2d 671 (N.C. App. 2009)..............................................................passim

*Metro Nat. Corp. v. Dunham-Bush Inc.*,
984 F. Supp. 538 (S.D. Tex. 1997) ................................................................17

*Mood v. Kronos Prods., Inc.*,
245 S.W.3d 8 (Tex. App. 2007)......................................................................21

*Moore v. Coachman Indus. Inc.*,
129 N.C. App. 389 (1998) ..............................................................................13

*Pace Corp. v. Jackson*,
155 Tex. 179, 284 S.W.2d 340 (1955)............................................................23

*Perfecting Serv. Co. v. Prod. Dev. & Sales Co.*,
259 N.C. 400, 131 S.E.2d 9 (1963)................................................................25

*Phillips v. Chesson*,
231 N.C. 566, 58 S.E.2d 343 (1950)..............................................................25

*Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*,
187 F.3d 415 (4th Cir. 1999) ..........................................................................26

*PPG Indus., Inc. v. JMB/Houston Centers P'ship Ltd. P'shp*,
146 S.W.3d 79 (Tex. 2004)..............................................................................16

*River Burch Assocs. v. City of Raleigh*,
326 N.C. 100, 388 S.E.2d 538 (1990)............................................................24

*Roane-Barker v. Se. Hosp. Supply Corp.*,
99 N.C. App. 30, 392 S.E.2d 663 (N.C. App. 1990) ......................................25

*Shady Grove Orthopaedic Assocs., P.A. v. Allstate Ins. Co.*,
130 S. Ct. 1431 (2010).....................................................................................13

*SJW Prop. Commerce, Inc. v. Sw. Pinnacle Props., Inc.*,
No. 13-08-00268, 2010 WL 1729858 (Tex. App. April 28, 2010)..................22

*Sw. Bell Media, Inc. v. Lyles*,
825 S.W.2d 488 (Tex. App. 1992)..................................................................23

*Steelcase, Inc. v. Lilly Co., Inc.*,
93 N.C.App. 697, 379 S.E.2d 40 (N.C. App. 1989) ......................................25

*U.S. v. Huete-Sandoval*,
681 F. Supp. 2d 136 (D. Puerto Rico 2010).....................................................26

iv

*Vance v. My Apartment Steak House of San Antonio, Inc.*,
   677 S.W.2d 480 (Tex. 1984) ...................................................................................... 22

*Vigus v. Milton A. Latta & Sons Farms, Inc.*,
   676 S.E.2d 669 (N.C. App. 2009) ............................................................................ 12

*Wade & Sons, Inc. v. Am. Standard, Inc.*,
   127 S.W.3d 814 (Tex. App. 2003) ........................................................................... 16

*Waters v. Massey-Ferguson, Inc.*,
   775 F.2d 587 (4th Cir. 1985) ............................................................................. 15, 16

*Williams v. Encompass*,
   969 F. Supp. 15 (E.D.N.C. 1999) .............................................................................. 1

*Wilson v. Dryvit Sys., Inc.*,
   206 F. Supp. 2d 749 (E.D.N.C. 2002) ...................................................................... 14

## STATUTES & RULES

Fed. R. Civ. P., Rule 56 ................................................................................................... 1

L.Civ.R. 56.1 .................................................................................................................... 2

N.C.G.S. 58-70-1 ............................................................................................................. 5

Chapter 75 of the North Carolina general statutes ........................................................ 10

Chapter 2A of the Uniform Commercial Code .............................................................. 10

N.C.G.S. § 75-1.1, et seq. ("UDTPA") ......................................................................... 12

N.C.G.S. § 75-16 ........................................................................................................... 24

Rule 56(e) ...................................................................................................................... 25

Federal Practice and Procedure: Civil 3d § 2740 ......................................................... 26

Fed.R.Evid. 803 ............................................................................................................. 26

# I.    INTRODUCTION AND OVERVIEW

Plaintiff Advanced Internet Technologies, Inc. ("AIT"), opposes Defendant Dell Inc.'s ("Dell") motion for partial summary judgment.  Dell's Motion serves up half-truths while sweeping inconvenient information under the rug in an effort to persuade the Court that there are no "genuine issues of material fact" for trial.  However, Dell and its wholly-owned subsidiary Dell Financial Services LLC's ("DFS") own documents and the testimony of their witnesses, establish genuine issues of material fact that Dell cannot wish away merely by omitting them from its Brief.  AIT's Opposition fills in "the rest of the story" and thereby demonstrates that summary judgment is improper.  Moreover, even assuming *arguendo* that AIT's Opposition is insufficient to demonstrate genuine issues of material fact precluding summary judgment, AIT further shows that due to Dell's failure to provide essential Court Ordered discovery to AIT, this Court should either deny summary judgment outright or order a continuance to allow such discovery be completed pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56; *Williams v. Encompass*, 969 F. Supp. 15, 18 (E.D.N.C. 1999) (setting forth requirement for Rule 56(f) affidavit in opposition to summary judgment).

Dell's brief also misrepresents the applicable law to the Court.  The most notable such misrepresentation concerns the interplay of the North Carolina Unfair and Deceptive Trade Practices Act with common law claims and defenses under the economic loss rule.  Similarly, Dell's  arguments relating to the prerequisites for enforcement of warranty limitations and consequential damage waivers under the Uniform Commercial Code fail to account for the disputed issues of fact that surround Dell's admitted supply of defective computers to AIT.  Lastly, Dell's painfully inadequate attempt to claim an entitlement to summary judgment on damages--supported by case law in which litigants offered almost no evidentiary support at all-- is conclusively refuted by the affidavits of AIT's officers and employees and the pages of documentary evidence AIT marshals in support of its entitlement to prove its damages at trial. Dell is therefore not entitled to summary judgment as to any legal ground on which Dell has so moved.

## II. DELL IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE DELL HAS FAILED TO DEMONSTRATE THE ABSENCE OF GENUINE ISSUES OF MATERIAL FACT

Dell's manifest inability to demonstrate the absence of "genuine issues of material fact" which are central to this litigation is fatal to its motion. Despite Dell's assertions, genuine issues remain as to the following material facts concerning Dell's conduct in relation to the marketplace generally and in its dealings with AIT in particular. Pursuant to L.Civ.R. 56.1, AIT identifies the following genuine issues of material fact that preclude summary judgment for Dell:

1) When Dell first knew or should have known about the defective capacitors in the Dell OptiPlex computers. Dell documents indicate a date years earlier than the date Dell's brief concedes. *See* Document 214-2, pg. 4 (Dell learned of capacitor problems in January 2004); cf. DELL 0130224-0130246 (showing that Dell admitted knowing as of January 2003 that a single customer had 450 motherboard failures) (Declaration of Darren T. Kaplan in Opposition to Defendant Dell, Inc.'s Motion for Summary Judgment ("Kaplan Dec.") Tab 1); DELL 0141994-0141997 (Dell admits in a 2004 e-mail in response to a customer inquiry its awareness of motherboard and thermal issues in November 2002) (Kaplan Dec. Tab 2); DELL 0075150-0075155 (Dell internal documents admit knowledge of Nichicon capacitor failures on OptiPlex motherboards no later than January 2004) (Kaplan Dec. Tab 3); DELL 0075151 (Dell receives failure reports from University of Texas in January 2004) (Kaplan Dec. Tab 4); DELL 143699-143709 (enterprise customer reports 75% failure rates around October 2003) (Kaplan Dec. Tab 5).

2) When Dell first, and whether Dell, acknowledged defective capacitors as the cause of computer failures to AIT or other customers. Dell documents indicate strenuous efforts to attribute OptiPlex failures to customer use and site conditions even when Dell knew that defective capacitors were to blame. *See* DELL 0141997 (evidence that Dell advised enterprise customer that it was the "only one" reporting OptiPlex problems) (Kaplan Dec. Tab 6); DELL 0075151 (Dell attributes failure of Nichicon capacitors to "very aggressive

2

user profile" because University of Texas mathematics laboratory used machines to perform "advanced mathematical calculations") (Kaplan Dec. Tab 4) ; DELL 0085246-0085258 (Dell aware that customer reporting failures is using OptiPlexes as servers but has no objections although Dell later explained AIT failures as being due to use of the OptiPlexes as servers) (Kaplan Dec. Tab 7);[1] DELL 0108144-0108150 (Dell knew of widespread failures in September 2004) (Kaplan Dec. Tab 8) ; DELL 0142229 (Dell's awareness of widespread problems with the OptiPlex models sold in 2003 onwards) (Kaplan Dec. Tab 9); AIT 32115-32151 (May 2005 Kenny Joines report maintains complete silence about defective capacitors as possible reason for the breakdown and attributes problems to use as servers) (Kaplan Dec. Tab 10); *cf.* DELL 0085376 (Dell considers offering upgraded warranties on OptiPlexes Dell knows are being used as servers) (Kaplan Dec. Tab 11); DELL 0090067 (Dell internal communication acknowledging that motherboard replacements would have solved the OptiPlex problems but "[t]his has not been messaged to the customer") (Kaplan Dec. Tab 12).

3) <u>What Dell knew about the pervasive impact of defective capacitors on computer failures when supplying the defective computers</u>.  Dell documents indicate that Dell knew or should have known that a high proportion of the OptiPlexes were defective when Dell was selling them to AIT.  *See* DELL 0075150 (Dell knew before March 2005 that 1.8m units were potentially affected and estimated in September 2005 that 8.m+ were potentially affected by motherboard issues) (Kaplan Dec. Tab 13); DELL 0075151 (Dell admits receiving communications from the University of Michigan and the Mayo Clinic reporting OptiPlex problems in June 2005) (Kaplan Dec. Tab 4); DELL 143699-143709 (Dell knows of enterprise customer experiencing a 75% failure rate in Fall 2003) (Kaplan Dec. Tab 5); DELL

---

[1] Dell attempts this same "explanation" in its brief. *See* Document No, 214-2, pg. 2. The explanation is questionable because Dell never denied warranty service based on this purported ground. *See* Document No. 214, pg. 6 (Dell provided warranty service "[r]egardless of the origin of the problems").

3

0108144-0108150 (Dell estimates 7m potentially affected units no later than October 2004 for a 97% projected rate) (Kaplan Dec. Tab 8); Document No. 201, pg. 2 (DFS summary judgment brief states that AIT entered into series of twenty-seven leases starting in December 2002 through April 2005 and made payments up to November 2005); DELL 0087996 (Dell announces incentives for promoting OptiPlex sales at the same time as they acknowledge mounting OptiPlex problems) (Kaplan Dec. Tab 14).

4) <u>Whether Dell misled AIT and other enterprise customers about the computer failures customers experienced.</u>  Dell documents indicate an orchestrated campaign to pin the failures on customers even though Dell knew about the capacitor problem.  *See* DELL 0088004 (Dell instructs sales personnel to "emphasize uncertainty" in responding to customer concerns about capacitor problems) (Kaplan Dec. Tab 15); DELL 0087997-0088005 (Dell instructs sales personnel to "[d]on't bring this to customer's attention proactively") (Kaplan Dec. Tab 16); DELL 0143711 (Dell internal communication expressing frustration concerning unauthorized or inadvertent disclosure to customer about true cause of computer failures) (Kaplan Dec. Tab 17); DELL 0142177-0142187 (Dell initially denied before admitting that Alston & Bird was experiencing systematic OptiPlex failures) (Kaplan Dec. Tab 18); DELL 0087998 (Dell denies possibility of data loss) (Kaplan Dec. Tab 19); DELL 0088008 (Dell denies possibility of data loss) (Kaplan Dec. Tab 20); cf. DELL 0137764-0137764 (Dell aware of data loss associated with capacitor defects) (Kaplan Dec. Tab 21); DELL 0075150 (Dell acknowledges that defective capacitors cause OptiPlexes to over-heat in idle state) (Kaplan Dec. Tab 3); AIT 32115-32151 (May 2005 Kenny Joines report attributes failures to AIT including rack mounting) (Kaplan Dec. Tab 10); cf. DELL 0086603 (Dell racked mounted OptiPlex machines).

5) <u>Whether Dell conducted sham analyses on the causes of computer failures to deflect attention from the cause of the capacitor failures at AIT. Dell documents indicate that Dell concocted "individualized" solutions to what Dell knew to be an "industry-wide" problem that affected</u>

4

all customers alike. *See, e.g.*, DELL 0087569 ("Dell was the first company to identify the problem and notify the vendor …") (Kaplan Dec. Tab 23); DELL 0087999 (capacitor issue was "industry wide" (Kaplan Dec. Tab 24)); AIT 32115-32151 (Dell consultant Kenny Joines's May 2005 site report attributing failures to AIT-related causes with no mention of capacitor problems then already known to Dell) (Kaplan Dec. Tab 10); DELL 0091067-0091067 (Dell internal communications in April 2005 directing Dell employees to divert attention from OptiPlex quality issues Dell was already aware of to customer-related causes) (Kaplan Dec. Tab 25).[2]

6) Whether Dell took effective steps to withhold defective computers from the marketplace. s so Dell kept selling computers knowing that a very significant proportion of those sold would contain defective capacitors because of deficient Dell or supplier manufacturing processes. *See* Hutten Deposition, p. 37-41(Kaplan Dec. Tab 26); DELL 0075150 (Dell failed to adhere to manufacturing best practices to identify affected motherboards because capacitors from different suppliers were comingled on individual motherboards) (Kaplan Dec. Tab 13); DELL 0108144-0108150 (Dell acknowledges supply chain and defect problems involving "second tier" suppliers in 2004 requiring escalation including demands for reimbursement from suppliers and noting failure rate up to 97% due to defective Nichicon capacitors) (Kaplan Dec. Tab 8).

7) Whether Dell discriminated among leasing customers making warranty claims in the interest of or at the behest of co-defendant Dell Financial Services ("DFS"). Dell and DFS documents indicate a variety of questionable Dell practices, including possible violations of N.C.G.S. 58-70-1 (requiring license for certain debt collection activities, leading some

---

[2] Dell's attempt to identify customer-specific explanations for OptiPlex failures is like trying to understand the loss of the Titanic by examining the actions of the passengers when the iceberg struck. Dell;s brief, Document No. 214-2, at pg. 9, continues to pursue this false line of argument, implying in the face of all the evidence available to Dell that the OptiPlexes would not have failed had AIT not used them as servers. Interestingly, Dell never even raised this issue until AIT reported failures. DELL 0085376 (AIT using 2000 computers as servers in November 2004) (Kaplan Dec. Tab 11).

employees to voice legal concerns, as detailed in AIT's Motion for Partial Summary Judgment (Document #208) and Opposition filed on May 28, 2010, to DFS's summary judgment motion (Document #___).

8) <u>Whether Dell offered warranties to customers without financial provisions to meet warranty claims</u>.  Dell public documents indicate that the Securities & Exchange Commission required Dell to restate its earnings for several years because Dell failed to make adequate contingent liability provision to address warranty claims for these years. See DELL SEC 10-K Filing for Fiscal Year Ending 2007 (restating earnings for 2003, 2004, 2004, 2005, 2006 to reflect inadequate contingent liability provisions on account of the OptiPlex product line following SEC investigation) (Kaplan Dec. Tab 27); DELL 008837-008852 (UBS analysis showing Dell made no allowance to meet contingent liability for successive years) (Kaplan Dec. Tab 28).

9) <u>Whether Dell ensured adequate supplies of replacement parts to meet warranty claims or replacement needs</u>.  Dell documents indicate replacements for defective motherboards were in short supply.  *See* DELL 0091291-0091293 (Dell internal discussion of motherboard supply shortage) (Kaplan Dec. Tab 29); DELL 0142187 (Dell admits that its "supply chain totally crashed") (Kaplan Dec. Tab 30); DELL 0143699-0146702 (Dell knew of motherboard shortages in November 2004) (Kaplan Dec. Tab 31); DELL 0146704-0146707 (Dell admits replacement motherboard shortages in November 2005) (Kaplan Dec. Tab 32); DELL 0135326-0135330 (indication to Dell from enterprise customer that motherboard replacement supplies are insufficient) (Kaplan Dec. Tab 33); DELL 0142229 (Dell acknowledges that replacement supplies are running short) (Kaplan Dec. Tab 8); DELL 0132394 (Dell and DFS discuss replacement shortage necessitating withholding of parts to benefit selected DFS customers) (Kaplan Dec. Tab 34); DELL 0090067 (Dell acknowledges AIT failure incidence of 245 out of 2300 machines as of that date calls for 'proactive field replacement' but failed to offer AIT such replacements) (Kaplan Dec. Tab 12).

6

10) <u>Whether Dell knowingly or otherwise used defective replacement parts to perform warranty</u> <u>repairs</u>. Dell documents show that Dell knew or should have known that its warranty services were being performed using defective capacitors Dell. *See* DELL 0142214 (Dell shipped replacement motherboard containing already failed capacitors to Alston & Bird) (Kaplan Dec. Tab 35); DELL 0148655-0148662 (Dell defective replacement motherboards to Best Western hospitality chain) (Kaplan Dec. Tab 36); DELL 0134854 (surgical product supplier expresses concern that Dell is supplying defective replacement parts) (Kaplan Dec. Tab 37).

11) <u>Whether AIT itself selected the OptiPlex machines to meet AIT's needs or Dell</u> <u>recommended the machines to AIT with knowledge of their intended use as racked servers</u>. Contrary to Dell's assertions. Dell knew how AIT intended to use the machines and recommended them along with warranties for that purpose. *See* Young Depo. p. 110-115 (Kaplan Dec. Tab 38); Carlson Depo. p. 56-57; 61-64 (Dell discussed using OptiPlex machines as servers at AIT) (Kaplan Dec. Tab 39); DELL0085376 (Dell notes in 2004 that AIT is using 2000 OptiPlexes as servers while promoting sales of upgraded warranties and service plans for those machines) (Kaplan Dec. Tab 11).

Notably, Dell selects facts to support the contention that Dell did not knowingly sell machines containing defective capacitors, and adopted reasonable corrective steps upon learning about the problem. Dell also selects "facts" to obscure when Dell actually learned or should have learned of the nature and extent of the problem. Dell also selects facts to obscure its manipulations of warranty services and Dell's well-orchestrated policy of affirmatively misleading customers concerning the causes and extent of computer failures.

AIT obtained some two thousand Dell OptiPlex computers from Dell. Many of these were financed through Dell's leasing affiliate, DFS, under some twenty-seven (27) leases of various inception dates. The OptiPlex machines were general purpose mid-market machines. AIT used them as rack-mounted servers in its data center and as desktop computers in its business offices and training facilities. Dell sales and service personnel knew how AIT intended to use the machines. Dell offered to provide

7

AIT rack equipment although AIT was able to obtain the same more economically from an after-market provider. Dell sold or offered AIT extended or upgraded warranties for these machines even though Dell personnel knew exactly how AIT used the machines. Dell never told AIT that the OptiPlexes were unsuitable for use as racked servers until Dell had to contrive an explanation attributing the OptiPlex failures to AIT rather than to what Dell knew to be capacitor problem which Dell assiduously avoided mentioning.

Dell has acknowledged that the OptiPlex machines were equipped with the same defective capacitors that caused an "industry-wide" problem. Dell claims to have been among the first in the industry to learn about this problem but, unlike its competitors, Dell withheld the information from its customers. DELL 0087997-0088005 (Dell instructs sales personnel "[d]on't bring this to customer's attention proactively") (Kaplan Dec. Tab 16).

When Dell learned of AIT's high incidence of failures Dell said nothing about the capacitor issue to AIT. Instead, Dell offered to "help" AIT by identifying what site conditions at AIT could be contributing to the failures. Dell employees warned their co-workers to be wary of AIT's in-house computer expertise. Dell's consultant Kenny Joines visited AIT in May 2005 and wrote a report about the visit. This report speculated at length on how conditions at AIT's site could have contributed to the failures. The report studiously avoided mentioning the "industry-wide" capacitor problem even though Dell concedes that they were already aware of the problem at that time.

The Kenny Joines Report's "explanation" made no sense as OptiPlexes seemingly failed everywhere they were used—e.g., *inter alia*, Wal-mart (5000 machines replaced), the Mayo Clinic, Wachovia, Merrill Lynch, the University of Texas (Dell claimed that complex mathematical calculations were ruining the computers used in the mathematics laboratory), the Supreme Court of Alaska, Thatcher Simpson Bartlett, Wachtell Lipton,Cullen & Dykman, and even at the offices of Dell's own lawyers in this litigation Alston & Bird. Clearly, Dell was marketing to enterprise customers through its small and medium business segment initiative knowing that virtually any such customer might choose to use the OptiPlexes in a range of applications from networked servers to free-standing desktops. The Kenny

8

Joines report is consistent with Dell's practice of attributing OptiPlex failures to ad hoc customer specific causes even when Dell knew that its own defective capacitors were the most likely cause of the failures.

Dell's litigation experts perpetuated this confusion as they went searching for the mysterious "x-factor" at AIT that was causing OptiPlexes to fail regardless of how or where they were used. For instance, these experts pursued the theory that high temperatures within the AIT data center were contributing to the OptiPlex failures. Yet, on cross-examination it became apparent that the highest temperatures recorded in the data-center were well within the design tolerance limits of the OptiPlex machines and that only one of four sensors in the Data center even showed such high temperatures. It became equally apparent that Dell's expert miscalculated installed cooling capacity at the AIT data center. Dell's litigation experts were also unable to explain why they believed that the racked installation of OptiPlex computers at the AIT data center explained the failure rate when in fact Dell recommended and sold racks for the OptiPlex and OptiPlexes were failing worldwide and failed even in "idle state." Dell's expert or experts never inquired about the AIT failure rate of computers other than the OptiPlexes.

Dell's own documents demolish its assertion that Dell first realized the scope of the OptiPlex problem not much before 2005. Dell had already, by Fall 2004, aggregated data showing OptiPlex failure rates up to 97%. Dell had already, in Fall 2003, received reports of widespread failures from sophisticated enterprise customers. Dell was reluctant to disclose to customers that Dell knew of the failures as early as 2002. Clearly, Dell knew about the scale and extent of the failures, and the fact that it was obviously a manufacturing or design defect of some sort, long before Dell pinpointed the actual cause. Enterprise customers at least as sophisticated as AIT, including among others Dell's own counsel in this action, Alston & Bird (not to mention other prominent firms such as Thatcher Simpson Bartlett and Wachtell Lipton) were frantically e-mailing Dell about epidemic computer failures long before the date Dell concedes it learned of the actual cause of the failures in its brief.

Dell documents show that its competitors, notably Hewlett Packard, and even Dell's suppliers who provided the defective capacitors, had proactively communicated the capacitor defect to their respective customers. Dell consciously avoided emulating the example. Instead, Dell orchestrated a

9

policy of obfuscation emphasizing "uncertainty" in general terms and shifting blame to the customer-for any expedient reason that appeared handy even when Dell knew the facts were otherwise. Following the same theme, Dell developed a pretense of working with customers ostensibly to discover what site-specific conditions ailed the OptiPlex and to develop "individualized solutions" for what Dell knew all along to be an "industry-wide" capacitor problem.

Incredibly, after learning of the defective capacitors installed in its computers, Dell made no efforts to withhold computers containing the defective capacitors from the stream of commerce. Instead, Dell deliberately continued selling computers that Dell knew to contain defective capacitors, or knew to be at high risk of containing defective parts, while withholding defect-free components as replacement parts. When the computers failed as Dell knew they inevitably would, Dell used defective parts to make warranty repairs. Dell was providing limited warranties and obtaining consequential damage waivers from customers knowing that its computers were defective and that replacement parts were continually in short supply. The chronic short supply was anything but an accident.[3]

Dell manipulated warranty services on computers for altogether extraneous reasons more fully detailed in AIT's Motion for Partial Summary Judgment requesting the Court to declare these acts as constituting unfair and deceptive trade practices pursuant to Chapter 75 of the North Carolina general statutes. *See* Document No. 208 (AIT's motion for summary judgment against DFS and Dell); *see also* Plaintiff's Opposition to Defendant DFS's Motion for Summary Judgment, filed May 28, 2010. Dell denied warranty service to disfavored customers who owed payment to DFS, nominally a "finance lessor" within the meaning of Chapter 2A of the Uniform Commercial Code. Dell or DFS acting as Dell's wholly owned subsidiary, internally indistinguishable from Dell, would cut off Dell warranties to disfavored customers even though DFS had already paid Dell in full for the leased equipment. Dell or

---

[3] Dell failed to set aside contingent liability provisions to meet warranty claims year after year even as OptiPlex complaints flooded in and even after the Dell learned or should have known the scale of the problem. In 2007, the Securities and Exchange Commission compelled Dell to restate its earnings for every year going back to 2003, to account properly for the over-statement of income resulting from the under-statement of OptiPlex-related contingent liabilities.

DFS would cut-off warranty services in DFS's interests even on Dell computers leased though other finance lessors. Under a policy separate from the cut-off policy, Dell rationed warranty services to ensure preferential treatment to favored DFS lessees when replacement motherboards were in short supply.

Dell's Brief either omits or otherwise fails to address the foregoing material facts as to AIT's claims for fraud, unfair and deceptive trade practices, and breach of warranty.[4] These facts establish that there are genuine material issues of fact despite what Dell claims in its brief. AIT further expects that when Dell complies with the Court's second Order to Compel, further information will come to light in support of AIT's position. The Court should therefore deny Dell's motion for summary judgment because genuine issues of material fact remain for trial.

### III. DELL IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY LEGAL GROUND BECAUSE DELL EITHER MISSTATES THE LAW OR FAILS TO INVOKE THE LAW APPLICABLE ON THE FACTS OF THE CASE

(d) *Dell's argument that North Carolina's "economic loss rule" bars AIT's claims of fraud and under the Unfair and Deceptive Trade Practices Act misstates the law of North Carolina.*

Dell, in a desperate attempt to escape responsibility for its fraudulent, unfair and deceptive conduct, *viz*:

(1) supplying computers to AIT when Dell knew or should have known the computers to be defective,

(2) failing to disclose the defect to AIT despite repeated requests from AIT and despite knowing that more than a few of the computers supplied to AIT were defective,

(3) acting affirmatively to mislead AIT concerning the cause of the failures in

---

[4] Indeed, Dell goes so far as to make an outright misrepresentation to the Court claiming that, "[i]n light of the nonpayment of the lease, the limited warranties for the OptiPlexes appear to have been terminated. The Warranty Contracts specifically provided that Dell's warranty obligations were conditioned on receipt of payment for the computers." Dell's Brief at p. 7. Unfortunately for Dell, its own wholly-owned subsidiary and co-defendant DFS sets the record straight, "Defendant DFS in turn paid Defendant Dell for the computer equipment and leased it to AIT." Document 200, Attachment 1 p. 3 [Sippel Affidavit ¶9].

attributing these to site-specific and use-specific conditions when Dell knew the computers to be defective; and

(4) permitting co-defendant DFS, nominally a third party finance lessor but actually a Dell subsidiary operationally and functionally indistinguishable from Dell, access to Dell warranty management software to manipulate Dell warranty services on all AIT's Dell equipment to enforce payments to DFS, now seeks refuge in the "economic loss rule."[5]

There is no question that the "economic loss rule" disfavors common law tort recovery for injuries that sound in common law contract. *See Lord v. Customized Consulting Specialty Inc.*, 182 N.C. App. 635, 639 (2007) ("… the economic loss rule prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law"); *see also Vigus v. Milton A. Latta & Sons Farms, Inc.*, 676 S.E.2d 669, at *5 (N.C. App. 2009, Table). However there is no basis for Dell to jump to the conclusion that AIT therefore cannot assert claims for fraud or claims under the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, et seq. ("UDTPA") under the economic loss rule just because this action features claims of warranty breach.

Dell's "ample precedent" for the dismissal of fraud and UDTPA claims under the economic loss rule, *see* Dell's Brief at p. 21, consists essentially of *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625 (M.D.N.C. 2006) ("[p]laintiff's unfair or (sic) deceptive trade practices claim should be dismissed pursuant to the "economic loss rule") and *Bussian*'s progeny, *Butcher v. DaimlerChrysler Co.*, LLC, No. 1:08cv207, 2008 WL 2953472 (M.D.N.C. July 29, 2008) and *First Care Med. Clinic v. Polymedco, Inc.*, No. 3:05-CV-82, 2006 WL 3497845, at*4-5 (W.D.N.C. Dec. 4, 2006) which do not merit independent discussion. However, *Bussian* has no precedential value because it misstates state law and the state courts have severely criticized the state court opinion which the *Bussian* court cited in

---

[5] Neither the North Carolina nor the Texas courts generally capitalize the expression as in Dell's brief. AIT will follow the more usual practice of not capitalizing the expression.

support of its dubious holding.  *See Shady Grove Orthopaedic Assocs., P.A. v. Allstate Ins. Co*., 130 S. Ct. 1431, 1447-1448 (2010) (federal courts must follow state law on substantive questions of state law).

The *Bussian* court cited only two authorities for the proposition Dell represents as its "ample precedent." One of these two, *Moore v. Coachman Indus. Inc.*, 129 N.C. App. 389, 401-402 (1998), nowhere extends the economic loss rule to the UDTPA and provides Dell no footing. The other authority, *Coker v. DaimlerChrysler Corp.*, 01-CVS-1264, 2004 WL 32676, at *3, fn. 3 (Rowan County Sup. Ct. Jan. 5, 2004) ("[t]he unfair trade practice claim is based upon the same theories of liability and damages as the common law fraud claim"), *affirmed by Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386 (2005) (affirming result solely on standing grounds and holding that plaintiff did not argue UDTPA case before the trial court), provides, at best, tenuous support for the *Bussian* shot-gun marriage between the UDTPA and the economic loss rule.  In *Coker*, the trial court found that the plaintiffs who in the first place had no injury in fact and who should have exhausted primary jurisdiction before arriving at the courthouse, lacked standing to file an action for breach of warranty or via operation of the economic loss rule, for fraud. The court went on to hold that the plaintiffs had asserted no independent grounds to sustain a UDTPA claim.  See *Coker*, 2004 WL 32676, at *3, fn. 3; *Coker*, 172 N.C. App. at 398 ("[p]laintiff did not argue statutory standing for their claim of unfair and deceptive trade practices either before the Business Court or this court").  The *Coker* trial court opinion never expressly held that the economic loss rule as such cuts off recovery under the UDTPA as matter of legal doctrine. *Bussian* read far too much into that opinion.  To the extent Judge Tennille's opinion lent itself to misinterpretation, it provoked a fire-storm of criticism within the state courts. Dell omits these further developments of state law at its own peril and invites this Court to follow *Bussian*'s clear error.

Judge Hudson's dissent in the appeal court's review of Judge Tennille's *Coker* trial court opinion clearly explained why *Bussian* cannot be correct.  See *Coker*, 172 N.C. App. at 406-407 ("the loss involved in a fraud claim is very often economic" and further that "[t]he legislature could hardly have intended that the [economic loss] rule would bar the very claims the [UDTP] statute created").

13

Demolishing the argument that the UDTPA came under the economic loss rule Judge Hudson commented, as part of a much longer passage, as follows:

> The defendant here concedes that the North Carolina appellate courts have not applied the economic loss rule to claims based on fraud or Chapter 75. I do not believe that we should extend the doctrine, as such a holding is not justified by precedent, nor by logic or sound policy … In fact, the only ruling that we can locate which applies the economic loss doctrine to bar a claim for fraud is the decision of the business court below … the economic loss rule does not bar plaintiffs' claims for fraud. *See Id.* at 403-406 (Hudson dissent).

Notably too, the *Coker* majority which expressly addressed the dissent and which affirmed the trial court on unrelated grounds, voiced no disagreement with respect to Judge Hudson's analysis of the interplay of the economic loss rule and the UDTPA.  *See Id.* at 398 (affirming trial court on the unrelated ground that plaintiffs who suffered no injury in fact lacked standing).

Judge Diaz, following the *Coker* Dissent, has also concluded that the economic loss rule does not cut off claims for fraud, misrepresentation, or UDTPA violations, implicitly rejecting *Bussian*.  *See Club Car Inc. v. Dow Chem. Co.*, 06-CVS-15530, 2007 WL 2570088, at *3-4 (Mecklenberg County Sup. Ct. May 3, 2007) (extensively discussing *Coker*).  Notably, this District has avoided following *Bussian* on at least two occasions when opportunity presented.  *See Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 799, fn. 4 (E.D.N.C. 2009) (discussing economic loss rule but declining extension to UDTPA claims denied for lack of aggravating circumstances surrounding the breach of contract while indicating potential disagreement with *Bussian* through use of "cf." citation signal); *Wilson v. Dryvit Sys., Inc.*, 206 F. Supp. 2d 749 (E.D.N.C. 2002) (declining to apply the doctrine to claims for fraud).

*Coker* and *Bussian* should be harmonized with the traditional propositions that a breach of contract must be aggravated to support a UDTPA claim and that a breach of contract does not also give rise to a claim for negligence.  *See Ada Liss Group (2003) v. Sara Lee Corp.*, No. 1:06CV610, 2009 WL 3241821 (M.D.N.C. Sept. 30, 2009) (contract breach does not ordinarily sound in tort and must be aggravated to support a UDTPA claim); *Indemn. Ins. Co. of N. Amer. v. Amer. Eurocopter LLC*, No. 1:03CV949, 2005 WL 1610653 (M.D.N.C. July 8, 2005) (economic loss rule bars pursuit of negligence claim on same facts

as breach of contract). This Court should reject Dell's effort to perpetuate the *Bussian* error in this District which no state court would endorse. *See Media Networks, Inc. v. Long Haymes Carr, Inc.*, 678 S.E.2d 671, 685 (N.C. App. 2009) (holding that business court properly allowed UDTP and fraud claims in a case arising from breach of contract and rejecting defendant's argument that the breach of contract was insufficiently aggravated to state a UDTPA claim); *Curtis B. Pearson Music Co. v. Everitt*, No. 08-1933, 2010 WL 707700, at *2 (4th Cir. Mar. 2, 2010) (federal courts must follow the lead of North Carolina state courts in construing UDTPA and where law is unclear should anticipate how North Carolina courts would handle the issue).

   (e) *Dell's argument that the Uniform Commercial Code Limits AIT's recovery of consequential*
       *damages for breach of limited warranties pursuant to warranty disclaimers misstates the*
       *applicable law.*

No one questions that limited warranties and consequential damage disclaimers under the Uniform Commercial Code are generally enforceable between sophisticated parties such as Dell and AIT. However, it is equally undisputed that aggravated breach of warranty can defeat warranty limitations and consequential damages disclaimers in exceptional circumstances such as the circumstances here. In *Waters v. Massey-Ferguson, Inc.*, 775 F.2d 587 (4th Cir. 1985), Judge Wilkinson found that a consequential damage exclusion under a "standard' limited warranty would not bar recovery of such damages when the manufacturer sold to a commercial farm a defective tractor that was unusable for much of its expected service life because the manufacturer failed to correctly or timely repair it, causing business to hire additional hands and lose revenues, and upheld the award of such damages. The court, applying a broad UCC analysis held that the consequential damage waiver was not unconscionable because it was predicated on the promise to repair but that the waiver was nonetheless ineffective when the promise to repair was egregiously breached. *See Waters*, 775 F.2d at 590-592 (consequential damages may be recoverable despite waiver when seller fails to carry out promise to repair causing catastrophic losses). The Court held that this is especially true of mass-produced and standardized products. *Id*. at 587, 590-592 ("The subject matter of this transaction … is built from familiar technology, manufactured

to standard specifications, and sold to trusting consumers; most important, sellers routinely restore such tractors to working order. Given these mechanical and marketing characteristics of the tractor, the premise that the warranty foresaw only repair is a commercially reasonable construction. For another product, and particularly for complex, delicate, or jointly designed equipment, the same premise might not be commercially reasonable"); *see also Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp.*, 63 N.C. App. 292 (1983) (dicta implying that consequential damages waiver may be over-ridden for failure to perform promised repairs even if waiver was not unconscionable). Notably the *Waters* court did not rely on consumer protection or fraud theories to arrive at its conclusion.

The *Waters* analysis is even more applicable on the facts here. AIT had no reason to imagine that nearly every one of some two thousand of Dell's OptiPlex computers would be defective out of the box or that Dell was knowingly selling these defective computers or would either refuse to carry out its repair duties or be unable to live up to its warranties for lack of supplies or funding for such ubiquitous products. *See Hahnemann Univ. Hosp. v. Dudnick*, 292 N.J.Super. 11, 16 (App. Div. 1996) ("[n]ow computers are universally accepted, have become part of everyday life and work and are presumed reliable"). Dell knew that its computers, just like farm tractors, would be used in commercial settings and that failure to repair defective products would cause consequential damages. If anything, the instant facts are more egregious than in *Waters* because Dell knew all along that they were selling a defective product to commercial customers who stood to suffer consequential damages from product failure and that Dell lacked provisions to properly perform the promised warranty repairs or refused to do so on one pretext or another.

The Texas courts similarly generally enforce consequential damage waivers between sophisticated parties. *See Wade & Sons, Inc. v. Am. Standard, Inc.*, 127 S.W.3d 814, 822-823 (Tex. App. 2003); *Balderson-Berger Equip. Co. v. Blount*, 653 S.W.2d 902 (Tex. App. 1981). However, under Texas law, warranties are treated as services outside the scope of the UCC. *See PPG Indus., Inc. v. JMB/Houston Centers P'ship Ltd. P'shp*, 146 S.W.3d 79, 96 (Tex. 2004) (warranty repairs are services outside the sale of goods and failure to repair may violate consumer protection statutes). Conceivably, a Texas court may

enforce the consequential damages waiver for the sale of the initially defective goods, but still override the waiver for subsequent failure to repair. Notably, the Fifth Circuit Court of Appeals applying Texas law has awarded the right to elect between consumer protection statutory damages or fraud damages in warranty breach cases among sophisticated parties without discussing consequential damages waiver provisions in a context in which it appears all but certain that the contract would feature such language. *See Great Pines Water Co., Inc. v. Liqui-Box, Inc.*, 203 F.3d 920 (5th Cir. 2000) (remanded to recalculate damages and permit the defendant to elect between consumer protection statute damages and fraud damages).

In *Metro Nat. Corp. v. Dunham-Bush Inc*., 984 F. Supp. 538 (S.D. Tex. 1997) ("[defendant] acted with reckless disregard of the rights end-users), the court discussed the manufacturer's repeated failure to repair a defective product which failed to perform as warranted. The court took adverse notice of the fact that the manufacturer recognized the problem but chose to ignore it and also actively concealed the existence and frequency of problems from customers. *See Id.* at 548, 554-555 ("[defendant] acted with reckless disregard of the rights end-users"). The court awarded fraud damages even though the court did not agree with all aspects of the plaintiff's handling of the dispute, loss mitigation efforts, and damage calculations. *Id.* at 553 (holding economic loss rule does not bar fraud claims in contract breach cases). The court held that warranty disclaimers limiting remedies to repair were ineffective and justified money damages when the defendant persistently failed to make repairs and misrepresented the cause of the failures. *See Id.* at 560 (there was failure of essential purpose when defendant failed to make repairs or kept making ineffective repairs). The court awarded damages in the manner calculated to maximize recovery including attorney fees. *Id.* at 564.

The defendant's conduct in *Metro Nat. Corp.* presents notable parallels to Dell's conduct here in that Dell knowingly sold, and then failed to repair hundreds if not thousands of defective products under warranty, and intentionally misled AIT about the nature or extent of the product defect. Like the plaintiff in *Metro Nat. Corp.*, AIT could therefore recover under a fraud theory or a warranty breach theory under

17

Texas law. Additionally, the reasonable expenses of mitigation would be recoverable. *Id.* at 551-552. The consequential damage waiver is therefore not insurmountable.

Even though AIT is a sophisticated party that understands the legal result of consequential damage waivers, and the interplay of the consequential damage waiver and the failure of essential purpose doctrine under Texas law, even a sophisticated party is not expected to anticipate affirmative misrepresentations by the defendant knowingly selling defective products, misrepresenting the cause of product failures, knowingly using defective replacement parts to perform warranty repairs, and purposefully withholding warranty services for improper reasons such as non-payment to a purported UCC-2A finance lessor that has already "paid Dell." These unfair and deceptive, fraudulent acts render the consequential damage waivers procedurally and substantively unconscionable regardless of the fact that the terms are standard and regardless of the fact that AIT understood what such terms entail in an honest commercial relationship. Therefore Dell is not entitled to the benefit of the consequential damages waiver to protect Dell from its own fraud and misrepresentation. Dell's argument that the consequential damage waiver was no different than that which AIT entered into with AIT's own customers misses the point. AIT, unlike Dell, never contracted to provide goods or services AIT knew it would not or could not provide. Dell, in contrast, knew that the OptiPlexes were defective out of the box and knew that the funds and supplies to make warranty repairs were lacking.

In support of its position on consequential damages, Dell cites *Global Octanes Texas, LP v. BP Exploration & Oil, Inc.*, 154 F.3d 518 (5th Cir. 1998), which enforced contractual damages limitations. This case is not on point because it involved the termination of a petroleum additive purchase contract by the defendant purchaser who cited regulatory changes as a pretext for termination where the real motive for termination was the purely commercial one of exiting a price lock-in amidst falling price levels. *Global Octanes* is distinguishable because it involves the product supplier's action against the customer for "efficient breach" for straightforward commercial reasons and not the customer's action against the product supplier involving defective products, concealment of the defect, and willful refusal to perform warranty obligations. The only damage the *Global Octanes* plaintiff could possibly incur would be the

loss of profit incidental to the breached contract itself which was precisely the loss addressed through liquidated damages. Defective products pose a different set of risks and call for a different analysis.

(f) *Dell is not entitled to partial summary judgment on AIT's UDTPA claims.*

The UDTPA is a creation of statute and not common law. *See Marshall v. Miller*, 302 N.C. 539, 542 (1981) (North Carolina modeled its consumer protection statutes after several federal trade commission statutes including the Sherman Act and Clayton Act but added a private right of action "because common law remedies had proven often ineffective" and required proof of burdensome elements such as scienter or were susceptible to defenses such as puffery). One aspect of the UDTPA is its function as a counter-part of the anti-trust laws in promoting the freedom of commerce. Just as the antitrust laws protect the competitive marketplace and combat monopoly, i.e. relations between sellers as sellers, the UDTPA protects the relationship between sellers and buyers. Just like the anti-trust laws, the UDTPA uses a case-by-case factual analysis to test the "effect" of given conducts on the marketplace and creates a private right of enforcement to supplement public enforcement of its provisions. Additionally, the UDTPA sweeps aside the technical elements of or defenses to common law causes of action such as contract breach or fraud such as good faith and reliance. *See Id.* at 546-547 (explaining that because UDTPA "…is a hybrid statute, providing a remedy for an entirely statutory cause of action, analogies to other rules of common law … should not govern" and rejecting the view that good faith or scienter are relevant to analysis of liability); *Media Networks, Inc.*, 678 S.E.2d at 681-684 (holding that elements required in common law contract or tort claims or common law affirmative defenses are inapplicable to the UDTPA because the sole test of a UDTP claim is "the effects of the defendant's actions upon commerce"). The UDTPA also provides remedies where the common law contract, tort, or warranty theory does not provide an adequate remedy, such as in aggravated breach of contract/warranty not amounting to common law fraud. At the same time, fraudulent acts are *ipso facto* violative of the UDTPA.

Dell's claims of "good faith" or lack of "scienter" are of no avail. Such protestations of innocence are open to challenge on purely factual grounds when there is ample evidence of Dell's bad faith and

unscrupulous dealings with its customers including disseminating disinformation about the capacitor problem and OptiPlex failures and the failure to adequately fund warranty reserves or ensure supplies of replacement components, not to mention the manipulation of warranties with DFS. Regardless of Dell's subjective state of mind if one can speak thus of a corporation, there is no question that Dell's course of conduct effectively deceived AIT and deceived countless other customers. Dell's conduct therefore clearly violated the UDTPA. *See Id.* at 683 ("[a] UDTP claimant need not establish a defendant's bad faith, intent, willfulness, or knowledge").

AIT's sophistication or lack of reliance is not a defense for Dell as such affirmative defenses are not applicable to UDTPA claims. *See Marshall*, 302 N.C. at 544 (bad faith is irrelevant to finding of UDTPA violation); *Media Networks, Inc.*, 678 S.E.2d at 683-684 (holding that, "not only is a defendant's intent irrelevant when evaluating a UDTP claim, the plaintiff's intent and conduct are also irrelevant" and ruling out several common law affirmative defenses when facing UDPT claims). However, AIT did reasonably rely on Dell to provide working computers and to provide warranty services when required. AIT also reasonably relied on Dell to provide a truthful explanation of the causes of OptiPlex failures and failure frequency when Dell expressly undertook to investigate. In so undertaking, Dell had a duty to disclose and to weigh the impact of the capacitor defects on AIT. Dell instead diverted attention as it went through Kenny Joines's sham investigation that omitted the most obvious explanation from consideration even as Kenny Joines blew even the most implausible causes out of proportion if it would pin the blame on AIT. Dell had a pattern and practice of coming up with customer-specific explanations for failure even when they knew very well that defective capacitors were the real culprit--a pattern that persists even today in this litigation. Dell thereby failed to live up to the reasonable expectations of thousands of customers as Dell flooded the market with shoddy goods under short-funded warranties and repaired with shoddy replacement parts then turned around and blamed customer after customer for what Dell knew to be the capacitor defect. Such conduct too clearly violated the UDTPA. Even if AIT site conditions contributed to the OptiPlex failures—an absurd proposition impossible to maintain with a

straight face—that is no defense under the UDTPA. *See Media Networks, Inc.*, 678 S.E.2d at 684 (common law defenses including contributory negligence inapplicable under UDTPA).

Most importantly, the Court could find that Dell violated the UDTPA even if it did not in the traditional sense breach its contract or warranty or commit fraud if its actions were commercially dubious and had the effect of deceiving the marketplace regardless of Dell's intent. *See Id.* at 681, 683 (holding that UDTP claims lie neither wholly in contract nor wholly in tort because "UDTP developed in response to the ineffective common law remedies available to the victims of unfair and deceptive commercial acts" and relieves the plaintiff of meeting burdensome elements of common law claims). Therefore, AIT is entitled to trial as to all genuine issues of material fact in relation to its claims under the UDTPA regardless of Dell's purported warranty or fraud defenses. The Court should accordingly deny Dell's motion for partial summary judgment as to AIT's UDTPA claims and instead find that AIT was a victim of Dell's UDTPA violations. *See Marshall*, 302 N.C. at 544, 548 (holding that UDTPA cause of action may exist regardless of warranty cause of action or warranty defenses) ("whether a trade practice is unfair or deceptive depends on the facts of each case and the impact the practice has in the marketplace"). There is no question that Dell's defective OptiPlexes wreaked havoc on the marketplace.

## IV.    DELL IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES

*(a) Plaintiff Has Sufficient Evidence To Support Its Claim for Damages for Breach of Contract Under Texas Law*

Generally, the measure of damages for breach of a contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App. 2007) (*pet. denied*). This measure may include reasonably certain lost profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Lost profits may be in the form of direct damages-that is, profits lost on the contract itself-or in the form of consequential damages-such as profits lost on other contracts resulting from the breach. *Mood*, 245 S.W.3d at 12.

In order to recover consequential damages, a plaintiff must produce some evidence from which the fact finder could reasonably infer that the damage sued for has resulted from the conduct of the defendant.

21

*McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex.1985). "Uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." *Id.* at 207. To prove damages, the plaintiff must produce evidence that the defendant's conduct "caused an event and that event caused the plaintiff to suffer compensable damages." *See Keo v. Vu*, 76 S.W.3d 725, 731 (Tex.App. 2002) (pet. denied).

A directed verdict, however, is improper if the plaintiff produces some evidence of a reasonable basis for determining his loss, even if the exact amount is not ascertainable or is contradicted by other evidence. *See Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 483-84 (Tex. 1984); *Field v. AIM Mgmt. Group, Inc.*, 845 S.W.2d 469, 472 (Tex.App. 1993) (no writ). "Recovery for lost profits does not require that the loss be susceptible to exact calculation"; however "[a]t a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex.2001). Nor is the injured party required to produce in court the documents supporting the lost-profits opinions or estimates. *Holt Atherton Indus.*, 835 S.W.2d at 84. The *Helena Chemical* court further noted that:

> [o]ur focus is on whether damages can be shown with reasonable certainty. This can be accomplished with a profit history or some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty.

*Helena Chemical*, *supra*, 47 S.W.3d at 505. "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus.*, 835 S.W.2d at 84.

In the recent case of *SJW Prop. Commerce, Inc. v. Sw. Pinnacle Props., Inc.*, No. 13-08-00268, 2010 WL 1729858, at *20 (Tex. App. April 28, 2010), the court considered a claim for lost profits arising from a breach of contract wherein the evidence consisted of:

> . . . a spreadsheet documenting actual rental payments made by businesses that were situated on the Kayser tract near the time of trial and determined that the assumed twelve-month delay due to SJW's wrongful actions, caused Palmer to lose $3,326,823 in rental income. Abington then used a conservative estimate of 6.25% for cost of capital and ultimately concluded that the Palmer companies sustained $207,926 in losses of rental income associated with the Kayser tract, after

subtracting "[a]ny expenses associated with really running the property." emphasis in original).

The *SWJ Property Commerce* court held:

> Furthermore, based on the foregoing, we conclude that the Palmer companies' damages evidence described, with reasonable certainty, the profits they lost; therefore, we cannot say that the jury was unreasonable in adopting Abington's damages calculations. Abington provided the jury with ample documentary and testimonial evidence that was objective in nature and allowed the jury to determine the proper amount of actual damages to award.

*Id.* at *21 (citations omitted).

Moreover, while the *SWJ Property Commerce* court considered expert testimony that was used to explain the spreadsheets evidencing lost profits, there is no requirement under Texas law that expert opinion evidence be offered in support of a claim for lost profits and a layperson who routinely maintains the business records of a litigant is sufficiently qualified to perform the, "fairly simple task to calculate with reasonable certainty his lost revenue." *Sw. Bell Media, Inc. v Lyles*, 825 S.W.2d 488, 498-99 (Tex. App. 1992). In the absence of highly technical issues, Texas cases do not require an expert's opinion to support an award of lost profits. *Id. (*citing *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 348 (1955)).

In addition, Texas courts have found that the use of spreadsheets may constitute sufficient evidence to support an award of lost profits where the numbers contained in the spreadsheets are supportable. *See, SWJ Property Commerce*, 2010 WL 1729858, at *20; *Brecheisen v. James*, No. 07-01-0236, 2002 WL 31778667, at *5 (Tex. App. Dec 12, 2002) (*rehearing overruled* (Feb. 20, 2003)). Likewise, printouts of computer screens showing business records are acceptable evidence of damages when properly authenticated. *See, Bower v. Metro. Transit Auth. of Harris County*, No. 01-06-00553, 2007 WL 1299803, at *1 (Tex. App. May 3, 2007). *See, also, C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981) ("Computer printouts showing the outboard motor sales to every Mercury dealer in Georgia from 1970 through 1978 were thereafter admitted and could have been used to draw a more accurate picture of the other dealers' profitability.").

23

*(b) Plaintiff Has Sufficient Evidence To Support Its Claim for Damages for Fraud and Unfair Trade Practices Under North Carolina Law*

With regard to AIT's claims for fraud and violations of the UDTPA, AIT's damages are adjudicated under North Carolina law. It is well settled that the sale of a product that is not as represented will give rise to claims for both fraud in the inducement and unfair and deceptive trade practices as well as breach of contract under North Carolina law. *See, e.g., Lapierre v. Samco Dev. Corp.*, 103 N.C. App. 551, 406 S.E.2d 646 (N.C. App. 1991) (judgment for plaintiff on claim of unfair and deceptive trade practices affirmed where builder built deck for plaintiff that was smaller than promised at time of sale); *Bernard v. Cent. Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 314 S.E.2d 582 (N.C. App. 1984) (judgment for plaintiff on claims for fraudulent representations and unfair and deceptive trade practices affirmed where defendant sold plaintiff tractor with different engine than represented at time of sale) As held by the North Carolina courts:

> It is elementary that a plaintiff in a fraud suit has a right to recover an amount in damages which will put him in the same position as if the fraud had not been practiced on him . . . It is the jury's responsibility to determine the exact amount of damages from the evidence presented at trial.
> *Goodfrey v. Res-Care, Inc.*, 165 N.C.App. 68, 79, 598 S.E.2d 396, 404 (N.C. App. 2004) (internal citations and quotations omitted) (*disc. rev. denied*, 359 N.C. 67, 604 S.E.2d 310 (2004)).

According to the North Carolina Supreme Court, "[t]he measure of damages for fraud in the inducement of a contract is the difference between the value of what was received and the value of what was promised, and is potentially trebled by N.C.G.S. § 75-16." *River Burch Assocs. v. City of Raleigh*, 326 N.C. 100, 130, 388 S.E.2d 538, 556 (1990) (internal citation omitted). Further, in *Media Networks,* 678 S.E.2d 671 (affirming Judge Diaz's Order in the case below), the court observed that "[i]n a UDTP case, it is proper to use lost profits that were proximately caused by the [violator] as the measure of damages."

On the other hand, damages for UDTPA violation are not so circumscribed in recognition of the statute's broad remedial purpose. "Unfair and deceptive trade practices claims . . . are neither wholly tortious nor wholly contractual in nature and the measure of damages is broader than common law

24

actions." *Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 40, 392 S.E.2d 663, 669 (N.C. App. 1990), *review denied*, 328 N.C. 93, 402 S.E.2d 418 (1991). The measure of damages used should further the purpose of awarding damages, which is "to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money." *Phillips v. Chesson*, 231 N.C. 566, 571, 58 S.E.2d 343, 347 (1950); *see also Bowen v. Bank*, 209 N.C. 140, 144, 183 S.E. 266, 268 (1936).

Although evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion, "absolute certainty is not required." *Perfecting Serv. Co. v. Prod. Dev. & Sales Co*., 259 N.C. 400, 417, 131 S.E.2d 9, 22 (1963); *see also Keith v. Day*, 81 N.C. App. 185, 196 343 S.E.2d 562, 569 (1986) ("the indefiniteness consequent upon this difficulty does not, however, by itself preclude relief.... What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages"). There is no bright-line rule in determining what amount of evidence is sufficient to establish lost profits. Rather, courts "have chosen to evaluate the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with 'reasonable certainty." *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847-48, 431 S.E.2d 767, 770 (1993).

Under North Carolina law, business records showing credits to customers made in the ordinary course of business resulting from a detective product are admissible as evidence of damages. *See, Steelcase, Inc. v. Lilly Co., Inc.*, 93 N.C.App. 697, 379 S.E.2d 40 (N.C. App. 1989). As in Texas, North Carolina also does not require expert testimony to support a claim for damages based on lost profits. *See*, *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 378 542 S.E.2d 689, 694 (N.C. App. 2001) (expert witness not required when president of company based his testimony on recollection of revenues realized by plaintiff on contracts and his knowledge, based on experience, of plaintiff's percentage of profit).

*(c) The Briggs, Macomber,and Roberts Affidavits Set Forth Sufficient Evidence For A Jury To Return A Verdict of Damages to AIT*

Rule 56(e) requires that "affidavits submitted by the party defending against a summary judgment motion contain specific facts, admissible in evidence, from an affiant competent to testify, 'showing that there is a genuine issue for trial.' " 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*: Civil 3d § 2740, at 399 (1998). The Briggs, Macomber and Roberts Affidavits contain specific facts, admissible in evidence, from affiants competent to testify showing that the amount of AIT's damages are a genuine issue for trial.

The affidavits also present evidentiary support for the testimony provided therein from the books and records of AIT as kept in the regular course of business. Affidavits from the employees and officers of the litigants are the traditional and accepted manner of showing damages on summary judgment. The Briggs and Macomber affidavits show damages based upon AIT's General Ledger. With regard to damages, affidavits based on a company's General Ledger are appropriate for summary judgment. *See*, *e.g.*, *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 419 (4th Cir. 1999) (affirming summary judgment where director of financial planning provided affidavit detailing calculation of damages based on plaintiff's General Ledger). The Roberts affidavit is based upon his review of several AIT databases. Affidavits based on computerized databases can properly support a motion for summary judgment. *See*, *e.g.*, *Ferst v. Gaul*, No. 05-CV-0682, 2006 WL 1167886 (E.D.Pa. Apr. 28, 2006). Where appropriate, the Roberts Affidavit includes printouts of relevant entries from AIT's databases. A true copy of information contained within a database which was compiled in the normal course of business and is properly certified fits within the business record exception and are admissible under Fed.R.Evid. 803. *U.S. v. Huete-Sandoval*, 681 F. Supp. 2d 136, 140 (D. Puerto Rico 2010).

## V.      CONCLUSION

Dell is not entitled to summary judgment because Dell has not demonstrated the absence of genuine issues of material fact. AIT has drawn extensively on Dell's documents and the testimony of Dell witnesses in this litigation which, along with additional material, are attached as exhibits hereto, demonstrating that the existence of genuine issues of material fact rule out summary judgment for Dell.

Dell is no more entitled to summary judgment on legal grounds than on factual grounds. Dell grossly mischaracterizes the relationship between Unfair and Deceptive Trade Practices Act and common law causes of action in North Carolina, and misunderstands the limits of consequential damage waivers when the facts show fraudulent, unfair and deceptive sale of defective products, and just as fraudulent, unfair, and deceptive conduct in providing the promised warranty services for these defective products. Moreover, even an otherwise seemingly enforceable contractual waiver of consequential damages under contract/warranty law is of no avail against a valid claim for fraud or unfair and deceptive trade practices. The Court should accordingly deny Dell's summary judgment motion.

Respectfully submitted on the 28th day of May 2010.

s/ Darren T. Kaplan
Darren T. Kaplan (Admitted *Pro Hac Vice*)
Attorney for Plaintiff
Chitwood Harley Harnes LLP
11 Grace Avenue Suite 306
Great Neck, NY 11021
Tel. (516) 773-6090
Fax (516) 706-0497
GA State Bar No. 172670

s/ A. Bikash Roy
A. Bikash Roy, # 28382
Attorney for Plaintiff
c/o Advanced Internet Technologies, Inc.
421 Maiden Lane
Fayetteville, NC 28301
Tel. (910) 321-1365
NC State Bar No. 28382
Local Civil Rule 83.1 Counsel

27

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed or caused to be filed **Plaintiff's Opposition to Dell's Motion for Partial Summary Judgment** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the parties of record.

This is the 28th day of May, 2010.

s/ Darren T. Kaplan
Darren T. Kaplan (Admitted *Pro Hac Vice*)
Attorney for Plaintiff
Chitwood Harley Harnes LLP
11 Grace Avenue Suite 306
Great Neck, NY 11021
Tel. (516) 773-6090
Fax (516) 706-0497
GA State Bar No. 172670

s/ A. Bikash Roy
A. Bikash Roy, # 28382
Attorney for Plaintiff
c/o Advanced Internet Technologies, Inc.
421 Maiden Lane
Fayetteville, NC 28301
Tel. (910) 321-1365
NC State Bar No. 28382
Local Civil Rule 83.1 Counsel

**Attorneys for Plaintiff Advanced Internet Technologies, Inc.**