
--- S.W.3d ----, 2010 WL 1729858 (Tex.App.-Corpus Christi)
**(Cite as: 2010 WL 1729858 (Tex.App.-Corpus Christi))**

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RE-
LEASED FOR PUBLICATION IN THE PER-
MANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAW-
AL.

Court of Appeals of Texas,
Corpus Christi-Edinburg.
SJW PROPERTY COMMERCE, INC. n/k/a Leas-
ing Holding, Inc., and Property Commerce Devel-
opment Company n/k/a Development Holding, Inc
., Appellants,
v.
SOUTHWEST PINNACLE PROPERTIES, INC.,
Jackson I Corp., Palmer Enterprises, Inc., and G.J.
Palmer, Jr., Individually, Appellees.
**No. 13-08-00268-CV.**

April 28, 2010.

**Background:** Broker and plaintiff development
company brought action against defendant develop-
ment companies and owner of defendant companies
for breach of contract and fraud. Defendant com-
panies and their owner filed counterclaims against
broker and plaintiff company alleging breach of fi-
duciary duty, tortious interference with contracts,
and fraud. Following grant of directed verdict as to
common-law fraud claim of broker and plaintiff
company, the County Court at Law, Hidalgo
County, entered judgment for broker and plaintiff
company on their contract claim, and for defendant
companies on their fiduciary duty and fraud claims.
Broker and plaintiff and defendant development
companies appealed.

**Holdings:** The Court of Appeals, Valdez, C.J., held
that:
(1) first defendant company had standing to bring
counterclaims;
(2) defendant companies' counterclaims for breach

of fiduciary duty and fraud were tolled by relation-
back doctrine;
(3) claims against plaintiff company were not tolled
by relation-back doctrine;
(4) affirmation of judgment for defendant compan-
ies on their claims was required;
(5) award of actual damages to defendant compan-
ies was reasonable;
(6) award of exemplary damages to defendant com-
panies was supported by clear and convincing evid-
ence; and
(7) determination that defendant companies were
responsible for paying commissions to broker was
supported by sufficient evidence.

Affirmed in part; reversed and rendered in part.

West Headnotes

**[1] Action 13 🔑13**

13 Action
  13I Grounds and Conditions Precedent
    13k13 k. Persons Entitled to Sue. Most Cited
Cases

**Parties 287 🔑1**

287 Parties
  287I Plaintiffs
    287I(A) Persons Who May or Must Sue
      287k1 k. Capacity and Interest in General.
Most Cited Cases
A plaintiff must have both standing and capacity to
bring a lawsuit.

**[2] Action 13 🔑13**

13 Action
  13I Grounds and Conditions Precedent
    13k13 k. Persons Entitled to Sue. Most Cited
Cases
A plaintiff has "standing" to participate in an action
when he is personally aggrieved, regardless of
whether he is acting with legal authority.

--- S.W.3d ----, 2010 WL 1729858 (Tex.App.-Corpus Christi)
**(Cite as: 2010 WL 1729858 (Tex.App.-Corpus Christi))**

**[3] Parties 287** 🔑**1**

287 Parties
   287I Plaintiffs
      287I(A) Persons Who May or Must Sue
         287k1 k. Capacity and Interest in General.
Most Cited Cases
A party has "capacity" to participate in an action
when it has legal authority to act, regardless of
whether it has a justiciable interest in the contro-
versy.

**[4] Action 13** 🔑**13**

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons Entitled to Sue. Most Cited
Cases
For standing to sue, a plaintiff's complained-of in-
jury must be concrete and particularized, actual or
imminent, not hypothetical.

**[5] Action 13** 🔑**13**

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons Entitled to Sue. Most Cited
Cases
Standing to sue is implicit in the concept of subject-
matter jurisdiction and cannot be waived.

**[6] Brokers 65** 🔑**38(1)**

65 Brokers
   65IV Duties and Liability to Principal
      65k38 Actions for Negligence or Wrongful
Acts of Broker
         65k38(1) k. Right of Action and Defenses.
Most Cited Cases

**Fraud 184** 🔑**29**

184 Fraud
   184I Deception Constituting Fraud, and Liabil-
ity Therefor
      184k29 k. Persons Entitled to Sue. Most
Cited Cases

Defendant development company had justiciable
interest in development of first property, and there-
fore had standing to file counterclaims for breach of
fiduciary duty and fraud against broker and plaintiff
development company regarding first property, in
action by broker and plaintiff company against de-
fendant company and other entities that shared
common owner with defendant company, arising
out of development of first and second properties,
even though defendant company was not involved
with negotiations with broker regarding first prop-
erty, as claims in case were logically related and
therefore inextricably intertwined so as to constitute
same transaction, in that alleged brokerage relation-
ship between defendants and broker arose as result
of dealings at second property, in which defendant
company was signatory to listing agreement, broker
acted in its capacity as broker for projects at both
properties, and broker and plaintiff company con-
sidered projects as inextricably intertwined.

**[7] Action 13** 🔑**13**

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons Entitled to Sue. Most Cited
Cases
To determine whether a set of facts constitutes a
"transaction," for purposes of determining whether
a party has standing to allege a separate claim in an
action based on such facts, the Court of Appeals
employs the "logical relationship test," which ex-
amines whether the essential facts on which the
claims are based are significantly and logically rel-
evant to both claims.

**[8] Action 13** 🔑**13**

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons Entitled to Sue. Most Cited
Cases
Under the "logical relationship test," used to de-
termine whether facts on which several claims are
based are logically relevant to both claims, such
that facts constitute single transaction for purposes

of standing, a transaction is flexible, comprehending a series of many occurrences logically related to one another.

**[9] Action 13 🗝13**

13 Action
    13I Grounds and Conditions Precedent
        13k13 k. Persons Entitled to Sue. Most Cited Cases

The "logical relationship test," used to determine whether facts on which several claims are based are logically relevant to both claims, such that facts constitute single transaction for purposes of standing, is satisfied whenever the same facts, which may or may not be disputed, are significant and logically relevant to both claims; however, there is no logical relationship when none of the same facts are relevant to both claims.

**[10] Limitation of Actions 241 🗝129**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k129 k. Set-Offs, Counterclaims, and Cross-Actions. Most Cited Cases

Amended answer and counterclaims of defendant development companies, in which one defendant company was replaced as "counter-plaintiff" by individual who owned same defendant company and other defendant companies, in suit by broker and plaintiff development company against defendant companies and owner of defendant companies arising out of development projects, did not amount to new suit, and thus amended counterclaims for fraud and breach of fiduciary duty related back to original, timely-filed counterclaims, for purposes of tolling four-year limitations period applicable to breach of fiduciary duty and fraud claims, as same causes of action were advanced in both counterclaims, neither broker nor plaintiff company objected to substitution or demonstrated that they were prejudiced by it, and owner of defendant companies was substituted because first defendant company

lacked capacity to sue for damages pertaining to one of two development projects. V.T.C.A., Civil Practice & Remedies Code § 16.068.

**[11] Limitation of Actions 241 🗝121(2)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k121 Defects as to Parties
                241k121(2) k. Amendment of Defects. Most Cited Cases

Misnomer cases, in which a party is misnamed and the petition must be amended to correctly name the party, are analyzed, for limitations purposes, by considering the following: (1) whether a judgment under the original pleading bars recovery under the amended pleading; (2) whether the same evidence support both of the pleadings; (3) whether the measure of damages is the same in both pleadings; and (4) whether the allegations of each pleading are subject to the same defenses.

**[12] Limitation of Actions 241 🗝121(2)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k121 Defects as to Parties
                241k121(2) k. Amendment of Defects. Most Cited Cases

When a party is misnamed, but no one has been misled or disadvantaged by the error in pleading, the relation-back doctrine operates to preserve the claim against a bar of limitations.

**[13] Limitation of Actions 241 🗝125**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k125 k. Substitution of Parties. Most Cited Cases

If the nature of the suit against the defendants remains unchanged, the substitution of parties-plaintiff does not constitute a new suit for limitations purposes.

**[14] Limitation of Actions 241 ☞127(2.1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k127 Amendment of Pleadings
                241k127(2) Amendment Restating Original Cause of Action
                    241k127(2.1) k. In General. Most Cited Cases

The relation-back doctrine, which allows an amendment or supplement to pleadings without being subject to a plea of limitation as long as the amendments are not based on new, distinct, or different transactions, cannot retroactively create personal jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 16.068.

**[15] Limitation of Actions 241 ☞129**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k129 k. Set-Offs, Counterclaims, and Cross-Actions. Most Cited Cases

Claims of defendant development companies and their owner for fraud and breach of fiduciary duty, which were alleged against plaintiff development company in amended answer in action by broker and plaintiff company against defendant companies and their owner arising out of development projects, constituted third-party actions rather than counterclaims or cross-claims, and thus four-year limitations period applicable to breach of fiduciary duty and fraud claims was not tolled by relation-back doctrine; plaintiff company was not added to lawsuit as plaintiff through broker's amended answer until after limitations period had expired for causes of action alleged by defendant companies in

their counterclaims against broker. Vernon's Ann.Texas Rules Civ.Proc., Rule 38; V.T.C.A., Civil Practice & Remedies Code §§ 16.068, 16.004 (a)(4)-(5).

**[16] Appeal and Error 30 ☞1136**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(B) Affirmance
            30k1134 Error Not Shown
                30k1136 k. As to Part of Grounds of Decision. Most Cited Cases

Affirmation of trial court's judgment in favor of defendant development companies and their owner, regarding their counterclaims against broker for breach of fiduciary duty, fraud, and tortious interference with contracts, was required, as broker failed to attack all independent grounds supporting judgment, in that broker only argued that evidence was insufficient to support jury's finding on issue of tortious contract interference, and did not attack judgment as it pertained to fiduciary duty and fraud claims.

**[17] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1001 Sufficiency of Evidence in Support
                    30k1001(1) k. In General. Most Cited Cases

**Appeal and Error 30 ☞1001(3)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1001 Sufficiency of Evidence in Support

30k1001(3) k. Total Failure of Proof. Most Cited Cases

The Court of Appeals must sustain a challenge to a jury finding based on legal sufficiency only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the Court is barred by rule of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.

**[18] Appeal and Error 30 ⬅➡1001(3)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1001 Sufficiency of Evidence in Support
          30k1001(3) k. Total Failure of Proof. Most Cited Cases

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence, and thus is sufficient to sustain a challenge to a jury finding based on legal sufficiency.

**[19] Appeal and Error 30 ⬅➡1001(1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1001 Sufficiency of Evidence in Support
          30k1001(1) k. In General. Most Cited Cases

More than a scintilla of evidence exists, so as to warrant the denial of a challenge to a jury finding based on legal sufficiency, if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.

**[20] Appeal and Error 30 ⬅➡930(1)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k930 Verdict
        30k930(1) k. In General. Most Cited Cases

In the Court of Appeals' legal sufficiency review, the Court reviews the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not.

**[21] Appeal and Error 30 ⬅➡1001(1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1001 Sufficiency of Evidence in Support
          30k1001(1) k. In General. Most Cited Cases

The final test for legal sufficiency is whether the evidence presented at trial would enable reasonable and fair-minded people to make the finding under review.

**[22] Appeal and Error 30 ⬅➡994(2)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General
        30k994 Credibility of Witnesses
          30k994(2) k. Province of Jury. Most Cited Cases

**Evidence 157 ⬅➡588**

157 Evidence
  157XIV Weight and Sufficiency
    157k588 k. Credibility of Witnesses in Gen-

eral. Most Cited Cases

The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.

**[23] Appeal and Error 30 ⟺1002**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1002 k. On Conflicting Evidence. Most Cited Cases

Because it is the jury's province to resolve conflicting evidence, the Court of Appeals must assume, in a review of a jury's finding for legal sufficiency, that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so.

**[24] Appeal and Error 30 ⟺1003(5)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1003 Against Weight of Evidence
        30k1003(5) k. Great or Overwhelming Weight or Preponderance. Most Cited Cases

When reviewing a jury's finding for factual sufficiency, the Court of Appeals considers and weighs all of the evidence in a neutral light and concludes that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

**[25] Appeal and Error 30 ⟺1182**

30 Appeal and Error
  30XVII Determination and Disposition of Cause
    30XVII(E) Rendition, Form, and Entry of Judgment

30k1182 k. Form and Requisites. Most Cited Cases

If the Court of Appeals determines, on a factual sufficiency review of a jury finding, that the evidence supporting the jury's verdict is not supported by factually sufficient evidence, the Court must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.

**[26] Appeal and Error 30 ⟺1001(1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1001 Sufficiency of Evidence in Support
        30k1001(1) k. In General. Most Cited Cases

When a party properly objects to a jury question, the Court of Appeals reviews the sufficiency of the evidence in the light of the instruction that the trial court should have submitted.

**[27] Appeal and Error 30 ⟺215(1)**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k214 Instructions
      30k215 Objections in General
        30k215(1) k. Necessity of Objection in General. Most Cited Cases

Absent an objection to the jury instruction, the sufficiency of the evidence is reviewed in light of the instruction submitted.

**[28] Brokers 65 ⟺38(7)**

65 Brokers
  65IV Duties and Liability to Principal
    65k38 Actions for Negligence or Wrongful

Acts of Broker
    65k38(7) k. Damages. Most Cited Cases

**Evidence 157 ☞571(10)**

157 Evidence
    157XII Opinion Evidence
        157XII(F) Effect of Opinion Evidence
            157k569 Testimony of Experts
                157k571 Nature of Subject
                    157k571(10) k. Damages. Most Cited Cases

Jury's award of $709,587 in actual damages to defendant development companies, consisting of $376,397 in lost profits on tract delay, $207,926 in lost profits on delayed rental revenue, and $125,264 in lost profits on delayed sale of properties, that was not specifically attributed to any of defendant companies' counterclaims against broker for fraud, breach of fiduciary duty, and tortious interference, was reasonable; calculation of damages by defendant companies' expert described lost profits with reasonable certainty, in that expert provided jury with ample documentary and testimonial evidence that was objective in nature, broker did not offer any evidence contradicting such calculations, and damages could have applied to any of defendant companies' claims.

**[29] Damages 115 ☞40(1)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k35 Pecuniary Losses
                    115k40 Loss of Profits
                        115k40(1) k. In General. Most Cited Cases

"Lost profits" are damages for the loss of net income to a business, measured by reasonable certainty.

**[30] Damages 115 ☞190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of Profits. Most Cited Cases

In order to recover damages for lost profits, damages for loss of net income must be shown with reasonable certainty; "net profits," which are what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business, must be shown by objective, rather than subjective, facts, figures, and data.

**[31] Damages 115 ☞190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of Profits. Most Cited Cases

Recovery for lost profits damages does not require that the loss be susceptible to exact calculation; however, at a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained.

**[32] Evidence 157 ☞596(1)**

157 Evidence
    157XIV Weight and Sufficiency
        157k596 Degree of Proof in General
            157k596(1) k. In General. Most Cited Cases

The clear and convincing standard of proof falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings; while the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.

**[33] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
    30XVI Review

30XVI(G) Presumptions
   30k930 Verdict
      30k930(1) k. In General. Most Cited Cases

Under the legal sufficiency review, when a jury makes an affirmative finding of malice, so as to support an award of exemplary damages, the Court of Appeals reviews all of the evidence in the light most favorable to the jury's finding, taking into account contrary disputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice.

**[34] Appeal and Error 30 ⟜1004(11)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1004 Amount of Recovery
          30k1004(6) Particular Cases and Items
          30k1004(11) k. Exemplary or Punitive Damages. Most Cited Cases

When reviewing an award of exemplary damages for factual sufficiency, the Court of Appeals gives due consideration to any evidence the fact finder could reasonably have found to be clear and convincing.

**[35] Appeal and Error 30 ⟜1001(1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k1001 Sufficiency of Evidence in Support
          30k1001(1) k. In General. Most Cited Cases

The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of its finding is so significant that a fact finder

could not have reasonably formed a firm conviction or belief.

**[36] Brokers 65 ⟜38(7)**

65 Brokers
  65IV Duties and Liability to Principal
    65k38 Actions for Negligence or Wrongful Acts of Broker
      65k38(7) k. Damages. Most Cited Cases

Jury's award of $2 million in exemplary damages to defendant development companies, for harm caused to companies by broker's malicious conduct in brokerage relationship arising out of development projects, regarding defendant companies' counterclaims against broker for fraud and breach of fiduciary duty, was supported by clear and convincing evidence, including evidence that broker attempted to tie up development projects until companies' earnest money contracts expired so that broker could develop properties itself, that earnest money contractor holders were induced to terminate contracts with companies and sign new contracts with broker, and that broker did not inform companies that it was acting as their competitor in projects.

**[37] Brokers 65 ⟜38(3)**

65 Brokers
  65IV Duties and Liability to Principal
    65k38 Actions for Negligence or Wrongful Acts of Broker
      65k38(3) k. Pleading. Most Cited Cases

Broker's filing of notice indicating its intent to invoke statutory exemplary damages cap six days prior to trial, in broker's contract and fraud action against defendant development companies, did not provide defendant companies with fair notice of new defense, and thus constituted surprise to defendant companies, such that issue of damages cap was not properly before trial court, as record did not reflect that trial court had granted broker's request for leave to file pleading to invoke cap at any point prior to trial. V.T.C.A., Civil Practice & Remedies Code § 41.008; Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

**[38] Appeal and Error 30 ☞984(5)**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k984 Costs and Allowances
                30k984(5) k. Attorney Fees. Most Cited Cases

An award of attorney fees is reviewed under an abuse of discretion standard.

**[39] Appeal and Error 30 ☞946**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k944 Power to Review
                30k946 k. Abuse of Discretion. Most Cited Cases

The test for abuse of discretion is to determine whether the trial court acted without reference to any guiding rules or principles, or whether, under the circumstances of the case, the trial court's actions were arbitrary or unreasonable.

**[40] Costs 102 ☞194.16**

102 Costs
    102VIII Attorney Fees
        102k194.16 k. American Rule; Necessity of Contractual or Statutory Authorization or Grounds in Equity. Most Cited Cases

Under the "American Rule," litigants' attorney fees are recoverable only if authorized by statute or by a contract between the parties.

**[41] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim Inconsistent with Previous Claim or Position in General. Most Cited Cases

Broker was judicially estopped from complaining about trial court's award of attorney fees to defendant development companies, in broker's action against defendant companies arising out of provision of brokerage services in real estate development projects, even though listing agreement only contemplated attorney fees for disputes regarding one of two projects, where broker and defendant companies submitted attorney fees calculations and requests to trial court by separate agreement, and defendant companies prevailed on, and were awarded damages for, their breach of fiduciary duty and fraud counterclaims that were also based on broker's rendering of brokerage services. V.T.C.A., Civil Practice & Remedies Code § 38.001.

**[42] Brokers 65 ☞38(4)**

65 Brokers
    65IV Duties and Liability to Principal
        65k38 Actions for Negligence or Wrongful Acts of Broker
            65k38(4) k. Evidence. Most Cited Cases

Jury's determination that defendant development companies were responsible for paying commissions to broker, in broker's contract action against defendant companies, was supported by sufficient evidence, including evidence that listing agreement that created brokerage relationship required defendant companies to pay commissions to broker if broker found tenants for development properties, and broker did locate several retail tenants who signed leases for properties. V.T.C.A., Occupations Code § 1101.806(c).

On appeal from the County Court at Law No. 2 of Hidalgo County, Texas.David W. Green, Kathryn F. Green, for SJW Property Commerce, Inc. n/k/a Leasing Holding, Inc., and Property Commerce Development Company n/k/a Development Holding, Inc.

John R. Griffith, Sarah Pierce Cowen, for Southwest Pinnacle Properties, Inc., Jackson I Corp., Palmer Enterprises, Inc., and G.J. Palmer, Jr., Individually.

Before Chief Justice VALDEZ and Justices BENAVIDES and VELA.

**OPINION**

Opinion by Chief Justice VALDEZ.

**\*1** This case pertains to agreements between several parties for the development of property at Jackson Palmer Crossing located near the intersection of Business Highway 83 and Jackson Road in McAllen, Texas, and at the northeast corner of 10th Street and Trenton Road, also in McAllen. Appellants, SJW Property Commerce, Inc. ("SJW") and Property Commerce Development Company ("PCDC"), and appellees, Southwest Pinnacle Properties, Inc. ("SPP"), Jackson I Corp ("Jackson"), Palmer Enterprises ("PE"), and G.J. Palmer Jr., individually, complain about a jury verdict in which: (1) SJW was awarded $126,903.73 against SPP and PE and $38,400 against SPP and Jackson for damages associated with appellees' alleged failure to pay commissions owed for bringing tenants to the Jackson Palmer Crossing shopping center; (2) Palmer, individually, was awarded $709,587 in actual damages against SJW and PCDC, $376,397 and $2,000,000 in punitive damages against PCDC and SJW, respectively, associated with Palmer's breach of fiduciary duty and fraud claims; (3) SJW was awarded $55,767.91 in attorney's fees; and (4) appellees were awarded $390,152.23 in attorney's fees for work done at the trial court level, $30,000 for an appeal to this Court, $30,000 for an appeal to the Texas Supreme Court, and $100,570.23 in expenses.

By four issues, SJW and PCDC argue that: (1) SPP had no standing to bring suit and, therefore, its inclusion in the suit did not toll the applicable limitations period; (2) the evidence supporting the jury's finding that SJW and PCDC intentionally interfered with Palmer's alleged contracts is legally and factually insufficient; (3) the trial court erred in assessing exemplary damages against SJW and PCDC;

and (4) the trial court erred in awarding Palmer his attorney's fees. By one cross-issue, appellees assert that the evidence supporting the jury's award for damages associated with the commissions is legally and factually insufficient. We affirm, in part, and we reverse and render, in part.

**I. FACTUAL BACKGROUND**

**A. The Jackson Palmer Crossing Location**

In the early 1990's, Palmer first met Stanley J. Williams and Stanley Jay Williams Jr. ("Jay Williams"), both of SJW.[FN1] Over the course of a couple of years, Palmer and SJW discussed the development of land that Palmer had acquired from his family near the intersection of Jackson Road and Business Highway 83 in McAllen. Palmer and his companies are involved in the development of various properties in the Rio Grande Valley, while SJW facilitates the development of properties nationwide by acting as a broker and liaison with "big box" retailers, such as Target, Best Buy, and Home Depot, which often serve as anchor tenants for shopping centers.[FN2] Palmer contracted with SJW to develop the property near the intersection of Jackson Road and Business Highway 83, later named Jackson Palmer Crossing, whereby SJW served as Palmer's broker "in connection with the leasing and sale of the Property." The parties signed an "Exclusive Leasing and Sales Listing Agreement" (the "Listing Agreement") to memorialize the relationship. The Listing Agreement provided that: (1) the commencement of the agreement was June 30, 1999; (2) the agreement expired on June 30, 2000; and (3) Palmer was to pay SJW a 6% sales commission, a 4% commission for "total lease rental for the primary term (years 1-10)" and a 2% commission "of the total rental for the primary term (years 11-20) of each lease if Broker is the sole source of tenant."

**\*2** During the original term of the Listing Agreement, SJW allegedly secured Fashion Bug and

Staples as tenants in the shopping center at Jackson Palmer Crossing.[FN3] The record reflects that, on July 3, 2000, a couple days after the Listing Agreement supposedly expired, SJW secured Factory 2-U as a tenant in the Jackson Palmer Crossing shopping center. The record also includes a letter sent by Palmer to SJW on July 6, 2000, requesting that the term of the Listing Agreement be extended an additional thirty days from the June 30, 2000 expiration date. In response to Palmer's July 6, 2000 request, SJW sent another Listing Agreement to Palmer extending the term from June 30, 2000 to June 30, 2001. However, this agreement was signed by Jay Williams, as president of SJW, but it was not signed by Palmer.

## C. The 10th Street and Trenton Location

### 1. Palmer's Allegations

At some point during the transactions pertaining to the Jackson Palmer Crossing shopping center, Palmer alleges that he began discussing a second development project with Stanley and Jay Williams. The second development project was located at the northeast corner of 10th Street and Trenton Road in McAllen (the "Trenton Project"). At the beginning of the project, the property was primarily farmland; however, a small portion of the land already had a gas station and a McDonald's restaurant situated on it. Palmer further alleges that, when he began discussing the second development project with Stanley and Jay Williams, he asked them to continue to act as his broker, and they agreed to do so. No contract was signed to memorialize the purported brokerage agreement.

In any event, Palmer asked his friend, Butch Schwartz, a local realtor, to begin assembling the property at the northeast corner of 10th Street and Trenton. Schwartz was familiar with the property because he sold portions of the tracts to the existing owners, and he was listing the tracts for sale. Among the tract owners were B.R Whisenant; Wayne and Gelee Allen; Bill and Opal Baldwin;

Yvonne Robinson; Harlon and Mary Robinson; and Michael Kilgore, M.D. Most of the tract owners were descendants of the Robinson family.

Palmer states that, in 1998, SJW began providing "key services" for him in the development of the Trenton Project. According to Palmer, SJW contacted several of the same "big box" retailers that it had previously contacted for the Jackson Palmer Crossing development. Among the retailers contacted by SJW on Palmer's behalf was Albertson's grocery store; however, Albertson's initially declined to participate.

Palmer notes that he regularly attends an annual convention in Las Vegas conducted by the International Counsel of Shopping Centers ("ICSC"). Palmer recalled that, in 1999, he was invited to the ICSC convention by Stanley and Jay Williams to discuss the Trenton Project at Le Montrachet, a restaurant located in the Las Vegas Hilton Hotel. Whisenant and his wife accompanied Palmer and his wife to the 1999 ICSC convention to meet with Stanley and Jay Williams at Le Montrachet to discuss the Trenton Project.

**\*3** Palmer also recalls that Jay Williams and Clay Trozzo, a broker for PCDC and SJW and Jay Williams's brother-in-law, invited Palmer to go hunting in Encino, Texas, so that the parties could discuss progress on the Trenton Project. Jay Williams and Trozzo allegedly explained to Palmer that Albertson's was again interested in being the anchor tenant for the Trenton Project, so Steve Jarvios, an Albertson's representative, was invited to hunt as well. However, upon arriving, Jarvios explained to the parties that he had just resigned from Albertson's and that he was now working for Lowe's Home Improvement Centers. Despite this disclosure, the parties allowed Jarvios to stay and hunt with them.

Later, the parties discovered that Albertson's was no longer interested in the site, so Jay Williams and Trozzo began searching for a new anchor tenant for the property. Eventually, Jay Williams and Trozzo

were able to interest Target, a long-time client of SJW, in the location. On March 15, 2000, Trozzo allegedly sent Schwartz and Palmer a letter of intent, indicating that PCDC intended to purchase, on Palmer's behalf, 13.34 acres at the northeast corner of 10th Street and Trenton from the landowners for $2.3 million and that Palmer would be responsible for paying SJW a 6% commission from the total sales price. Essentially, the purchase of the tracts of land for $2.3 million would create one large tract of land with one owner, Palmer, who would then sell the land to Target for development of a store and possibly an attached shopping center.

On March 17, 2000, Palmer sent Trozzo a letter of intent to sell approximately 18.85 acres of land located at the northeast corner of 10th Street and Trenton to SJW for $4.9 million, plus a 6% broker's commission for SJW. At this time, Palmer did not have any of the land under contract; however, he apparently intended to assemble the land via earnest money contracts to sell the land to SJW who would, in turn, sell the land to Target for development. On March 21, 2000, Trozzo, acting as a representative of PCDC, countered Palmer's offer with a letter of intent to purchase 13.34 acres of the property from Palmer for $2.6 million plus a 6% commission for SJW.

In light of his discussions with SJW and PCDC, Palmer began approaching the owners of the tracts in an attempt to assemble the land through earnest money contracts. The process of assembling land for future development is a delicate process that requires speed, secrecy, and timing. Palmer signed earnest money contracts with the landowners.[FN4] Most of the contracts: (1) provided for a 120-to-150-day "feasibility period"; (2) gave Palmer the exclusive right to purchase the property; and (3) expired on April 15, 2000.[FN5] Palmer was able to assemble all of the necessary tracts of land, except for one-a 3.7-acre tract owned by Dr. Kilgore.[FN6] Palmer's failure to secure an earnest money contract from Dr. Kilgore severely jeopardized the Trenton Project because Dr. Kilgore's tract

was situated in such a way that prevented Palmer from selling the package of land to Target for further development.

**\*4** As negotiations proceeded in the assembly of the tracts for presentment to Target, Stanley and Jay Williams invited Palmer to the 2000 ICSC convention to further discuss the Trenton Project. At the 2000 ICSC convention, Palmer updated Stanley and Jay Williams as to the progress of his negotiations with the landowners. In these discussions, Palmer conveyed confidential price information and acknowledged that he did not have Dr. Kilgore under contract. According to Palmer, Trozzo, after learning that Palmer was unable secure an earnest money contract with Dr. Kilgore, got Dr. Kilgore to sign a letter of intent on June 6, 2000, indicating that PCDC would purchase Dr. Kilgore's land and that SJW would receive a 6% brokerage commission.[FN7] However, Trozzo repeatedly informed Palmer that Dr. Kilgore was not under contract, even though he really was, and never once told Palmer that Dr. Kilgore intended to sell his property to SJW and PCDC.

The landowners secured by Palmer's earnest money contracts began to worry about whether the project would be completed as the expiration date of Palmer's earnest money contracts neared. Palmer contacted Trozzo to relay additional pricing information that he had received, inform Trozzo that his earnest money contracts were expiring, and to request a letter of intent from Dr. Kilgore indicating that he was going to sell his property to SJW or PCDC.[FN8] At this time, Palmer believed that: (1) SJW and PCDC were working as his broker to get Dr. Kilgore under contract; and (2) by showing the landowners that he had a letter of intent from Dr. Kilgore, the landowners would elect to extend their contracts with Palmer and allow the Trenton Project to come to fruition. Jay Williams informed Palmer that Dr. Kilgore was not under contract and that no assurances would be provided. Around this time, several of the landowners attempted to contact Dr. Kilgore to inquire about the status of his property

so that the Trenton Project could be completed. In fact, Wayne Allen wrote an impassioned letter to Dr. Kilgore and even visited Dr. Kilgore's office, masquerading as a walk-in patient in order to ask Dr. Kilgore about what it would take to complete the deal. Wayne and the other landowners were consistently rebuffed and ignored by Dr. Kilgore, who was apparently under contract with PCDC at this time.

Shortly before Palmer's earnest money contracts expired, Trozzo approached the landowners to inquire about whether the landowners were still under contract. Trozzo's efforts were memorialized in one such letter, dated September 7, 2000, to Harlon and Mary Robinson which stated the following: "Thank you for the opportunity to meet you in McAllen, Texas[,] last week. We did not realize your property on Trenton was currently under contract with another party. We hope that all goes well with your transaction and you [ ] reach your goals with your sale." Palmer alleges that Trozzo, SJW, and PCDC were aware at all times of the existence of his earnest money contracts with the landowners and that Trozzo's meeting with the landowners was for the purpose of inducing the landowners to breach Palmer's earnest money contracts so that SJW and PCDC could get the landowners under contract and package the land for sale to Target themselves. [FN9]

**\*5** On September 6, 2000, Opal Baldwin sent Palmer a letter stating the following: "Please be advised that for various reasons, including Paragraph 5 of the Unimproved Property Commercial Contract, Mrs. Baldwin considers the contract concerning her property as *terminated* and *null and void.*" (Emphasis in original.) Subsequently, on September 8, 2000, Harlon and Mary Robinson sent Palmer a similarly-worded letter terminating their contract with Palmer. On September 13, 2000, Trozzo, on behalf of PCDC, sent Palmer a letter requesting proof that Palmer had "control of the Property" by providing PCDC with copies of "receipted contracts with the title company." Trozzo also noted that Palmer's failure to provide copies of the contracts

would result in SJW and PCDC dealing directly with the landowners.

After receiving the various termination letters and Trozzo's September 13, 2000 letter, Palmer believed that "he had been betrayed." Thus, in response to Trozzo's September 13, 2000 letter, Palmer sent Trozzo, SJW, and PCDC a letter stating that: (1) they had tortiously interfered with Palmer's earnest money contracts with the landowners; (2) as a result of the interference and accompanying delay in the development process, "[y]our [Trozzo, SJW, and PCDC] actions have tarnished my reputation as a developer in the community and have resulted in substantial financial loss to me"; and (3) "[y]our letter of September 13, 2000 appears to be nothing more than a self-serving attempt to disguise the damage you have caused." In response to SJW and PCDC's purported actions, Palmer began to withhold commissions from Jackson Palmer Crossing, thinking that it was not fair to pay the commissions when SJW and PCDC had betrayed him. Palmer also refused to renew the Listing Agreement he had with SJW at Jackson Palmer Crossing.

Now believing that SJW and PCDC were acting counter to his interests, Palmer hired Trammell Crow Company as his new broker on the Trenton Project, and they convinced the landowners to renew their earnest money contracts with Palmer in hopes of packaging the land to Target or another anchor tenant. [FN10] However, shortly thereafter, Target, Home Depot, and SJW allegedly pressured Trammell Crow to stop acting as Palmer's broker. Target then instructed the landowners to deal directly with SJW and PCDC, rather than Palmer.

Later, Jarvios, now with Lowe's, informed the landowners that Lowe's would be interested in developing the site. Using this information, Palmer was able to secure another 180-day contract with the landowners. At some point, Jarvios allegedly received an "aggressive and irate" phone call from a Target representative attempting to prevent Lowe's from developing the site. Jarvios proposed that Lowe's and Target work together to develop the

site; however, SJW and PCDC could not be involved because SJW and PCDC also represented Home Depot, one of Lowe's competitors. Target did not respond to Jarvios's proposal.

**\*6** In May 2001, Stanley Williams called Palmer and proposed a meeting to try to work out the problems associated with the Trenton Project. Palmer agreed to meet as long as Trozzo and Jay Williams were not involved in the deal because Palmer believed that Trozzo and Jay Williams were the main perpetrators of the earlier deception. Palmer's sentiments regarding Trozzo and Jay Williams were also echoed by the landowners. After meeting with Stanley Williams, Palmer agreed to assign the landowners' property that he had under contract to Target for no profit. In exchange for this assignment, Palmer received a conditional reciprocal easement agreement ("REA"). The REA was conditioned on Palmer purchasing, within twelve months, at least ten acres of land to the north of the Trenton Project owned by Eugene J. Kayser Jr. At the time of the negotiations with Stanley Williams, Palmer notes that he was already in the midst of negotiations with Kayser to develop the tract of land adjoining the Trenton Project. The REA was valuable to Palmer because it allowed for traffic to cross parts of the Target property to access land to the north of the Trenton Project, where the Kayser tract is situated. Without the REA, Palmer would have had a very difficult time marketing and developing the Kayser tract, as access to the land would be impeded. Palmer alleges that Stanley Williams knew that the REA was crucial to Palmer's development of the Kayser tract and that Stanley Williams used the REA as leverage to obtain the assignment of the landowners' property with no markup.

Palmer later discovered that, despite his insistence on Trozzo not being involved in the renewed negotiations with SJW and PCDC, Trozzo was indeed involved in the transactions and that Trozzo's involvement had been hidden from Palmer from May to December 2001. Trozzo, on behalf of SJW, attempted to purchase the Kayser tract for $3 million,

which was significantly more than the $1,960,000 bid Palmer had previously made. Palmer believed that SJW's $3 million bid for the Kayser tract was an attempt by SJW to bid up the price of the Kayser tract to prevent Palmer from purchasing the tract and, therefore, rendering the REA meaningless. In addition, Palmer found out that Stanley and Jay Williams formed a single-asset entity, McAllen Shopping Center, Ltd., and acquired a portion of the Trenton Project for their own development. This portion of the Trenton Project was eventually sold by SJW to Chick-Fil-A. [FN11]

In the end, the Trenton Project was developed with Target being the anchor tenant. Target purchased the property for a sum significantly less than what had been previously offered. As a result of SJW and PCDC's actions, Palmer alleges that he was prevented from making a profit on the assembly of the land tracts for Target and that SJW and PCDC bid up the price of the Kayser tract so as to prevent the negotiated REA from having any value whatsoever.

## 2. The Trenton Project According to SJW and PCDC

**\*7** SJW and PCDC, on the other hand, allege that they first learned about the development opportunities at the northeast corner of 10th Street and Trenton in 1999 or 2000, when they drove by the property and saw Schwartz's sign listing the property for sale. After viewing Schwartz's sign listing the property for sale, SJW and PCDC made several inquires and offers to purchase the land. In particular, SJW and PCDC obtained a letter of intent from Dr. Kilgore regarding the sale of his land to SJW and PCDC. SJW and PCDC then began to assemble the properties on their own for future sale to Target. SJW and PCDC argue on appeal that PCDC was never a party to any of the transactions in question and that, because the record does not contain a writing evidencing a brokerage agreement between SJW and Palmer similar to the Jackson Palmer Crossing development, neither SJW nor PCDC

were Palmer's broker for Palmer's Trenton Project. Instead, SJW and PCDC recalled that they competed with Palmer in developing the northeast corner of 10th Street and Trenton. However, the record reflects that Trozzo, Jay Williams, and Stanley failed to explicitly tell Palmer that neither SJW nor PCDC were Palmer's broker in the development of Palmer's Trenton Project. SJW and PCDC also allege that the earnest money contracts Palmer had with the landowners were null and void because Palmer failed to deposit earnest money with the title company. FN12 Moreover, SJW and PCDC argued at trial that because the record did not contain a copy of all the contracts Palmer had with the landowners, Palmer could not recover any damages on the contracts not admitted into evidence. Furthermore, throughout the course of this case, SJW and PCDC have denied any wrongdoing regarding the Trenton Project and attributed Opal Baldwin's and Harlon and Mary Robinsons' termination of their contracts with Palmer to coincidence.

## II. PROCEDURAL HISTORY

On December 2, 2003, SJW filed its original petition against SPP, Jackson, PE, and Palmer, individually, (collectively the "Palmer companies") alleging a breach of contract action for commissions owed under the "Listing Agreement" pertaining to properties located at Jackson Palmer Crossing. In this filing, SJW argued that Jackson and PE were both assigns of SPP and that Palmer was the owner of all of the entities and, therefore, liability was attributable to all of the named entities. On February 9, 2004, the Palmer companies filed an original answer and counterclaim: (1) denying the allegations made by SJW in its original petition; (2) asserting various affirmative defenses, including that Jackson, PE, and Palmer were not liable in the capacity in which they were sued; and (3) asserting counterclaims for breach of fiduciary duty, malicious tortious interference with contract and prospective business relations, and fraud against SJW pertaining to an implied agency relationship regarding transactions at the Trenton Project.

SJW filed its first amended petition on May 13, 2004, asserting the same causes of action as contained in its original petition and adding an additional common-law fraud cause of action against Palmer, individually. Subsequently, on November 8, 2005, the Palmer companies filed their first amended answer and counterclaim: (1) generally denying the allegations contained in SJW's first amended petition; (2) asserting various affirmative defenses, including laches; (3) arguing, by verified plea, that Jackson was not liable in the capacity it was sued; (4) requesting attorney's fees pursuant to article 6.04 of the Listing Agreement; FN13 (5) invoking the statutory damage caps enumerated in chapter 41 of the civil practice and remedies code; (6) re-asserting their breach of fiduciary duty, tortious interference with contract and prospective business relations, and fraud causes of action and noting that SJW owed Palmer "fiduciary duties of loyalty, good faith, integrity of the strictest kind, fair and honest dealing, and the duty not to advance self-interest"; (7) substituting Palmer as "Counter-Plaintiff"; and (8) requesting exemplary damages.

**\*8** On June 23, 2006, the Palmer companies filed a second amended answer and counterclaim, adding PCDC as a third-party defendant and asserting an additional counterclaim against both SJW and PCDC for negligent misrepresentation. On September 11, 2006, the Palmer companies filed their third amended answer and counterclaims, arguing that: (1) because the Listing Agreement failed to identify the property with sufficient certainty, the Listing Agreement does not sufficiently establish that SJW and PCDC were owed commissions; and (2) because SJW and PCDC breached its duties of loyalty and good faith owed to the Palmer companies, SJW and PCDC's claims were barred.

SJW filed its second amended petition on September 15, 2006:(1) re-asserting its breach of contract and common-law fraud causes of action against the Palmer companies; (2) alleging that the actions of the Palmer companies amounted to civil conspir-

acy; and (3) requesting exemplary damages. Also on September 15, 2006, SJW and PCDC filed separate original answers: (1) denying the assertions contained in the Palmer companies' pleadings; (2) asserting various affirmative defenses, including limitations; and (3) requesting attorney's fees pursuant to article 6.04 of the Listing Agreement.

Later, on November 28, 2006, SJW filed its third amended petition, adding a statutory fraud cause of action against the Palmer companies. On February 13, 2007, the Palmer companies filed their fourth amended answer and counterclaims, which mirrored their third amended answer and counterclaims and also specifically denied that SJW was entitled to commissions related to the lease to Factory 2-U. SJW and PCDC filed a second amended original answer on April 10, 2007.

On April 16, 2007, the trial on this matter commenced. After SJW and PCDC rested their case-in-chief, the trial court granted a directed verdict as to SJW and PCDC's common-law fraud claim, leaving only SJW and PCDC's breach of contract claim and the Palmer companies' counterclaims to be determined by the jury.[FN14] After several days of testimony and the admission of hundreds of exhibits, the jury entered a mixed verdict. In particular, the jury concluded the following:

THE COURT: The first-Question No. 1: Did the following agree to pay SJW Property Commerce, Inc. a commission to [the] Staples lease? Southwest Pinnacle [Properties], Inc., yes; Palmer Enterprises, Inc., yes.

Question No. 2: Did the following agree to pay SJW Property Commerce, Inc. a commission to [the] Fashion Bug lease? A. Southwest Pinnacle Properties, yes; Jackson I Corp., yes.

[Question No. 3:] Did Southwest Pinnacle Properties agree to pay SJW Property Commerce, Inc. a commission on Factory 2-U lease? Answer: No.

Did the following fail-Question No. 4: Did the following fail to comply with their agreement regarding the commission to Staples lease Southwest Pinnacle Properties? Answer: Yes. Palmer [Enterprises], Inc., yes.

Question No. 5: Did the following fail to comply with [the] agreement regarding commission on the Fashion Bug Lease? Southwest Pinnacle Properties, yes; Jackson I Corp., yes.

**\*9** Was-Question No. 7: Was Southwest Pinnacle Properties, Inc.'s failure to comply excused? Answer: No.

Question No. 8: Was Palmer Enterprise[s], Inc.'s failure to comply excused? Answer to the Question No. 8: No.

Was-Question No. 9: Was Jackson I Corp.'s failure to comply excused? Answer: No.

Was G.J. Palmer's failure to comply excused-Question No. 10. Answer: No.

What sum of money if paid-if any, if paid now in cash would fairly and reasonably compensate SJW Property Commerce for damages, if any, that were proximately caused by such conduct? Past commission owed to Staples lease, $128,903.72; commission owed to Fashion Bug lease, $38,400.

Question No. 12: Did a relationship of trust and confidence exist between Southwest-SJW Property Commerce, Inc. and G.J. Palmer as to North 10th & Trenton? Answer: Yes.

Question No. 13: Did [SJW] Property Commerce, Inc. comply with its fiduciary duty to G.J. Palmer, Jr.? Answer: No.

[Question No. 14:] Did [SJW] Property Commerce, Inc. intentionally interfere with G.J. Palmer's earnest money contracts, if any? A. [W]ith Opal Baldwin, yes; B. [W]ith B.W.-B.R. Whisenant, yes; C. [W]ith Wayne

Allen and [Gelee] Robinson Allen, yes; D. [W]ith Yvonne Robinson, yes; E. [W]ith Harlon and Mary Robinson, yes; and F. [W]ith Eugene Kayser[, yes].

Question No. 15: Did [SJW] Property [Commerce] interfere because it has a good-faith belief it has a right to do so? A. [N]o; B. [N]o; C. [N]o; D. [N]o; E. [N]o; F. [N]o.

....

[Question No. 18:] What date should G. Palmer in the exercise of reasonable diligence have discovered the interference of the contracts of SJW Property Commerce? Answer with was [sic] a date in the back. August 8th, 2000.

Question No. 19: Did [SJW] Property Commerce, Inc. commit fraud against G.J. Palmer, Jr.? Answer: Yes.

....

Twenty-one: By what date should G. Palmer in [the] exercise of reasonable diligence have discovered the fraud of [SJW] Property Commerce, Inc.? Answer: September 8, 2000.

[Question No. 22:] What sum of money, if paid now in cash, would fairly and reasonably compensate G.J. Palmer, Jr. for his damages, if any, that were proximately caused [by SJW Property Commerce's] conduct? A. The lost profit from the Robinson tract deal, answer $376,397. B. [L]ost profits from the rental revenue delay $207,926. And lost profit from the property sale delay $125,264.[FN15]

Question No. 23: Do you find by clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice [regarding PCDC's purported actions]? Answer: Yes.

[Question No. 24:] What sum of money, if paid now in cash, would-should be assessed

against Property Commerce Development [PCDC] and awarded to G.J. Palmer as exemplary damages, if any, for the conduct found in response to a Question No. [2]3? And it's $376,397.

Question No. 25: Do you find by ... clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice [regarding SJW's purported actions]? Answer: Yes.

**\*10** Number 26: What sum of money, if any, if paid now in cash should be assessed against [SJW] Property Commerce, Inc. and awarded to G.J. Palmer, Jr. as exemplary damages, if any.... Answer: $2 million dollars.

At the conclusion of the trial, the parties filed various post-judgment motions, including motions to disregard various portions of the jury's verdict and a motion for judgment notwithstanding the jury's verdict.FN16 The trial court entered its final judgment adopting the jury's verdict on February 7, 2008.FN17 On March 6, 2008, SJW filed a motion for new trial, a motion to modify the judgment, and a motion for remittitur, asserting, among other things, that: (1) the evidence supporting the damages awarded to Palmer was insufficient; (2) the amount of attorney's fees awarded to Palmer's attorneys required modification; and (3) limitations barred all claims brought by the Palmer companies. In response to SJW's March 6, 2008 motions, the Palmer companies filed their own motion for new trial, arguing that the evidence supporting the jury's verdict as to the commissions owed to SJW was insufficient. SJW's March 6, 2008 motions and the Palmer companies' motion for new trial were overruled by operation of law. *See* TEX.R. CIV. P. 329b(c). SJW and PCDC filed a notice of appeal, and the Palmer companies responded by filing a notice of cross-appeal.

## III. STANDING AND TOLLING OF THE LIMITATIONS PERIOD

In their first issue, SJW and PCDC assert that SPP did not have standing to assert its February 9, 2004 counterclaims against SJW and PCDC because SPP "was not damaged with respect to any actions at 10th Street and Trenton Road." SJW and PCDC further assert that even if SPP did have standing, its causes of action do not constitute a counterclaim and are, instead, a third-party action that is barred by limitations. SJW and PCDC also argue that SPP's counterclaim did not arise out of SJW's claim for commissions. The Palmer companies counter by arguing that SPP had standing to sue and that limitations did not bar the Palmer companies' counterclaims because SPP was an aggrieved party and the Palmer companies' counterclaims were brought in accordance with sections 16.068 and 16 .069 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 16.068, 16.069 (Vernon 2008).

## A. Applicable Law

### 1. Standing and Capacity

[1][2][3][4][5] A plaintiff must have both standing and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 848 (Tex.2005) (citing *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 884 (Tex.2001). The standing inquiry "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.' " *Id.* (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1559, at 441 (2d ed.1990)). A plaintiff has standing when he is personally aggrieved, regardless of whether he is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 661

(Tex.1996) (holding that the standing doctrine requires that there be (1) "a real controversy between the parties," that (2) "will be actually determined by the judicial declaration sought"). The complained-of injury "must be concrete and particularized, actual or imminent, not hypothetical." *DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299, 304-05 (Tex.2008) (footnotes omitted); *see Tex. Lottery Comm'n v. Sci. Games Int'l,* 99 S.W.3d 376, 380 (Tex.App.-Austin 2003, pet. denied) (holding that "[t]o establish standing, one must show a justiciable interest by alleging an actual or imminent threat of injury peculiar to one's circumstances and not suffered by the public generally"); *see also Elizondo v. Tex. Natural Res. Conservation Comm'n,* 974 S.W.2d 928, 932 (Tex.App.-Austin 1998, no pet.) (citing *Warth v. Seldin,* 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (noting that the general standard for determining whether plaintiff has standing is whether she has such a personal stake in the outcome of the controversy as to warrant invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on her behalf)). Furthermore, standing is implicit in subject-matter jurisdiction and cannot be waived. *See Lovato,* 171 S.W.3d at 849; *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993).

## B. Discussion

### 1. SPP's Standing to Bring Its February 9, 2004 Counterclaims

*11 [6] On appeal, SJW and PCDC first argue that there is no evidence in the record demonstrating that SPP was involved in any negotiations for the purchase of property at the northeast corner of 10th Street and Trenton Road; therefore, because the Palmer companies' counterclaims centered on SJW and PCDC's purported conduct regarding Palmer's Trenton Project, SPP did not have a justiciable interest in the matters asserted in the Palmer companies' counterclaims. The Palmer companies counter by arguing that they timely filed their counter-

claims and that sections 16.068 and 16.069 of the civil practice and remedies code allowed for the substitution of Palmer as the aggrieved party in place of SPP. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 16.068, 16.069. Moreover, the Palmer companies construe SJW and PCDC's standing argument as a capacity issue that was waived by SJW and PCDC's failure to file a verified plea. *See* TEX.R. CIV. P. 93.

As mentioned earlier, SJW filed its original petition against the Palmer companies on December 2, 2003. Subsequently, on February 9, 2004, the Palmer companies filed their original answer and counterclaims against SJW. However, the Palmer companies identified SPP as the sole "Counter-Plaintiff" in their original counterclaims. In their first amended counterclaims filed on November 8, 2005, the Palmer companies amended their counterclaims to replace SPP with Palmer as "Counter-Plaintiff." No new causes of action were asserted in the Palmer companies' November 8, 2005 amended counterclaims.

SJW and PCDC correctly state that SPP was not involved in any negotiations regarding the development of Palmer's Trenton Project, which is the basis of the Palmer companies' counterclaims. SJW and PCDC argue that SPP was a proper party to the Jackson Palmer Crossing dispute but not to the Trenton Project dispute. However, after viewing the entire record, we find that the claims at issue in this case are inextricably intertwined so as to constitute the same transaction or occurrence. *See id.* at R. 97(a). Thus, even though the Palmer companies first named SPP as the "Counter-Plaintiff" in their counterclaims, we find that SPP had a justiciable interest in this matter and, therefore, had standing.

[7][8][9] In arriving at our conclusion, we first determine what constitutes a "transaction." To determine whether a set of facts constitutes a "transaction," we employ the logical relationship test, which examines whether the essential facts on which the claims are based are significantly and logically relevant to both claims. *Wells v. Dotson,*

261 S.W.3d 275, 281 (Tex.App.-Tyler 2008, no pet.) (citing *Cmty. State Bank v. NSW Invs.,* 38 S.W.3d 256, 258 (Tex.App.-Texarkana 2001, pet. dism'd w.o.j.) (considering the term "transaction" in determining whether a counterclaim was compulsory)); *see Smith v. Ferguson,* 160 S.W.3d 115, 120 (Tex.App.-Dallas 2005, pet. denied). "Under this test, a transaction is flexible, comprehending a series of many occurrences logically related to one another." *Wells,* 261 S.W.3d at 281 (citing *NSW Invs.,* 38 S.W.3d at 258; *Klein v. Dooley,* 933 S.W.2d 255, 259 (Tex.App.-Houston [14th Dist.] 1996), *rev'd on other grounds,* 949 S.W.2d 307 (Tex.1997)). "There is no logical relationship when none of the same facts are relevant to both claims. However, whenever the same facts, which may or may not be disputed, are significant and logically relevant to both claims, the 'logical relationship' test is satisfied." *Jack H. Brown & Co. v. Nw. Sign Co.,* 718 S.W.2d 397, 400 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

**\*12** Here, Palmer testified that the alleged brokerage relationship between himself and SJW at the Trenton Project arose as a result of their dealings at the Jackson Palmer Crossing shopping center, where SPP was a signatory to the Listing Agreement. Several witnesses testified that SJW acted as Palmer's broker at both the Jackson Palmer Crossing project and the Trenton Project. Furthermore, even SJW admits that it and Palmer engaged in numerous conversations regarding the development of both sites at around the same point in time. Finally, we find it particularly noteworthy that Jay Williams informed Trammell Crow, Palmer's one-time broker, that "if ... Palmer pays to [SJW] Property Commerce commissions allegedly owed to them for two (2) deals that were completed at Jackson Palmer Crossing," SJW and PCDC would "assign [Dr. Kilgore's] contract to [Palmer]." As noted above, Dr. Kilgore's contract exclusively involved Palmer's Trenton Project. Therefore, the statement made by Jay Williams to Trammell Crow indicates that SJW and PCDC viewed the disputes at Jackson Palmer Crossing and at 10th Street and Trenton

Road as inextricably intertwined. Because the record suggests that the claims in dispute are logically related, we conclude that SPP had a justiciable interest in the outcome of this matter and, thus, was aggrieved; as such, we cannot say that SPP lacked standing to assert its February 9, 2004 counterclaims.[FN18]

## 2. The Substitution of Palmer as "Counter-Plaintiff"

[10] Despite concluding that SPP had standing to assert its counterclaims, we do not believe that SPP had the capacity to sue SJW and PCDC for damages sustained at the Trenton Project because SPP was not a party to the negotiations pertaining to the Trenton Project. *See Nootsie, Ltd.,* 925 S.W.3d at 661 (defining "capacity" as the legal authority to act, regardless of whether it has a justiciable interest in the controversy). Realizing that SPP lacked the capacity to sue for damages associated with the Trenton Project, the Palmer companies substituted Palmer as the proper "Counter-Plaintiff" without asserting any new causes of action. *See Carter v. DeJarnatt,* 523 S.W.2d 88, 91 (Tex.App.-Texarkana 1975, writ ref'd n.r.e.) (concluding that suit was not barred by limitations where the amended petition, which was filed after the expiration of the limitations period, did not change the cause of action but, rather, changed the capacity in which appellant sued). Texas courts have recognized that a mistake in naming parties to a lawsuit, such as here, constitutes a case of misnomer.

[11][12][13] "Misnomer cases are analyzed by asking the following questions: (1) Would a judgment under the original pleading bar recovery under the amended pleading? (2) Would the same evidence support both of the pleadings? (3) Is the measure of damages the same in both pleadings? (4) Are the allegations of each pleading subject to the same defenses?" *Foust v. Estate of Walters,* 21 S.W.3d 495, 501 (Tex.App.-San Antonio 2000, pet. denied) (citing *Phoenix Lumber Co. v. Houston Water Co.,*

94 Tex. 456, 61 S.W. 707, 709 (1901)). "When a party is misnamed, but no one has been misled or disadvantaged by the error in pleading, the relation-back doctrine operates to preserve the claim against a bar of limitations." *Id .* (citing *Dougherty v. Gifford,* 826 S.W.2d 668, 677 (Tex.App.-Texarkana 1992, no writ); *Palmer v. Enserch Corp.,* 728 S.W.2d 431, 434 (Tex.App.-Austin 1987, writ ref'd n.r.e.)). "If the nature of the suit against the defendants remains unchanged, the substitution of parties-plaintiff does not constitute a new suit." *Id.* (citing *Vaughn Bldg. Corp. v. Austin Co.,* 620 S.W.2d 678, 682 (Tex.Civ.App.-Dallas 1981), *aff'd,* 643 S.W.2d 113 (Tex.1982); *Medford v. Red River County,* 84 S.W.2d 345, 352 (Tex.Civ.App.-El Paso 1935, no writ)). In other words, so long as the purpose and the nature of the claim asserted are clear from the outset, the substitution of a personal representative for a party without capacity does not introduce a new or different cause of action, and the substitution should satisfy the relation-back doctrine. *See Lovato,* 171 S.W.3d at 852-53; *see also Lorentz v. Dunn,* 171 S.W.3d 854, 856 (Tex.2005).

*13 In the present case, the record demonstrates that Palmer is the president and, therefore, personal representative of SPP. Furthermore, the Palmer companies' first amended answer and counterclaims filed on November 8, 2005, substituted Palmer himself as the proper "Counter-Plaintiff" and advanced the same causes of action against SJW as contained in the Palmer companies' original counterclaims. Neither SJW nor PCDC objected to Palmer's substitution as "Counter-Plaintiff." Moreover, neither SJW nor PCDC demonstrated to the trial court that they were prejudiced or disadvantaged by Palmer's substitution as "Counter-Plaintiff." It is clear to us that Palmer was substituted in place of SPP because SPP lacked the capacity to sue for damages pertaining to the Trenton Project. Based on the record before us, we cannot say that the substitution of Palmer as "Counter-Plaintiff" amounted to a new suit or was improper.

## 3. The Relation-Back Doctrine and Limitations

Given that we have concluded that Palmer was the proper party to bring suit against SJW for the purported conduct that transpired at the Trenton Project, we must now determine whether the Palmer companies' counterclaims were barred by limitations or whether the limitations period was tolled by sections 16.068 and 16.069 of the civil practice and remedies code, as alleged by the Palmer companies on appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 16.068, 16.069. The Palmer companies alleged that SJW: (1) tortiously interfered with Palmer's earnest money contracts; (2) tortiously interfered with Palmer's prospective business relations with the landowners; (3) breached its fiduciary duty owed to Palmer; and (4) committed fraud. On appeal, SJW and PCDC argue that the Palmer companies' counterclaims were time-barred. SJW and PCDC further argue that the Palmer companies' counterclaims were really third-party actions; thus, section 16.069 of the civil practice and remedies code did not serve to toll the limitations period.

The limitations period for breach of fiduciary duty and fraud is four years. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(4)-(5) (Vernon 2002); *see also Willis v. Donnelly,* 199 S.W.3d 262, 278 n. 33 (Tex.2006); *Exxon Corp. v. Emerald Oil & Gas Co.,* No. 05-1076, 2009 Tex. LEXIS 113, at *22 (Tex. Mar. 27, 2009) (citing *Little v. Smith,* 943 S.W.2d 414, 420 (Tex.1997)). In question number 21, the jury, after considering all the evidence adduced at trial, concluded that Palmer should have discovered the alleged fraud perpetrated by SJW on September 8, 2000; therefore, the statute of limitations for the Palmer companies' breach of fiduciary duty and fraud causes of action began to run from that date. *See Emerald Oil & Gas Co.,* 2009 Tex. LEXIS 113, at *22 (citing *Little,* 943 S.W.2d at 420) (holding that the limitations period for fraud begins to run from the time the party knew of the misrepresentation). The Palmer companies first asserted their breach of fiduciary duty and fraud causes of action as to SJW in their original counterclaims filed on February 9, 2004, which was more

than six months before the four-year limitations period expired. Thus, the Palmer companies' breach of fiduciary duty and fraud causes of action were timely filed by SPP against SJW. However, in asserting these causes of action, the Palmer companies designated SPP as "Counter-Plaintiff," and we have already concluded that SPP lacked the capacity to bring these causes of action. The substitution of Palmer as "Counter-Plaintiff" did not transpire until November 8, 2005, which was more than one year after the four-year limitations period expired. Absent any tolling of the limitations period, the Palmer companies' breach of fiduciary duty and fraud claims would be time-barred.

**\*14** However, the Palmer companies argue that the relation-back doctrine tolls the applicable limitations period. Under the relation-back doctrine, as outlined by section 16.068 of the civil practice and remedies code,

> if a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.068; *see Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.,* 269 S.W.3d 314, 317 (Tex.App.-Dallas 2008, no pet.). Section 16.068 is a tolling statute that stops the clock at the time that the original petition is filed, if filed within the limitations period, but cannot toll a time period already expired. *See Almazan v. United Servs. Auto Ass'n,* 840 S.W.2d 776, 779 (Tex.App.-San Antonio 1992, writ denied). This section is designed to protect litigants from loss of their claims by a plea of limitations in cases where that would otherwise occur and, therefore, should be liberally construed. *Milestone Props., Inc. v. Federated Metals Corp.,* 867 S.W.2d 113, 116 (Tex.App.-Austin 1993, no writ).

"The relation-back doctrine originated as an equit-able remedy designed to effectuate justice." *Lovato v. Austin Nursing Ctr., Inc.,* 113 S.W.3d 45, 55 (Tex.App.-Austin 2003), *aff'd,* 171 S.W.3d 845 (citing *Cain v. State,* 882 S.W.2d 515, 518 (Tex.App.-Austin 1994, no writ)). " 'It enables the court to arrive at conclusions that will effectuate justice while maintaining simultaneously the appearance of logical consistency.' " *Id.* (quoting *Cain,* 882 S.W.2d at 518).

[14] "The relation-back doctrine has been applied to cure capacity issues, but it cannot retroactively create personal jurisdiction." *Armes v. Thompson,* 222 S.W.3d 79, 84 (Tex.App.-Eastland 2006, no pet.). For example, the Texas Supreme Court has allowed the alleged personal representative in probate cases to obtain the probate court's permission to represent the estate after litigation had been filed on behalf of the estate. *See Lovato,* 171 S.W.3d at 853-56; *see also Lorentz,* 171 S.W.3d at 856. However, this does not mean "that subsequent pleadings can give the trial court jurisdiction over new parties retroactive to the original filing of the suit." *Armes,* 222 S.W.3d at 84 (citing *Covington v. Sisters of Charity of the Incarnate Word,* 179 S.W.3d 583, 587-88 (Tex.App.-Amarillo 2005, pet. denied)).

Essentially, the relation-back doctrine allows for a party to amend or supplement a pleading changing facts or grounds of liability or even to correct capacity issues, as long as the original claims were timely filed and the amendments or supplementation are not based on a "new, distinct, or different transaction or occurrence." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.068; *see also Armes,* 222 S.W.3d at 84. Here, we have already concluded that: (1) the Palmer companies' breach of fiduciary duty and fraud claims were timely filed by SPP against SJW; (2) SPP had standing to file suit against SJW for the purported actions occurring during the development of the Trenton Project; and (3) the disputes at the Jackson Palmer Crossing shopping center and the Trenton Project were logic-

ally related so as to constitute the same transaction or occurrence. Therefore, in applying the relation-back doctrine, we conclude that the Palmer companies' substitution of Palmer as "Counter-Plaintiff," though subject to a plea of limitation on its own, relates back to the original, timely-filed breach of fiduciary duty and fraud counterclaims brought by SPP against SJW. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.068; *see also Armes,* 222 S.W.3d at 84. The Palmer companies were allowed to cure capacity issues in their first amended counterclaims without losing their counterclaims to a plea of limitations. *See Armes,* 222 S.W.3d at 84; *Milestone Props., Inc.,* 867 S.W.2d at 116; *see also Lovato,* 113 S.W.3d at 55. Thus, we hold that the Palmer companies' breach of fiduciary duty and fraud counterclaims were timely filed.[FN19]

**\*15** With regard to SJW and PCDC's argument that the Palmer companies' counterclaims were really third-party actions, SJW and PCDC do not cite to any authority supporting their contention. However, in reviewing rules 38 and 97 of the rules of civil procedure, we conclude that the Palmer companies' claims against SJW are not third-party actions but, rather, constitute counterclaims. *See* TEX.R. CIV. P. 38, 97. Rule 38, entitled "Third-Party Practice," states that:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him.

*Id.* at R. 38. On the other hand, rule 97(b) provides that: "A pleading may state as a counterclaim any claim against an opposing party whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." *Id.* at R. 97(b).

In the instant case, SJW filed suit against the Palmer companies, including SPP and Palmer, indi-

vidually. The Palmer companies' February 9, 2004 counterclaims did not assert causes of action against "a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him." *See id.* at R. 38. Instead, the Palmer companies' February 9, 2004 counterclaims state claims that, as we have already concluded, arise out of the same transaction or occurrence as SJW's dispute involving commissions at the Jackson Palmer Crossing shopping center and were against the opposing party-SJW. *See id.* at R. 97(b); *CDB Software, Inc. v. Kroll,* 982 S.W.2d 629, 632 (Tex.App.-Houston [1st Dist.] 1998, no pet.); *Latham v. Allison,* 560 S.W.2d 481, 485 (Tex.App.-Fort Worth 1977, writ ref'd n.r.e.) (defining a counterclaim as "a claim, which, if established will defeat or in some way qualify a judgment to which the plaintiff is otherwise entitled. It embraces both setoff and recoupment, and also comprehends reconvention as well as all adversary actions by the defendant in a case"); *see also* BLACK'S LAW DICTIONARY 402 (9th ed.2009) (defining a counterclaim as "[a] claim for relief asserted against an opposing party after an original claim has been made"). We therefore conclude that the Palmer companies' claims against SJW constituted counterclaims and, thus, fell within the scope of section 16.068 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.068; *see also* TEX.R. CIV. P. 97(b).

**4. The Palmer Companies' Claims Against PCDC**

[15] Regarding PCDC's inclusion in this dispute, SJW and PCDC argue that because PCDC was not added to the lawsuit until June 23, 2006, the Palmer companies' claims against PCDC are barred by limitations. SJW and PCDC further argue that the Palmer companies' claims against PCDC constitute a third-party action rather than a counterclaim; thus, the tolling of the limitations period under sections 16.068 and 16.069 is not allowed for the third-party action . [FN20] The Palmer companies contend that:

(1) PCDC had fair notice of the Palmer companies' claims, and, thus, PCDC could not have been prejudiced by its inclusion in the lawsuit; and (2) the evidence suggests that SJW and PCDC "are closely related, if not identical" and that the claims alleged against PCDC arose out of the same transaction or occurrence as the Palmer companies' claims against SJW.[FN21]

**\*16** PCDC was not a party to SJW's original petition and was joined to the lawsuit when the Palmer companies filed their second amended answer and counterclaims on June 23, 2006, approximately six years after the causes of action contained in the Palmer companies' counterclaims accrued. Therefore, absent any tolling of the limitations period, the Palmer companies' claims against PCDC were untimely. Because PCDC was first joined as a party to the action by the Palmer companies on June 23, 2006, Texas Rule of Civil Procedure 38 dictates a finding that the Palmer companies' claims against PCDC constituted a third-party action. *See* TEX.R. CIV. P. 38. Therefore, because the Palmer companies claims against PCDC were actually third-party actions rather than counterclaims or cross claims, we conclude that the claims against PCDC were not tolled by either section 16.068 or section 16.069 of the civil practice and remedies code and were, thus, time-barred. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 16.068, 16.069; *see also J.M.K. 6, Inc. v. Gregg & Gregg, P.C.,* 192 S.W.3d 189, 199-202 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (holding that third-party actions are not contemplated by the terms "counterclaim or cross claim" contained in section 16.069 of the civil practice and remedies code and that "the purpose of section 16.069 would not be served by rewriting it to allow a defendant to revive an expired claim against a non-party").

In sum, we hold that: (1) the Jackson Palmer Crossing dispute and the Trenton Project dispute are inextricably intertwined and, thus, constitute a single transaction or occurrence; (2) SPP had standing to file its February 9, 2004 counterclaims against

SJW; (3) Palmer was properly substituted as "Counter-Plaintiff" in the Palmer companies' first amended answer and counterclaims; (4) the Palmer companies' claims against SJW constituted counterclaims; (5) the Palmer companies' counterclaims against SJW for fraud and breach of fiduciary duty were tolled by section 16.068 of the civil practice and remedies code and relate back to the Palmer companies' timely-filed February 9, 2004 counterclaims; and (6) the Palmer companies' claims against PCDC constituted third-party actions, which did not toll the applicable limitations periods. Accordingly, we overrule SJW and PCDC's first issue, in part, and sustain it, in part.

## IV. SUFFICIENCY OF THE EVIDENCE THAT SJW INTENTIONALLY INTERFERED WITH PALMER'S EARNEST MONEY CONTRACTS FN22

[16] By their second issue, SJW argues that the evidence supporting the jury's verdict that it intentionally interfered with Palmer's earnest money contracts is insufficient. However, SJW does not complain about the jury's findings as to the Palmer companies' breach of fiduciary duty and fraud claims. Texas courts have held that SJW's failure to attack all independent grounds supporting a judgment requires us to affirm the trial court's judgment. See Britton v. Tex. Dep't of Crim. Justice, 95 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2002, no pet.); Oliphant Fin. LLC v. Angiano, 295 S.W.3d 422, 423 (Tex.App.-Dallas 2009, no pet.) ("If an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment."); see also Kelly v. Klein, 827 S.W.2d 609, 611 (Tex.App.-Houston [14th Dist.] 1992, no writ) (citing Midway Nat'l Bank of Grand Prairie, Tex. v. W. Tex. Wholesale Supply Co., 453 S.W.2d 460, 461 (Tex.1970); Tex.

Dep't of Human Res. v. Orr, 730 S.W.2d 435, 436 (Tex.App.-Austin 1987, no writ)).

**\*17** Neither party has argued on appeal that the jury's damages awards cannot be supported by either of the fraud or breach of fiduciary duty findings, and it is clear to this Court that the jury's damages award can be supported by either of the jury's liability findings. See TEX. CIV. PRAC. & REM.CODE ANN. § 41.002 (Vernon 2008) (providing that chapter 41 of the civil practice and remedies code-the exemplary damages chapter-"applies to any action in which a claimant seeks damages relating to a cause of action"). Therefore, because the jury concluded that SJW committed fraud and breached a fiduciary duty owed to the Palmer companies, and because SJW does not attack those causes of action on appeal, we need not analyze SJW's sufficiency challenge as to the Palmer companies' tortious interference with contract claims. See Britton, 95 S.W.3d at 681; see also Angiano, 295 S.W.3d at 423; Kelly, 827 S.W.2d at 609. Thus, we affirm the jury's findings as to SJW's liability. See Britton, 95 S.W.3d at 681; see also Angiano, 295 S.W.3d at 423; Kelly, 827 S.W.2d at 609. Accordingly, we overrule SJW's second issue on appeal.

## V. THE DAMAGE AWARD

By its third issue, SJW argues that the jury's damage awards are not supported by legally and factually sufficient evidence. In particular, SJW challenges: (1) the damage calculations made by Palmer's expert, Abington, as speculative; and (2) the jury's finding that SJW acted with malice in allegedly intentionally interfering with Palmer's earnest money contracts. The Palmer companies contend that the jury's damage awards are supported by legally and factually sufficient evidence. The Palmer companies highlight the fact that SJW did not object to Abington's damages model and testimony at trial. Furthermore, the Palmer companies argue that the punitive damages cap does not apply, and the jury was not required to find that a vice-

principal of SJW intentionally interfered with Palmer's earnest money contracts in order to sustain the punitive damage awards.

## A. The Jury's Award of Actual Damages to the Palmer Companies

### 1. Standard of Review and Applicable Law

[17][18][19] On appeal, SJW challenges the legal and factual sufficiency of the jury's actual damages award. We must sustain a challenge to a jury finding based on legal sufficiency only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rule of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810-11 (Tex.2005). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

*18 [20][21] In our legal sufficiency review, we review the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller,* 168 S.W.3d at 807. The final test for legal sufficiency is whether the evidence presented at trial would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827.

[22][23] The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *Id.* at 819. Be-cause it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so. *Id.*

[24][25] On the other hand, when reviewing a jury finding for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). If we determine that the evidence supporting the jury's verdict is not supported by factually sufficient evidence, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam).

We do note that actual damages are a prerequisite to an exemplary damage award. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.004(a) (Vernon 2008); *see also Wright v. Gifford-Hill & Co.,* 725 S.W.2d 712, 713-14 (Tex.1987); *Swinnea v. ERI Consulting Eng'rs, Inc.,* 236 S.W.3d 825, 842 (Tex.App.-Tyler 2007, pet. granted). Therefore, if we were to find that the jury's actual damages award was not supported by legally and factually sufficient evidence, then we would not need to analyze the jury's exemplary damages award.

[26][27] When a party properly objects to a jury question, we review the sufficiency of the evidence in the light of the charge that the trial court should have submitted. *W.L. Lindemann Operating Co. v. Strange,* 256 S.W.3d 766, 775 (Tex.App.-Fort Worth 2009, no pet.). Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Id.* (citing *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex.2000)). Here, SJW did not object to any questions contained in the jury charge that pertained to the calculation of damages; thus,

we review the sufficiency of the damage awards in light of the charge submitted. *See id.; see also Sturges,* 52 S.W.3d at 715; *Zimlich,* 29 S.W.3d at 71.

**2. Discussion**

[28] On appeal, SJW argues that the evidence supporting the jury's actual damages awards is insufficient because Abington's calculations are speculative in nature and, therefore, amounted to no evidence.

**\*19** In question number 22 of the charge, the jury was asked to determine the amount of money that would fairly and reasonably compensate Palmer for his damages, if any, that were proximately caused by SJW's conduct. The charge did not specifically attribute this damage question to any particular cause of action; therefore, it could have applied to the Palmer companies' fraud, breach of fiduciary duty, or tortious interference causes of action.[FN23] In any event, the jury concluded that Palmer sustained: (1) $376,397 in damages for lost profits from the Robinson tract delay; (2) $207,926 in damages for lost profits from the rental revenue delay on the Kayser tract; and (3) $125,264 in damages for lost profits from the property sale delay, also on the Kayser tract. The jury's actual damages calculation is premised on evidence submitted by the Palmer companies as to lost profits.

[29][30][31] "Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen,* 96 S.W.3d 207, 213 (Tex.2002); *see Bossier Chrysler Dodge II, Inc. v. Rauschenberg,* 201 S.W.3d 787, 808 (Tex.App.-Waco 2006), *rev'd in part,* 238 S.W.3d 376 (Tex.2007) (per curiam). "Net profits" are defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner v. PV Int'l Corp.,* 765 S.W.2d 455, 465 (Tex.App.-Dallas 1988, writ denied) (citing *R.A. Corbett Transp., Inc. v. Oden,* 678 S.W.2d 172, 176

(Tex.App.-Tyler 1984, no writ)). "[I]n order to recover lost profits, damages must be shown with 'reasonable certainty'[;] net profits must be shown by *objective,* rather than *subjective,* facts, figures, and data." *Turner,* 765 S.W.2d at 465 (quoting *Automark of Tex. v. Discount Trophies,* 681 S.W.2d 828, 830 (Tex.App.-Dallas 1984, no writ)) (emphasis in original). "Recovery for lost profits does not require that the loss be susceptible to exact calculation"; however "[a]t a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained." *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 504 (Tex.2001) (citing *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)); *see Sw. Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098-1099 (1938); *Orchid Software, Inc. v. Prentice-Hall, Inc.,* 804 S.W.2d 208, 211 (Tex.App.-Austin 1991, writ denied). The *Helena Chemical* court further noted that:

> We have held that past profits, coupled with other facts and circumstances, *may* establish a lost-profits amount with reasonable certainty. However, lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. Rather, our focus is on whether damages can be shown with reasonable certainty. This can be accomplished with a profit history *or* some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty.

**\*20** 47 S.W.3d at 505 (citations omitted) (emphasis in original).

The Palmer companies called Abington to testify on damages sustained as a result of SJW's wrongful conduct. Additionally, Abington provided numerous spreadsheets, which were admitted into evidence, to corroborate his testimony. After reviewing the evidence contained in the record, Abington con-

cluded that the Palmer companies sustained $709,587 in actual damages. This calculation was comprised of three figures: (1) $376,397 in lost profits on the Robinson tract delay; (2) $207,926 in lost profits on delayed rental revenue; and (3) $125,264 in lost profits on the delayed sale of the properties.

In calculating damages associated with the Robinson tract delay, Abington relied on Palmer's earnest money contracts with Opal Baldwin, Wayne and Gelee Allen, Harlon and Mary Robinson, Yvonne Robinson, and Whisenant and assumed that all five of the contracts were effective on April 15, 2000, and were assigned to Target for no profit on June 15, 2001.[FN24] This accounted for a fourteen-month delay. Abington then calculated a sales price for the land to be $2,950,101, which was based on representations made by Target as to the maximum price it would pay for the land-$4.50 per square foot for 15.05 acres.[FN25] Abington then subtracted the prices for which Palmer agreed to purchase the landowners' land and closing costs, which appears to include the 6% commission fee included in each earnest money contract. The total costs amounted to $2,573,704, and the net profit amounted to $376,397.

With regard to his second calculation, Abington analyzed damages involving delayed rental income from the Kayser tract. Regarding the delays, Abington assumed a twelve-month delay, which was less than the actual nineteen-month delay to which Palmer testified-from the time Palmer and Kayser began negotiating, and Kayser's alleged approval of Palmer's $1.96 million offer around July 2000 to when the property was finally sold to Palmer in February 2002. Abington relied on a spreadsheet documenting actual rental payments made by businesses that were situated on the Kayser tract near the time of trial and determined that the assumed twelve-month delay due to SJW's wrongful actions, caused Palmer to lose $3,326,823 in rental income. Abington then used a conservative estimate of 6.25% for cost of capital and ultimately concluded

that the Palmer companies sustained $207,926 in losses of rental income associated with the Kayser tract, after subtracting "[a]ny expenses associated with really running the property."

Abington's final damages calculation addressed losses sustained by the Palmer companies as to the sale of portions of the Kayser tract to Bank of America, Jack-in-the-Box, and Logan's Roadhouse. Abington noted that: (1) Bank of America bought a portion of the Kayser tract on June 5, 2003, for $566,636; (2) Jack-in-the-Box bought a portion of the Kayser tract on October 15, 2004, for $566,711; and (3) Logan's Roadhouse bought another portion of the Kayser tract on September 1, 2004, for $870,875. The sum total of these sales amounted to $2,004,222. Abington, once again, multiplied the sales amount by a conservative measure for cost of capital-6.25%-to arrive at his damage calculation of $125,264.

**\*21** Based on the damages awarded by the jury, it is clear that the jury agreed with Abington's damages calculations. Furthermore, based on the foregoing, we conclude that the Palmer companies' damages evidence described, with reasonable certainty, the profits they lost; therefore, we cannot say that the jury was unreasonable in adopting Abington's damages calculations. *See City of Keller,* 168 S.W.3d at 807, 810-11; *see also Miga,* 96 S.W.3d at 213; *Helena Chem. Co.,* 47 S.W.3d at 504-05; *Rauschenberg,* 201 S.W.3d at 808. Abington provided the jury with ample documentary and testimonial evidence that was objective in nature and allowed the jury to determine the proper amount of actual damages to award. *Helena Chem. Co.,* 47 S.W.3d at 504; *Szczepanik,* 883 S.W.2d at 649; *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279; *Heine,* 835 S.W.2d at 84; *see Orchid Software, Inc.,* 804 S.W.2d at 211. Moreover, SJW did not offer any evidence contradicting Abington's calculations, nor did it object to the admission of Abington's testimony or exhibits relating to damages.

We note that in virtually all damages calculations, there is some degree of subjectivity involved, espe-

cially when forecasting future profits and losses. However, we do not believe that the evidence submitted by the Palmer companies as to actual damages was speculative in nature or failed to describe with reasonable certainty the damages sustained. Thus, we cannot say that the jury's actual damages award, viewed in a neutral light, was so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain,* 709 S.W.2d at 176. Accordingly, we uphold the jury's actual damages award and overrule SJW's third issue to the extent that it challenges the sufficiency of the jury's actual damages award.

## B. The Jury's Award of Exemplary Damages Against SJW

### 1. Standard of Review

[32] Exemplary damages must be established by clear and convincing evidence, thus requiring an elevated standard of review. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004); *see* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a) (Vernon Supp.2009) (providing also that an exemplary damage award may be premised on a jury's finding that the defended engaged in fraud, malice, or gross negligence). Clear and convincing evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(2) (Vernon 2008); *see Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979); *see Strange,* 256 S.W.3d at 775. "While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed." *Strange,* 256 S.W.3d at 775 (citing *Addington,* 588 S.W.2d at 570).

## B. Discussion

**\*22** On appeal, SJW specifically asserts that: (1) the evidence supporting the jury's malice finding is legally and factually insufficient; and (2) the "cap buster" provisions of section 41.008 of the civil practice and remedies code were not properly pleaded; therefore, the jury's exemplary damages award was excessive . FN26

### 1. The Jury's Malice Finding

[33][34][35] Under legal sufficiency review, when a jury makes an affirmative finding of malice, we review all of the evidence in the light most favorable to the jury's finding, taking into account contrary disputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice. *Qwest Int'l Commc'ns, Inc. v. AT & T Corp.,* 167 S.W.3d 324, 326 (Tex.2005); *see also Garza,* 164 S.W.3d at 627; *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). Under factual sufficiency review, we give due consideration to any evidence the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must consider the disputed evidence and determine whether a reasonable fact finder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of its finding is so significant that a fact finder could not have reasonably formed a firm conviction or belief. *Id.*

[36] Here, question number 25 of the charge asked the jury whether there was "clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice." The charge further explained that " '[m]alice' means a specific intent by SJW Property Commerce, Inc. to cause substantial injury or harm to G.J. Palmer, Jr." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (defining malice as "a specific intent by the defendant to cause substantial injury or harm to the claimant"). The jury

answered in the affirmative to question number 25 of the charge. The Palmer companies were subsequently awarded $2 million in exemplary damages against SJW. The trial court's final judgment adopted the jury's exemplary damages award.

The evidence shows that Stanley and Jay Williams and Trozzo were all associated with SJW and that their actions served as the basis of the Palmer companies' causes of action. Stanley testified that he had retired ten to twelve years prior to this dispute and that he merely facilitated the development of the Trenton Project. However, Stanley later appeared to contradict himself when he admitted that he consults with Jay Williams, the president and owner of SJW, about deals "about every hour." Furthermore, Palmer alleged that Stanley was heavily involved in the development of the Trenton Project because Stanley directed the actions of Jay Williams and Trozzo, and Stanley met with Palmer to negotiate the assignment of Palmer's earnest money contracts in exchange for the REA. In addition, prior to negotiating the assignment of Palmer's earnest money contract in exchange for the REA, Stanley agreed to no longer allow Jay Williams and Trozzo to be involved in the development of the Trenton Project. However, shortly after negotiations were finalized, Trozzo bid up the price of the Kayser tract in an apparent attempt to render Palmer's REA worthless.

**\*23** Moreover, the record reflects that: (1) Jay Williams actively participated in the development of the Trenton Project; (2) several witnesses recalled seeing Jay Williams at various meetings to discuss the progress of the Trenton Project; and (3) Jay Williams signed most of the relevant documents in this dispute in his capacity as president of SJW. Trozzo, Jay Williams's brother-in-law, testified that: (1) he is "an independent contractor" who works for SJW; and (2) as an employee of SJW, he typically takes direction from Jay Williams.

In addition, Dr. Kilgore testified as to SJW's actions to get him under contract to tie up the Trenton Project until Palmer's earnest money contracts expired so that SJW could develop the property itself. Furthermore, Wayne Allen testified that the landowners were approached by Trozzo to induce them to terminate their contracts with Palmer and sign new contracts with SJW. These actions transpired all the while Palmer, Schwarz, and the landowners believed that SJW was acting as Palmer's broker on the development project. In fact, Charles Ray Porter Jr., a commercial real estate broker and expert, testified at trial that he reviewed the depositions, documents, and pleadings in this case and the Real Estate License Act and other ethical rules promulgated by the Texas Real Estate Commission and, based on that information, concluded that an agency relationship existed between SJW and Palmer at the Trenton Project.

Another expert, Mark Freeland, a McAllen attorney who board certified in residential, commercial, and farm and ranch real estate law, confirmed Porter's findings and testified that he believed SJW began working as Palmer's broker at the Trenton Project in 2000. Freeland also noted that the correspondences between SJW and Palmer did not contain a correspondence from SJW expressing that it was not Palmer's broker at the Trenton Project. Freeland stated that the course of conduct between SJW and Palmer at the Trenton Project gave rise to an agency relationship and that the expiration of the Listing Agreement at the Jackson Palmer Crossing site had no bearing on the existence of the agency relationship at the Trenton Project. Porter and Freeland's conclusions as to agency were contested by SJW; however, the jury ultimately concluded that an agency relationship existed between SJW and Palmer.

The record also demonstrates that Palmer regularly discussed confidential pricing and contractual information with Stanley and Jay Williams at various meetings, even though SJW later argued at trial that the parties were competitors. However, SJW never once disclosed to Palmer that the parties were competitors, nor did it request that Palmer discontinue revealing confidential information regarding the

Trenton Project.

We find that the evidence supports a finding that SJW authorized, ratified, or adopted the acts of malice perpetrated by Stanley and Jay Williams and Trozzo, and that, in particular, Jay Williams, president of SJW, participated in the wrongful conduct that transpired at the Trenton Project. *See Qwest Int'l Commc'ns,* 167 S.W.3d at 326 (stating that a corporation is liable for exemplary damages only if it: (1) authorizes or ratifies an agent's malice, (2) maliciously hires an unfit agent, or (3) acts with malice through a vice principal) (citing *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921-22 (Tex.1998); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997) (defining a "vice principal" as (1) a corporate officer; (2) those who have authority to employ, direct, and fire employees; (3) those who engage in non-delegable duties; and (4) those is charge of the management of a department or division of the business)). In reviewing the evidence in the light most favorable to the jury's malice finding, we conclude that reasonable jurors could have formed a firm belief or conviction regarding malice. *See Qwest Int'l Commc'n, Inc.,* 167 S.W.3d at 326; *see also Garza,* 164 S.W.3d at 627; *In re J.F.C.,* 96 S.W.3d at 266. We further conclude that, in light of the entire record, the jury was reasonable in concluding that SJW's actions at the Trenton Project were malicious. *See In re J.F.C.,* 96 S.W.3d at 266.

**2. The "Cap Buster" Provisions of the Texas Civil Practice and Remedies Code**

**\*24** Section 41.008 of the civil practice and remedies code allows for the recovery of two times the amount of economic damages plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon Supp.2009). "[T]he amount of exemplary damages to be awarded is within the discretion of the trier of fact." *Id.* § 41.010(b) (Vernon 2008). The following factors are relevant to the assessment of the amount of ex-

emplary damages that should be assessed against a tortfeasor: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which the conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. *Id.* § 41.011(a) (Vernon 2008). In our opinion, we must "address the evidence or lack of evidence with specificity" as it relates to the statutory requirements. *Id.* § 41.013(a) (Vernon 2008).

On April 10, 2007, SJW first invoked section 41.008's exemplary damages cap. This filing preceded the commencement of the trial in this dispute by six days.[FN27] The Palmer companies filed their opposition to SJW's April 10, 2007 filing, alleging that the filing was prejudicial on its face and requesting that SJW's motion for leave be denied. *See Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co.,* 844 S.W.2d 664, 664 (Tex.1992) (per curiam) (" Rule 63, [of the Texas Rules of Civil Procedure] states that pleadings may be amended within seven days of trial only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party."); *see also* TEX.R. CIV. P. 63. Texas courts have held that the punitive damage cap must be pleaded and proved. *See Shoreline, Inc. v. Hisel,* 115 S.W.3d 21, 25 (Tex.App.-Corpus Christi 2003, pet. denied) ("Where maximum damages are provided in statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that must be plead[ed] and proved.") (citing TEX.R. CIV. P. 94; *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896-97, 904-05 (Tex.2000)); *see also Marin v. IESI TX Corp.,* No. 01-08-00539-CV, 2010 Tex.App. LEXIS 981, at *45 (Tex.App.-Houston [1st Dist.] Feb. 11, 2010, no pet. h.) (mem.op.) (noting that section 41.008's exemplary damages cap is an affirmative defense that must be pleaded); *Wackenhut Corr. Corp. v. De La Rosa,* No. 13-06-00692-CV, 2009 Tex.App. LEXIS 2262, at *157 (Tex.App.-Corpus Christi Apr. 2, 2009, no

pet.) (same). Moreover, the failure to raise a new defense via an amended pleading more than seven days before trial without leave constitutes surprise and is prejudicial on its face if it does not give plaintiff "fair notice" of defendant's intent to invoke the cap. *See Chapin & Chapin, Inc.,* 844 S.W.2d at 664; *see also Horizon/CMS Healthcare Corp.,* 34 S.W.3d at 896-97.

**\*25** [37] Here, the record does not reflect that the trial court granted SJW leave to file its late April 10, 2007 pleading first asserting the exemplary damages cap. *See* TEX.R. CIV. P. 63. Therefore, because the record does not demonstrate that the trial court granted SJW leave to file its April 10, 2007 pleading, we find that SJW's late filing did not give the Palmer companies "fair notice" of the new defense and, thus, constituted a surprise.[FN28] *See* TEX.R. CIV. P. 63. Moreover, because SJW was required to properly plead section 41.008's exemplary damages cap and failed to do so, we conclude that the damages cap was not properly before the trial court.

Based on our review of the record, we further conclude that the Palmer companies proved by clear and convincing evidence that they were entitled to an exemplary damages award based on SJW's malicious conduct at the Trenton Project. *See Garza,* 164 S.W.3d at 627; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a). Employing the proper standards of review, we hold that the evidence supporting the jury's exemplary damage award is legally and factually sufficient. *See Qwest Int'l Commc'n, Inc.,* 167 S.W.3d at 326; *see also Garza,* 164 S.W.3d at 627; *In re J.F.C.,* 96 S.W.3d at 266. Accordingly, we overrule SJW's third issue as it pertains to the jury's exemplary damages award.

## VI. ATTORNEY'S FEES AND EXPENSES AWARDED TO PALMER

In their fourth and final issue, SJW argues that the Palmer companies are not entitled to attorney's fees because a plaintiff in a tortious interference with an

existing contract cause of action may only recover actual damages rather than attorney's fees. SJW further argues that the Palmer companies cannot recover attorney's fees under article 6.04 of the Listing Agreement because the Palmer companies did not prevail on the cause of action-the failure to pay commissions for bringing tenants to the Jackson Palmer Crossing shopping center-brought under the Listing Agreement. The Palmer companies claim entitlement to the jury's attorney's fees award because they prevailed on their counterclaims and the Listing Agreement provides that attorney's fees may be awarded to the prevailing party for any action or proceeding relating to the agreement.

### A. Standard of Review and Applicable Law

[38][39] An award of attorney's fees is reviewed under an abuse of discretion standard. *Dail v. Couch,* 99 S.W.3d 390, 391 (Tex.App.-Corpus Christi 2003, no pet.) (citing *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990)). The test for abuse of discretion is to determine whether the trial court acted without reference to any guiding rules or principles, or whether, under the circumstances of the case, the trial court's actions were arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985).

[40] "Under the American Rule, litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties." *Intercontinental Group P'ship v. KB Home Lone Star, L.P.,* 295 S.W.3d 650, 653 (Tex.2009) (citing *MBM Fin. Corp. v. Woodlands Operating Co.,* 292 S.W.3d 660, 669 (Tex.2009) (citing *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310-11 (Tex.2006) )). Section 38.001 of the civil practice and remedies code provides that reasonable attorney's fees may be recovered:

**\*26** from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

(1) rendered services;

(2) performed labor;

(3) furnished material;

(4) freight or express overcharges;

(5) lost of damaged freight or express;

(6) killed or injured stock;

(7) a sworn account; or

(8) an oral or written contract.

TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 2008). The supreme court has held that "before a party is entitled to fees under section 38.001, that 'party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages.' " KB Home Lone Star, L.P., 295 S.W.3d at 653 (citing Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex.1997)).

**B. Discussion**

[41] The record reflects that the parties submitted their attorney's fees calculations to the trial court by agreement.FN29 See Tittizer v. Union Gas Corp., 171 S.W.3d 857, 860 (Tex.2005) (per curiam) ("As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him."); see also Naguib v. Naguib, 137 S.W.3d 367, 375 (Tex.App.-Dallas 2004, pet. denied) (recognizing the "invited error" doctrine and noting that "[a] party to a lawsuit cannot ask something of a trial court and then complain on appeal that the trial court committed error in granting that party's request"). In any event, after reviewing the Listing Agreement and the testimony adduced at trial, we agree with SJW that the Listing Agreement is not an adequate basis for awarding the Palmer companies attorney's fees because the unambiguous language of the Listing Agreement solely pertains to the Jackson Palmer Crossing site.

Our earlier conclusion that the disputes at Jackson Palmer Crossing and the Trenton Project constituted a single transaction or occurrence centered on the parties' relationship, conduct, and correspondence with one another rather than construing the breadth of the Listing Agreement to include the Trenton Project. Nowhere in the Listing Agreement do the parties indicate that they intended for the agreement to cover properties other than those situated at the Jackson Palmer Crossing site.

SJW only cites us to one case supporting its contention that a plaintiff cannot recover attorney's fees for an action for tortious interference with an existing contract. See Browning-Ferris, Inc. v. Reyna, 852 S.W.2d 540, 549 (Tex.App.-San Antonio 1992), rev'd on other grounds, 865 S.W.2d 925 (Tex.1993). The Reyna case, however, does not mention the propriety of an attorney's fees award in a tortious interference with an existing contract claim. See id. Therefore, we do not find this case to be persuasive as to this issue and, in turn, reject SJW's contention that the Palmer companies were not entitled to attorney's fees on their tortious interference with an existing contract claim.

**\*27** As noted previously, the disputes at Jackson Palmer Crossing and the Trenton Project are related so as to constitute a single transaction or occurrence. The crux of the dispute pertaining to the Trenton Project involves SJW's rendering of brokerage services, or lack thereof, to the Palmer companies, which falls under the purview of section 38.001 of the civil practice and remedies code. See TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(1). The trial court did not abuse its discretion in awarding the Palmer companies attorney's fees because SJW was judicially estopped from complaining about the attorney's fees award given that SJW and the Palmer companies submitted their attorney's fees requests by agreement and because the Palmer companies prevailed and were awarded damages on their counterclaims, which were based on SJW's rendering of brokerage services, or lack thereof, at the Trenton Project. See id.; see also KB

*Home Lone Star, L.P.,* 295 S.W.3d at 653; *Downer,* 701 S.W.2d at 241-42; *Dail,* 99 S.W.3d at 391. Accordingly, we overrule SJW's fourth issue.

## VII. SUFFICIENCY OF THE EVIDENCE THAT APPELLEES WRONGFULLY WITH-HELD THE PAYMENT OF COMMISSIONS ASSOCIATED WITH JACKSON PALMER CROSSING

By their sole cross-issue, the Palmer companies contend that the jury's award for commissions associated with the Jackson Palmer Crossing shopping center is not supported by legally and factually sufficient evidence. Specifically, the Palmer companies argue that the Listing Agreement was not enforceable because it lacked an adequate description of the property involved. SJW responds by arguing that the evidence supports the jury's finding that commissions were owed by the Palmer companies, especially considering Palmer's admissions at trial that he owed the commissions and that SJW brought several tenants to the Jackson Palmer Crossing shopping center. SJW also asserts that the Palmer companies' argument that the contract was unenforceable "is both untenable and unsupported in law or fact."

### A. Applicable Law

In arguing that the Listing Agreement was an unenforceable contract, the Palmer companies rely on section 1101.806(c) of the Texas Occupations Code . *See* TEX. OCC.CODE ANN. § 1101.806(c) (Vernon 2004). Section 1101.806(c) provides as follows:

A person may not maintain an action in this state to recover a commission for sale or purchase of real estate unless the promise or agreement on which the action is based, or a memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign the document.

*Id.; see* Trammel Crow Co. No. 60 v. Harkinson, 944 S.W.2d 631, 633 (Tex.1997).

### B. Discussion

On appeal, the Palmer companies complain about a document, labeled "Exhibit A," which was attached to the Listing Agreement and presented at trial. Palmer testified at trial that "Exhibit A" was a "site plan" for the Jackson Palmer Crossing development "that was never part of the original agreement." The Palmer companies allege that the failure to tender "Exhibit A" at the time the document was signed made the Listing Agreement unenforceable because it did not contain an adequate description of the property in question. The Palmer companies also allege that section 1101.806(c) required that the Listing Agreement contain an adequate description of the property. We disagree with the Palmer companies' contentions.

**\*28** With respect to "Exhibit A," the Listing Agreement provided that:

WHEREAS, Owner owns the Property described as Exhibit "A" attached hereto and made a party herein by reference, the improvements and fixtures thereon, and all appurtenances thereto (said land, improvements, fixtures and appurtenances and any personal property of Owner on said land or in such improvements being herein called the "Property"). This Property is located at the intersection of business highway 83 and Jackson Road in McAllen, Texas and Pharr, Texas.

"Exhibit A" is a drawing labeled "Site Master Plan," which clearly references all the property in question. The Listing Agreement further provides that SPP, in particular, was responsible for paying SJW a 6% sales commission, a 4% commission for "total lease rental for the primary term (years 1-10)" and a 2% commission "of the total rental for the primary term (years 11-20) of each lease if Broker is the sole source of tenant."

In the instant case, Palmer did not complain about

"Exhibit A" until trial. Based on the testimony at trial, it is clear to us that the parties understood to which property the Listing Agreement applied. In addition, the version of the Listing Agreement admitted into evidence as "Plaintiff's Exhibit 1" included "Exhibit A" and described the property in question with reasonable certainty. *See Tex. Builders v. Keller,* 928 S.W.2d 479, 481 (Tex.1996) (citing *Morrow v. Shotwell,* 477 S.W.2d 538, 539 (Tex.1972) ("A writing need not contain a metes and bounds property description to be enforceable; however, it must furnish the data to identify the property with reasonable certainty.")); *see also Duncan v. F-Star Mgmt., L.L.C.,* 281 S.W.3d 474, 478-79 (Tex.App.-El Paso 2008, pet. filed).

The thrust of the Palmer companies' argument as to this issue appears to be that "Exhibit A" was not tendered to Palmer at the time of signing and, therefore, the Listing Agreement was unenforceable because it lacked an adequate property description. The Palmer companies cite to Palmer's testimony at trial that he first saw "Exhibit A" attached to the Listing Agreement when reviewing a lien filed by SJW in 2000. Despite the above-mentioned statements, we note that it was within the province of the jury to reconcile Palmer's allegations that the "Exhibit A" was not presented to him at the time he signed the agreement on behalf of SPP with the version of the Listing Agreement admitted into evidence, which clearly references "Exhibit A," includes a copy of "Exhibit A," and provides a description of the property at issue. *See City of Keller,* 168 S.W.3d at 819. In concluding that the Palmer companies were responsible for paying commissions on the Staples and Fashion Bug leases and that the Palmer companies were not excused from compliance with the Listing Agreement, the jury clearly believed that the Listing Agreement was enforceable and that "Exhibit A" was tendered at the time of signing.[FN30] Because the Palmer companies have not directed us to any evidence in the record, other than Palmer's own self-serving testimony, demonstrating that the jury was unreasonable in its conclusions pertaining to the leases at

Jackson Palmer Crossing, and because we find none, we must defer to the jury's implicit conclusion that the "Exhibit A" was presented to Palmer at the time of signing the Listing Agreement and that the agreement was enforceable. *See id.*

**\*29** Moreover, in reviewing section 1101.806(c), we find that the statute merely requires that an agreement to sell or purchase real estate be in writing and signed by the party against whom an action is brought, which does not appear to support the Palmer companies' argument that the Listing Agreement is unenforceable. *See* TEX. OCC.CODE ANN. § 1101.806(c). We therefore reject the Palmer companies' argument that the Listing Agreement was unenforceable because it lacked an adequate property description.[FN31]

[42] With respect to the Palmer companies' legal and factual sufficiency arguments, we find that the evidence contained in the record supports the jury's verdict. In fact, the record reflects that both SJW and SPP signed the Listing Agreement. Furthermore, Palmer admitted at trial that he owed commissions to SJW for work done at the Jackson Palmer Crossing shopping center but that he chose to withhold the payment of commissions because of what had transpired between himself and SJW at the Trenton Project. *See Mendoza v. Fid. & Guar. Ins.,* 606 S.W.2d 692, 694 (Tex.1980) (holding that testimony is a judicial admission); *AEP Tex. Cent. Co. v. Pub. Util. Comm'n of Tex.,* 286 S.W.3d 450, 469, n. 24 (noting that a "judicial admission is binding on the party admitting it, and he may not introduce contradicting evidence") (citing *Cameron County v. Velasquez,* 668 S.W.2d 776, 782 (Tex.App.-Corpus Christi 1984, writ ref'd n.r.e.)); *see also Tex. Dep't of Pub. Safety v. Morales,* No. 13-07-00552-CV, 2008 Tex.App. LEXIS 3898, at *6 (Tex.App.-Corpus Christi May 22, 2008, no pet.) (mem.op.). The record also contains a letter sent by Palmer to SJW recognizing that SJW was owed commissions for work done at the Jackson Palmer Crossing shopping center and requesting additional time to make such payments. The Listing

Agreement provides that it was effective from June 30, 1999 to June 30, 2000, and the record reflects that SJW facilitated the signing of leases by Staples and Fashion Bug at the Jackson Palmer Crossing shopping center during the term of the Listing Agreement.[FN32]

In reviewing the evidence in the light most favorable to the jury's findings, we conclude that the jury was reasonable in concluding that the Palmer companies were responsible for paying commissions to SJW on the Staples and Fashion Bug leases. *See City of Keller,* 168 S.W.3d at 807, 810-11. Furthermore, in reviewing the evidence in a neutral light, we cannot conclude that the jury's findings as to this issue were so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain,* 709 S.W.2d at 176. Accordingly, we find that the evidence is legally and factually sufficient, and we overrule the Palmer companies' sole cross-issue. *See City of Keller,* 168 S.W.3d at 807, 810-11; *see also Cain,* 709 S.W.2d at 176.

## VIII. CONCLUSION

Based on the foregoing, we reverse the jury's award of $376,397 in punitive damages against PCDC and render judgment that the Palmer companies take nothing as to PCDC. However, because the trial court concluded that SJW and PCDC were jointly and severally liable for the jury's award of $709,587 in actual damages, we affirm the jury's damages awards against SJW. Moreover, we affirm the remaining aspects of the trial court's judgment.

> FN1. Stanley J. Williams is the father of Stanley Jay Williams Jr. The record reflects that Stanley Jay Williams, also known as Jay Williams, owns and controls SJW and PCDC, while Stanley Williams serves as a retired consultant. Stanley Williams testified at trial that he is consulted by Jay Williams about deals involving SJW and PCDC "about every hour."

FN2. Palmer owns and operates SPP, Jackson, and PE.

FN3. Additionally, pursuant to a "Development Consultant Agreement" between Palmer and Property Commerce Management Company, SJW, after contacting several different "big box" retailers, was able to secure Home Depot as the anchor tenant at the Jackson Palmer Crossing shopping center. As a result of its efforts, SJW was paid a $74,100 development fee by Palmer. The "Development Consultant Agreement" is not disputed in this case.

FN4. Palmer executed earnest money contracts with: (1) B.R. Whisenant for 1.99 acres for $467,712.50, or, in other words, $10 per square foot; (2) Wayne and Gelee Allen for 1.07 acres; (3) Bill and Opal Baldwin for 2.36 acres for $282,277 or, in other words, $2.75 per square foot; (4) Yvonne Robinson for 3.81 acres for $414,635, or, in other words, $2.50 per square foot; and (5) Harlon and Mary Robinson for 5.82 acres for $532,362, or, in other words, $2.10 per square foot. The record does not contain a contract for Wayne and Gelee Allen executed at the time of the others; however, Wayne testified via deposition that he and his wife did execute an earnest money contract with Palmer at this time. Moreover, testimony was adduced at trial as to the discrepancy in the prices for each tract of land. Real estate experts testified that the price of a tract of land is dependant upon how it is situated in relation to streets or areas of high traffic. Whisenant received a higher offer than the others because his land is situated nearest to the corner of 10th Street and Trenton, a heavy traffic area, while the other tracts are situated further away from the intersection.

FN5. The April 15, 2000 expiration date was allegedly extended by agreement with the landowners and Palmer. Testimony at trial reveals that the landowners granted Palmer an additional 180 days to determine the feasibility of the Trenton Project.

FN6. Dr. Kilgore testified at trial that Palmer and the other landowners approached him several times in order to coax him to sell the land to Palmer; however, Dr. Kilgore ignored most of the communications and insisted on dealing directly with Target rather than any middlemen or local realtors and land purchasers.

FN7. As a part of his deal with PCDC, Dr. Kilgore was offered $1,128,204 for his 3.7-acre tract.

FN8. The record contains several letters from Palmer addressed to Trozzo, requesting information regarding the purchasing of Dr. Kilgore's tract of land and stating that time was of the essence.

FN9. Wayne Allen testified via deposition that he and the other landowners were approached by SJW and PCDC while the landowners were still under contract with Palmer. The landowners were encouraged by SJW and PCDC to break their contracts with Palmer; however, several of the landowners refused to do so because they did not desire to do business with SJW and PCDC. Dr. Kilgore testified via deposition that he was approached by Trozzo, who represented that he was from Target rather than SJW or PCDC. Dr. Kilgore had previously informed all parties that he preferred to deal directly with Target representatives. In any event, Dr. Kilgore recalled a conversation he had with Trozzo where Trozzo noted that Palmer was trying to assemble the tracts of land for development but Trozzo wanted to get Dr. Kilgore under contract and wait until Palmer's earnest money contracts expired so that SJW and PCDC could develop the land themselves.

FN10. During its representation of Palmer, Trammell Crow sent a letter to Schwartz regarding the Trenton Project, which stated: "Furthermore, in the presence of Home Depot, Jay Williams assured us [Trammell Crow] that he would assign the Doctor's contract to us if Jay Palmer pays to Property Commerce commissions allegedly owed to them for two (2) deals that were completed at Jackson Palmer Crossing."

FN11. In his testimony, Palmer referenced an email from Charles Thompson, an architect for SJW, regarding the Trenton Project. In his email, Thompson instructed Larry Heimer, a civil engineer doing work at the Trenton Project, to: "Do not send Jay Palmer a plan showing the lease space next to Target and/or the Chick-[F]il-A plan .[SJW] Property Commerce does not want him having that information."

FN12. The record reflects that Palmer tendered earnest money for the contracts contained in the record; however, the contracts do not reflect that the title company received the earnest money. In other words, the earnest money does not appear to be "receipted" by the title company. Palmer testified that he provided Schwartz with the earnest money that was to be provided to the title company. Schwartz noted that he received the earnest money, thus corroborating Palmer's testimony regarding the earnest money; however, Schwartz could not recall why the earnest money was not deposited with the title company. In any event, the landowners never sought to terminate their contracts with Palmer until they were approached by

SJW and PCDC.

FN13. Article 6.04 of the Listing Agreement provides, as follows:

6.04 If either party hereto shall institute any action or proceeding against the other party hereto relating to this Agreement, the successful party in such action or proceeding shall be entitled to recover from the unsuccessful party all fees and expenses incurred in connection therewith, including court costs, reasonable attorneys' fees and related expenses.

FN14. The record reflects that SJW and PCDC abandoned their civil conspiracy cause of action against SPP, Jackson, PE, and Palmer. Moreover, SJW's statutory fraud claim was dismissed earlier in the case.

FN15. The sum of the figures mentioned in the jury's answer to question number 22 is $709,587. The trial court, in its final judgment, stated that SJW and PCDC were jointly and severally liable for the $709,587 in actual damages awarded by the jury in question number 22. *See Kinzbach Tool Co., Inc. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (holding that wrongdoers may be held jointly and severally liable if the victim establishes that only one breached a fiduciary duty owed to the victim and that the other knowingly participated therein); *see also Jung Fu Chien v. Chen*, 759 S.W.2d 484, 487 (Tex.App.-Austin 1988, no writ) (same).

FN16. The record does not contain a written order ruling on the parties' various post-judgment motions; however, the apparent failure to rule of these motions is not the basis of this appeal.

FN17. In its February 7, 2008 final judgment, the trial court noted that the parties had submitted affidavits with the attorney's fees requests and subsequently awarded SJW $55,767.91 in attorney's fees and the Palmer companies $289,582 in attorney's fees and $100,570.23 in expenses.

FN18. The parties do not challenge whether the Palmer companies' counterclaims were filed within the proper time frame after SJW and PCDC filed their original petition and the Palmer companies filed their original answer. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.069(b) (Vernon 2008). In their appellate brief, the Palmer companies merely state that the counterclaims were timely filed; moreover, SJW and PCDC never address this statement in their response to the Palmer companies' appellate brief.

FN19. Because we later hold that SJW and PCDC's failure to attack the jury's findings regarding the independent causes of action for fraud and breach of fiduciary duty requires us to affirm the jury's liability findings, we need not analyze SJW and PCDC's limitations argument pertaining to the Palmer companies' tortious interference with existing contracts and prospective business relations causes of action. *See infra* Part IV; see also TEX.R.APP. P. 47.1.

FN20. Section 16.069 of the civil practice and remedies states as follows:

(a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file a counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

(b) The counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.069 (Vernon 2008).

FN21. The Palmer companies do not cite, nor are we aware of, authority supporting the application of the relation-back doctrine to time-barred claims against a third-party that may be "closely related, if not identical" to a properly named party to a lawsuit.

FN22. Because we have concluded that the Palmer companies' claims against PCDC were time-barred, we only reference SJW as appellant/cross-appellee for the remaining issues in this case.

FN23. SJW did not challenge, in the trial court, the charge's wording regarding the actual damages award and the fact that the question pertaining to actual damages is not attributed to a particular cause of action. See *Religious of the Sacred Heart of Tex. v. City of Houston,* 836 S.W.2d 606, 613-14 (Tex.1992) (holding that any complaint as to the wording of the jury charge is waived if a proper objection is not made in the trial court).

FN24. Abington testified that when he made his conclusions, he did not have contracts for two of the landowners that conclusively established effectiveness in April 2000, which appears to contradict the testimony of Palmer, Wayne Allen, and Schwarz that the contracts existed. Abington did note that he did have contracts for all five landowners that were effective in October 2000. For the two April 2000 contracts that were allegedly missing, Abington used the prices quoted in the corres-

ponding October 2000 contracts and adjusted them by 3.85% to "roll them back to April 2000 prices," which was a low estimate for the price difference between April 2000 and October 2000, based on the average price differentials for Palmer's other earnest money contracts. Abington stressed that such calculations were necessary because, as a damages expert, he is charged with determining "[w]hat would have reasonably been expected to have occurred" and because that was what was contemplated to happen in April 2000, by the Palmer companies.

FN25. Target eventually acquired the property for approximately $3.98 per square foot.

FN26. SJW also argues that the jury's exemplary damage award was erroneous because the Palmer companies did not "submit a question asking if an employee of PCDC committed an intentional tort." However, because we have concluded that the Palmer companies' claims against PCDC are time-barred, we need not address this contention. See TEX.R.APP. P. 47.1.

FN27. Trial in this matter commenced on April 16, 2007.

FN28. In fact, the Palmer companies argue on appeal that it did not have time to specifically plead any "cap busting" theories because of SJW's late filing. Moreover, the Palmer companies highlight the fact that SJW did not object to any of the charge questions that pertained to damages. See *Allen v. Am. Natural Ins. Co.,* 380 S.W.2d 604, 609 (Tex.1964) (" 'Where, however, the ground (of recovery or defense) is submitted, however erroneously or incompletely, the parties are thereby put upon notice that the jury's answers to the issues

actually submitted will form the basis of the court's judgment thereafter to be rendered thereon. *It then becomes the duty of each party to point out errors of omission or commission, or be held estopped from thereafter urging them.'* ") (quoting *Panhandle & S.F. Ry. Co. v. Friend,* 91 S.W.2d 922, 930 (Tex.Civ.App.-Austin 1936, no writ)) (emphasis in original).

FN29. In support of their attorney's fees request, the Palmer companies tendered affidavits from co-counsel at trial, Sarah Pierce Cowen and John R. Griffith, requesting $289,582 as reasonable attorney's fees and $100,570.23 in reasonable expenses. On appeal, SJW does not challenge the reasonableness of the Palmer companies' attorney's fees requests.

FN30. Question number 10 of the jury charge provided the following with respect to the Palmer companies' failure to pay SJW commissions at the Jackson Palmer Crossing:

Was G.J. Palmer, Jr.'s failure to comply [with the Listing Agreement's requirement to pay commissions to SJW for bringing tenants to the Jackson Palmer Crossing shopping center] excused?

Compliance is excused if:

a. The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not in writing; or

b. The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not signed by G.J. Palmer, Jr.; or

c. *The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. does not describe the property subject to the agreement with reasonable certainty; or*

d. SJW Property Commerce, Inc. breached its fiduciary duty to G.J. Palmer, Jr.

Answer: *No*

(Emphasis added.)

FN31. We find it ironic that the Palmer companies request that we find the Listing Agreement to be unenforceable as to the payment of commissions to SJW, yet the Palmer companies use article 6.04 of the same "unenforceable" Listing Agreement to argue entitlement to attorney's fees.

FN32. On appeal, SJW does not claim entitlement to commissions that may be associated with the Factory 2-U lease at the Jackson Palmer Crossing shopping center.

Tex.App.-Corpus Christi,2010.
SJW Property Commerce, Inc. v. Southwest Pinnacle Properties, Inc.
--- S.W.3d ----, 2010 WL 1729858 (Tex.App.-Corpus Christi)

END OF DOCUMENT